O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Case No. SACV09-0242 DOC (FMOx)            Date: November 5, 2009

Title: California Pharmacy Management, LLC v. Zenith Insurance Company; and ZNAT Insurance Company

DOCKET ENTRY
[I hereby certify that this document was served by first class mail or Government messenger service, postage prepaid, to all counsel (or parties) at their respective most recent address of record in this action on this date.]
                        Date:_____ Deputy Clerk:_____

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

   Kristee Hopkins                                    Not Present
Courtroom Clerk                                  Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:  ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                    NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER DENYING MOTION TO DISMISS

      Before the Court is Defendants Zenith Insurance Company and ZNAT Insurance Company (collectively "Defendants" or "Zenith") Motion to Dismiss the Second Amended Complaint ("Motion"). The Court finds the matter appropriate for decision without oral argument. Fed R. Civ. P. 78; Local R. 7-15. After considering the moving, opposing, and replying papers, and for the reasons stated below, the Court hereby DENIES the Motion.

**I.**    **Background**

      **A.**    **Procedural History**

      On February 26, 2009 Plaintiff California Pharmacy Management, LLC ("CPM") filed its original complaint alleging a Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action against Defendants based on mail and wire fraud. On April 23, 2009, CPM filed its First

Amended Complaint. Following the Court's grant of a Motion to Dismiss in a related action,[1] the parties entered into a stipulation to allow CPM to file a Second Amended Complaint ("SAC"). On August 18, 2009, CPM filed its SAC. Defendants argue that the SAC fails to cure the defects in either the Complaint or the First Amended Complaint and ask this Court to dismiss Plaintiff's action with prejudice.

A separate action between the parties is presently pending before the Los Angeles County Superior Court. On February 2, 2009, Zenith filed a state court action against CPM, alleging causes of action for unlicensed and illegal operation and management of pharmacies and for unlawful referral and fee-splitting arrangements with physicians. *See* Mot. at 2.

B.  **Factual Allegations**

By its SAC, CPM brings a RICO suit against Defendants, workers' compensation insurers and claims administrators, for undertaking a scheme to "defraud [CPM] through a collusive and systematic campaign of sham litigation, fraudulent objections and dilatory conduct carried out by mail fraud and wire fraud, to avoid payment of valid bills and liens for tens of thousands of needed medications prescribed and dispensed to injured workers in over 800 workers' compensation cases in the California Workers' Compensation Board ("WCAB"); to destroy CPM as a viable company; and to abuse the process of and defraud the WCAB." SAC ¶ 1. Both Defendants are wholly owned subsidiaries of Zenith National Insurance Corporation. *See* SAC ¶¶ 13-14. CPM's contracts obligate it to "bill and collect for medications dispensed to injured workers." *Id.* ¶ 2. Defendants have allegedly neglected to pay CPM because they do not "want to pay the prices legally submitted by CPM." *Id.*

The SAC alleges that Defendants strongly dislike the physician in-office medication programs, notwithstanding the legality of such programs. *Id.* ¶ 3. It further alleges that Defendants "conspired with other carriers and devised a scheme to put CPM out of business and to destroy the physician in-office medication dispensing program." *Id.* To effectuate their scheme, Defendants allegedly communicated to their "agents and representatives and the agents and representatives of other carriers the manner in which the scheme to defraud was to be implemented." *Id.* Pursuant to this scheme, Defendants: (1) ceased payment for all claims submitted by CPM; (2) delivered letters to CPM offering pretextual objections to CPM claims; and (3) consolidated all CPM lien claims before the WCAB. *Id.* ¶¶ 3-7. Plaintiff avers that Defendants' objection letters (and their subsequent litigation before the WCAB) were knowingly "baseless," "based on false assumptions," and "served as lulling activity that created a severe cash flow problem for CPM." *Id.* ¶¶ 5-7. Defendants allegedly "had no interest whatsoever in the actual *outcome* of any of its individual objections before the WCAB, but

---

[1] The Court previously granted a motion to dismiss filed by other workers' compensation insurers sued by CPM in *California Pharmacy Management, LLC v. Redwood and Casualty Ins. Co., et al.*, No. SAC 09-141 DOC (Anx) (C.D. Cal.). The parties are instructed to mark the face of their pleadings with the related case number.

intended to use the WCAB *process* to stonewall CPM and shut off its cash flow." *Id.* ¶ 6. Plaintiff allegedly sustained "millions of dollars" of economic losses as a result of Defendants' scheme. *Id.* ¶ 9.

The SAC contends that Defendants' activity violates RICO, 18 U.S.C. § 1961, *et seq.* Specifically, CPM contends that Defendants have engaged in and are continuing to engage in mail fraud and wire fraud in violation of 18 U.S.C. § 1962(c) and have engaged in a conspiracy to commit such acts in violation of 18 U.S.C. § 1962(d).¶

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562, 127 S. Ct. 1955 (2007). A plaintiff may not merely recite the elements of a cause of action in its complaint. *Id.* at 555. Instead, to survive a 12(b)(6) motion to dismiss, the complaint must contain factual allegations sufficient to "raise a right of relief above the speculative level. *Id.* Rule 12(b)(6) motions are viewed with disfavor. *Broam v. Bogan*, 320 F.2d 1023, 1028 (9th Cir. 2003). When evaluating a 12(b)(6) motion, the Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Id.*; *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006).

Federal Rule of Civil Procedure 12(b)(1) provides that a complaint must be dismissed for lack of subject matter jurisdiction. Subject matter jurisdiction is absent where there is not justiciable case or controversy as required by Article III, Section 2, of the U.S. Constitution.

## III. Discussion

Defendants advance a variety of arguments in support of dismissal. First, Defendants argue that the SAC's allegations are insufficient to sustain a RICO claim as they fail to allege fraud with sufficient particularity, fail to allege a pattern of racketeering activity, fail to allege an enterprise, and fail to allege a RICO conspiracy. Second, Defendants contend that CPM does not have standing as it is not the medical provider authorized to seek payment for services provided to injured workers. Third, Defendants contend that CPM's action is barred by the *Noerr-Pennington* doctrine. Finally, Defendants suggest that even if CPM's claims are not to be dismissed, they should be stayed pursuant to the *Colorado River* doctrine.

### A. Claim for Relief Under RICO

Defendants argue that the SAC's allegations of fraud are insufficient, incapable of sustaining a cause of action under the applicable RICO statutes, and unspecific as to the financial injury

allegedly suffered by Plaintiff.  In keeping with the parties' briefing on this sub-set of issues, the Court will deal with each argument separately:

### 1. Particularity

Civil RICO fraud claims are subject to Rule 9(b)'s requirement that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) (citing *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989)).  To satisfy Rule 9(b), a RICO complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* (internal citations and quotation marks omitted).  In a case with multiple defendants, the plaintiff must "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007).  However, RICO claims not predicated upon fraud need not be pleaded with particularity. *Lauter v. Anoufrieva*, No. CV 07-6811, 2009 WL 2192362, * 8 (C.D. Cal. July 14, 2009).

The SAC's RICO claim is predicated on alleged violations of federal statutes prohibiting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to violate 18 U.S.C. § 1962(c).  All three acts are fraud predicates that must be pleaded with particularity. *Id.*  To this end, Plaintiff alleges that Defendants violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 by delivering fraudulent objection letters and offering fraudulent explanations to CPM "[s]tarting approximately one year ago." *See* SAC ¶ 29-30.  Defendants allegedly continue to send baseless objection letters to CPM and continue to perpetuate their fraudulent representations as to their intent to resolve CPM's bills and liens in good faith. *See id.*  The SAC avers that Defendants gave the fraudulent impression that their objections to CPM's bills were "business-as-usual" when, in fact, "all of the initial objections were part of a preplanned scheme to defraud CPM." *Id.* ¶ 29.  The SAC further alleges that Defendants falsely claimed that they had investigated CPM's claims in good faith, when in fact they had not. *Id.* ¶ 31.  Finally, the SAC alleges that Defendants' petitions for consolidation before the WCAB are based on misrepresentations of fact about CPM's licensing and its business dealings with its contracting physicians. *Id.* ¶ 36.

The SAC alleges Defendants' systematic denial of claims and the not infrequent submission of letters that offered pretextual objections and false assurances of Defendants' intent to resolve CPM's bills and liens in good faith. *Id.* ¶¶ 28-36.  Defendants nonetheless claim that the SAC's factual allegations are not sufficiently particular as to the "time, place, and specific content of the false representations." *See* Mot. at 8-9 (citing *Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004); *Lancaster Cmty. Hosp. V. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989)).  As an initial matter, the Court recognizes that the SAC's allegations are narrow as to the precipitating conduct but expansive as to the manner in which Defendants effectuated their alleged fraud.  In relevant part, CPM alleges that Defendants, in conjunction with other insurers and claims administrators, devised a "preplanned scheme to defraud

CPM and destroy it and its physicians in-office medication dispensing program." SAC ¶ 29. The SAC's allegations as to the "lulling" conduct that accompanied this preplanned scheme do not, in fact, provide the specific time and date of such acts of fraud. However, Defendants neglect to acknowledge that the SAC alleges fraudulent conduct in objecting to over 800 bills and liens for medications, as well as the numerous overlapping correspondence concerning such bills and liens. *See id.* The SAC does, in sufficient detail, provide the content of the "lulling" communications, including, but not limited to, Defendants' alleged representation that their objections were "business-as-usual" and that Defendants intended to "resolv[e] the objections in good faith." *Id.* Moreover, the Court reads the SAC as alleging that the misrepresentations were fraudulent both individually *and in the aggregate* and CPM specifies that the alleged fraudulent acts occurred within one year of the filing of the SAC. *Id.*

In addition, Defendants' apparent reliance upon *Edwards*, *Lancaster*, and *Moore* is misplaced. *Edwards* disposed of plaintiff's RICO claim in part because she neglected to corroborate the content of two allegedly fraudulent eviction notices she received. 356 F.3d at 1060. Moreover, plaintiff failed to "explain in what respect either notice was in fact any of those things." *Id.* Similarly, in *Lancaster*, the court made passing reference to the fact that plaintiff failed to allege the specific content of any specific mailings. 940 F.2d at 405. Finally, in *Moore*, the court chided plaintiffs for failing to "attribute particular fraudulent statements or acts to the individual defendants." 885 F.2d at 540. The court nonetheless acknowledged that, in the securities litigation context where the defendants may possess more knowledge of the alleged fraud, Rule 9(b)'s standards may be circumstantially relaxed. *Id.* at 540-41. CPM has supported its RICO cause of action with sufficient facts so as to survive scrutiny under Rule 9(b). As previously mentioned, the SAC discusses Defendants' claims to be negotiating with CPM in good faith, their alleged misrepresentation as to the nature of their objections, and, ultimately, the specific amounts they offered to settle CPM's claims. *See* SAC ¶¶ 28-29. While the SAC does not provide factual specificity as to the time and place of the over 800 alleged objections lodged by Defendants, none of Defendants' cited authorities suggest that such a disclosure would be necessary to survive a Rule 9(b) inquiry. Indeed, as *Moore* notes, Defendants, as the alleged authors of the communications in question, are well aware of their time and place.

CPM has alleged that Defendants misrepresented their intent and capability over a one year time period leading up to the filing of the SAC. Accordingly, the Court finds that the SAC's allegations are sufficiently particular so as to satisfy Plaintiff's Rule 9(b) obligations.

### 2.  Sufficiency of Fraud Allegations

A violation of 18 U.S.C. § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275 (1985). In addition, to demonstrate a pattern of racketeering activity, Plaintiff must allege two predicate acts that are related and amount to, or threaten the likelihood, of continued criminal activity. *H.J., Inc. v. Northwestern Bell. Tel. Co.*, 492 U.S. 229, 239-40, 109 S. Ct. 2893 (1989).

The two predicate acts in the instant lawsuit are mail fraud and wire fraud. To allege a violation of mail fraud under 18 U.S.C. § 1341, Plaintiff must show that: "(1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620 (9th Cir. 2004) (quoting *Schreiber*, 806 F.2d at 1400). In addition, to allege a claim for wire fraud under 18 U.S.C. § 1343, Plaintiff must show "(1) the formation of a scheme or artifice to defraud[;] (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Schreiber*, 806 F.2d at 1400 (citing *United States v. Louderman*, 576 F.2d 1383, 1387-88 & n.3 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S. Ct. 257 (1978)).

Defendants argue that the SAC fails to plead an act of mail or wire fraud sufficient to sustain its RICO causes of action. More specifically, Defendants argue that the SAC does not allege any fraudulent conduct. The Court agrees that the SAC's allegations do not concern fraudulent conduct to the extent that they discuss: (1) the submission of baseless objections, *see* SAC ¶ 39; (2) the consolidation of claims before the WCAB, *see id.* ¶ 40; and/or (3) the filing of Defendants' state court lawsuit, *see id.* ¶ 42. First, an action for fraud cannot lie "where the sender knows the recipient will not be deceived by the falsehoods." *Sosa*, 437 F.3d at 941 (citing *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002)). To the extent that the objections submitted by Defendants had no "factual basis," CPM could not have been defrauded. Moreover, "misrepresentations of the law are not actionable as fraud, including under the mail and wire fraud statutes, because statements of the law are considered merely opinions." *Id.* at 940. The alleged existence of the objection letters delivered to CPM by Defendants therefore cannot support a claim for fraud where CPM claims that the letters lacked a legal or factual basis. *See* SAC ¶ 39.

Second, Defendants' alleged consolidation of claims before the WCAB is likewise incapable of supporting the existence of a scheme to defraud. Even without considering the important considerations of the *Noerr-Pennington* doctrine, the Court notes that CPM has failed to demonstrate how delay, even if intentional, before the WCAB is sufficient to evince a specific intent to deceive or defraud. Instead, CPM's allegations concerning the WCAB appear to be consistent with a general pattern of lamenting the WCAB's inability to resolve claims at a speed that satisfies Plaintiff. The Court therefore admonishes Plaintiff that this is not the appropriate forum to air general grievances against the WCAB process, especially when it is unclear how the mere use of an allegedly defective process by Defendants is sufficient to constitute fraud.

Third, CPM's claim that Defendants intend to "us[e] the process of litigation, rather than its outcome, to achieve an unlawful objective, which constitutes fraud on the WCAB, as well as CPM," is equally unavailing. *See* SAC ¶ 42. As an initial matter, it appears that CPM re-packages a claim intended to address the "sham litigation" exception to the *Noerr-Pennington* doctrine in terms intended to support a vague claim of fraud upon the WCAB. However, CPM fails to substantiate the precise manner in which the mere filing of a lawsuit (or even the consolidation of claims before the WCAB)

has the effect of defrauding the WCAB. Such conclusory allegations are insufficient to sustain Plaintiff's cause of action under Rule 12(b)(6). *See Twombly*, 550 U.S. at 562.

Notwithstanding the legal irrelevance of the SAC's allegations concerning the submission of baseless objection letters, consolidation proceedings before the WCAB, and the filing of the lawsuit in state court, the "lulling" claims are sufficient to demonstrate predicate acts of mail and wire fraud. In relevant part, Plaintiff alleges that Defendants "lulled" it into believing that they had investigated CPM's claims for payments and that Defendants intended to resolve their objections with haste and in good faith. *See* SAC ¶ 49. This scheme to defraud was allegedly designed well in advance of litigation before the WCAB; indeed, Plaintiff alleges that Defendants conspired with other carriers to put CPM out of service and implemented a scheme to deny all payments to CPM and fabricate pretextual objections to CPM's claims. *Id.* ¶ 3. It was only in effectuating this scheme that Defendants allegedly submitted fraudulent objection letters and issued blanket denials of CPM's claims in telephone calls with CPM's collectors. *Id.* ¶¶ 28-36. In short, Plaintiff alleges that Defendants intended to deceive CPM about Defendants' good faith in resolving CPM's claims and using the WCAB process. Accordingly, the Court finds that the SAC's allegations are sufficient to support a RICO claim under 18 U.S.C. § 1962(c) with predicate acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

### 3. Pattern of Racketeering Activity

Defendants argue that the SAC fails to "allege facts sufficient to state two predicate acts of racketeering activity." Mot. at 11. More specifically, Defendants argue that the alleged "lulling" conduct, misrepresentations as to Plaintiff's good faith, and fraudulent objection letters, were intermittent, unconnected, non-continuing, and therefore not part of a "pattern of racketeering activity." Mot. at 11-12. In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S. Ct. 2893 (1989), the Supreme Court held that 18 U.S.C. § 1961(5)'s statement that two predicate acts of racketeering are necessary for a "pattern" only "places an outer limit on the concept of pattern of racketeering activity that is broad indeed." 492 U.S. at 237. The Court held that, in addition to the requirement of two predicate acts of racketeering, the statute also contemplates the existence of an "order" or "arrangement" to the individual acts, such that there is both a continuity to and a relationship between the acts. *Id.* at 239.

In *H.J., Inc.*, the Supreme Court identified both closed and open ended continuity as capable of demonstrating a "pattern of racketeering activity." *Id.* at 241-42. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* at 242; *see also Relig. Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 (9th Cir. 1992) ("A pattern of racketeering activity lasting only a few months does not reflect the long term criminal conduct to which RICO was intended to apply."). However, even if the alleged racketeering activity has existed for only a short period of time, it can nonetheless constitute a "pattern" where the alleged continuity is open ended and the past conduct "by its nature projects into the future with a threat of repetition." *H.J., Inc.*,

492 U.S. at 243.

The SAC alleges that the predicate acts of racketeering activity began approximately one year before the SAC's filing and continue into the present. This Court has already acknowledged that the submission of objection letters and consolidation of claims before the WCAB cannot, themselves, constitute fraudulent activity under RICO. Likewise, such acts cannot, in the aggregate, demonstrate a "pattern of racketeering activity". However, the SAC's allegations do not end there. In relevant part, the SAC alleges that Defendants' objection letters and associated correspondence evinced a desire to resolve claims in "good faith" and in a regular manner when, in fact, no such intent existed. *See* SAC ¶¶ 28-32.

The Court recognizes the precedent cited by Defendants for the proposition that racketeering activity spanning less than one year cannot constitute a "pattern". *See* Mot. at 12 (citing *Allwaste v. Hecht*, 65 F.3d 1523, 1527-28 (9th Cir. 1995); *Wollersheim*, 971 F.2d at 367). However, even Defendants concede that the Ninth Circuit rejected the requirement that a "pattern" must last for a minimum period of time, whether that is one year or some other increment. *See Hecht*, 65 F.3d at 1527-28 ("We sould be misguided, however, if we construed these observations as establishing a hard and fast, bright line, one-year rule."). Similarly, in *Wollersheim*, the Ninth Circuit simply observed that it has yet to find a case in which the alleged conduct lasted for less than one year, but that observation was not the impetus for its finding that plaintiff had failed to plead a "pattern of racketeering activity." To the contrary, *Wollersheim* and *Hecht* both emphasized the relationship and continuity (or lack thereof) between the alleged predicate acts of racketeering. In particular, the cases were concerned with whether the acts were mere isolated instances of fraud or whether they were organized in pursuit of a common purpose. Thus, while the time period over which the acts occurred can prove or disprove the existence of continuity or relationship, it is not alone a dispositive factor in determining whether a pattern exists.

Defendants fail to demonstrate, or even argue, that there was no continuity or relationship between the alleged acts of racketeering. The Court considers the SAC's allegations sufficient to evince such a common scheme; after all, the alleged communications were delivered by Defendants in response to similar claims for payment and were transmitted with the common purpose of deceiving CPM. *See* SAC ¶¶ 28-36. Moreover, to the extent that any bright line rule is relevant, the SAC does allege that the scheme lasted for at least one year. *See id.* While Defendants attempt to draw the Court's attention to the apparent contradiction between the allegations in the First Amended Complaint and the SAC, the Court notes that the present Motion concerns the latter and not the former. Accordingly, if the SAC's allegations are taken as true, they allege a "pattern of racketeering activity" sufficient to sustain Plaintiff's RICO claim.

### 4. Enterprise

An enterprise "includes any individual, partnership, corporation, association, or other

legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The SAC alleges six alternate enterprises. First, it alleges that "[e]ach employer engaged in interstate commerce or whose activities affect interstate commerce contracting with a Zenith defendant to conduct and participate in their workers' compensation affairs either as an insurer or a third party administrator is a RICO enterprise. SAC § 45(a). Second, it alleges that "each defendant is a RICO enterprise." *Id.* § 45(b). Third, it alleges that "[t]he persons with decision-making power at each employer contracting with a Zenith defendant to conduct their workers' compensation affairs and the persons with decision-making power at each contracting Zenith defendant together form an association-in-fact enterprise for RICO purposes." *Id.* § 45(c). Fourth, it alleges that "[e]ach employer and contracting Zenith defendant together form an association in fact enterprise." *Id.* § 45(d). Fifth, it alleges that the two Zenith Defendants "form an association in fact enterprise known as Zenith Insurance Group ("ZIG") which is not a legal entity or corporation. ZIG is led by ZIC. ZIG directs, controls, coordinates and participates in the operation of ZIC and ZNAT." *Id.* § 45(e). Sixth, it alleges that "Zenith, Everest and BH together constitute an association in fact enterprise." *Id.* § 45(f).

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087 (2001). Defendants extend this rationale to argue that the SAC's treatment of each Defendant as both a "person" under 18 U.S.C. § 1961 and an "enterprise" is flawed. Mot. at 14-15. However, Defendants' argument, and their authorities in support thereof, are more relevant to a situation in which a RICO plaintiff alleges that a single individual constitutes an "enterprise." *See* Mot. at 14 (citing *River City Mkts., Inc.*, 960 F.2d 1458, 1461 (9th Cir. 1992); *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984)). While the Court agrees that each Zenith Defendant does not itself constitute an "enterprise," it is not convinced that the holdings in *River City* and *Rae* similarly prevent the Defendants from collectively constituting an enterprise. Indeed, in *River City*, the Ninth Circuit held that "we find nothing in our RICO case law which instructs that two contracting business entities cannot form an 'enterprise' for RICO purposes and still be named as individual RICO defendants, provided the enterprise otherwise falls within the statutory prescriptions." 960 F.2d at 1461.

Defendants nonetheless argue that the Zenith Defendants cannot collectively constitute an "enterprise" because they have a common parent, who Plaintiff alleges "directs, controls, coordinates and participates" in their operations. *See* Mot. at 15 (citing SAC ¶ 45(e)). Such an argument attempts to have it both ways. If the Zenith Defendants should be considered part of the same larger unit, then the Court sees no reason to treat each Defendant as an individual Defendant and the larger unit as the collective enterprise. The logic of *River City* and *Rae* is not that such a scenario can never exist, but that the larger enterprise cannot constitute both the defendant and the "enterprise" that the defendant conspires with – *i.e.*, "an individual cannot associate or conspire with himself." 960 F.2d at 1461. In this case, the Zenith Defendants should not simply be considered part of the same corporate entity, such that they cannot collectively constitute an "enterprise." Indeed, in *River City*, the Ninth Circuit considered the corporate defendants capable of constituting an "enterprise" even though they were

engaged in a joint venture. *Id.* A mere relationship, whether contractual or even structural, between two corporate defendants does not preclude their legal separability. Nor does it prevent them from acting in concert as an "enterprise" for the purposes of RICO.

Defendants' further claim that the SAC fails to adequately plead an "associated-in-fact" enterprise. An associated in fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524 (1981). Both parties agree that an associated in fact enterprise need not have a distinct structure that exists independent and apart from its constituent participants. *See* Mot. at 16. The parties furthermore agree that the critical requirement for an associated in fact enterprise is coordination and continuity between the acts of the enterprise's alleged participants. *Id.* (citing *Begala v. PNC Bank, Ohio Nat'l Ass'n*, 214 F.3d 776, 782 (6th Cir. 2000)). The SAC alleges several "association in fact" enterprises that can be reduced to two categories: (1) association in fact enterprises between Defendants and insured-employers; and (2) association in fact enterprises between Defendants and other insurers and claims administrators. With regard to the former, Defendants argue that the SAC offers only vague allegations as to the manner in which the Zenith-insured employers have engaged with Defendants to defraud CPM. Even the most thorough parsing of the SAC demonstrates that Defendants are correct – the SAC simply fails to substantiate the manner in which the employers coordinate with Defendants and offers mere legal conclusions that are insufficient to withstand Rule 12(b)(6) scrutiny. *See Twombly*, 550 U.S. at 562. The SAC's allegations regarding the association in fact enterprises between Defendants and other insurers and claims administrators do not suffer from the same defect. The SAC alleges that Defendants engaged other carriers to communicate the manner in which its scheme to defraud, including presumably its scheme to misrepresent its good faith in resolving claims and liens, was to be effected. *See* SAC ¶¶ 28-36. The SAC also alleges that Defendants instructed the employees of other insurers and claims administrators to utilize identical tactics when engaging CPM, including the dissemination of objection letters that, at least in part, misrepresented Defendants' (and other insurers') intent to properly resolve pending claims. *Id.* Accordingly, the Court does not share Defendants' conclusion that the SAC alleges only that "each insurer independently decided to object to CPM's bills." Mot. at 17.

The SAC's claim that Defendants individually and/or in concert with Zenith-insured employees constituted an enterprise is unavailing. However, the SAC does allege the existence of an "enterprise" to the extent that it alleges that: (1) Defendants collectively constitute an enterprise; and/or (2) Defendants and the Everest and BH entities constitute an enterprise.

### 5. Conspiracy

18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Defendants argue the SAC's failure to state a claim under subsections (a), (b), or (c) precludes its conspiracy claim. As the Court has considered and rejected Defendants' predicate arguments, it considers Defendants' present

argument moot.

    **B.**    **Standing**

Defendants separately argue that Plaintiff lacks standing, as only CPM's contracting physicians suffered injuries as a result of Defendants' alleged conduct. *See* Mot. at 19. To establish standing under Article III of the Constitution, a plaintiff must demonstrate: (1) an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, meaning that the injury must "affect the plaintiff in a personal and individual way," and (b) "'actual or imminent,' not 'conjectural' or 'hypothetical'"; (2) "there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;" (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992) (internal citations omitted). Each element of standing is "an indispensable part of the plaintiff's case," and accordingly "must be supported in the same way as any other matter on which the plaintiff bears the burden, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

    **1.**    **Interference with Contractual Relationships**

Plaintiff asserts that Defendants' fraudulent conduct interfered with its contractual relationships with contracting physicians and cut off its cash flow generated from those relationships. SAC ¶ 43. Defendants' only response is that this injury is too "remote and attenuated." As an initial matter, the Court notes that Defendants' Motion does not clearly distinguish between the allegations of contractual harm and the allegations of harm to CPM's contracting physicians. With respect to the former, Defendants offer little to no response. The Court acknowledges that the SAC does not substantiate or even provide a fair approximation of the alleged harm suffered as a result of Defendants' interference with CPM's contractual relationships with its physicians. *See* SAC § 43. Indeed, the SAC only identifies the damages suffered as a result of non-payment of claims submitted by CPM on behalf of its physicians. *Id.* However, the injury suffered – interference with contractual relationships – is nonetheless concrete, particularized, and actual, so as to confer standing upon Plaintiff. *See Lujan*, 504 U.S. at 560-61.

    **2.**    **Concrete Financial Harm**

Plaintiff also argues that it has suffered financial losses as a result of Defendants' failure to pay its contracting physicians amounts in excess of $1.2 million. But those losses were suffered by contracting physicians and not CPM. *See* SAC ¶ 43. Plaintiff concedes that it merely "collects bills and liens" but does not itself recover any of the monies ultimately paid to contracting physicians. *See id.* Nonetheless, Plaintiff asserts that, having acquired legal title to its contracting physicians claims, it

may bring such claims on their behalf. *See* SAC ¶ 12 ("CPM also has assignments from its highest volume contracting physicians and soon expects to have assignments from all or most of its physicians of their RICO causes of action against [Defendants for their] interference with the contractual relationships between CPM and its physicians.").

In *Sprint Commc'ns Co. v. APCC Servs. Inc.*, the Supreme Court held that "[l]awsuits by assignees, including assignees for collection, are cases and controversies of the sort traditionally amenable to, and resolvable by, the judicial process." 128 S. Ct. 2531, 2542, 171 L. Ed. 2d 424 (2008) (internal citations and quotation marks omitted). Defendants question whether "the physicians who CPM claims have been harmed have assigned their right to payment to CPM." Mot. at 15. Plaintiff's vague reference to its alleged assignments leaves doubt as to whether such assignments are sufficient to sustain its claims on behalf of *all* or even most contracting physicians. However, for the time being the Court must accept Plaintiff's allegations as true, even where those allegations concern facts predicate to its standing to bring claims on behalf of its contracting physicians.

Defendants nonetheless argue that *Annulli v. Panikkar*, 200 F.3d 189, 199 (3d Cir. 1999), bars Plaintiff's assigned claims. In *Annulli*, plaintiff based his RICO claim on defendants' alleged breaches of contract and their interference with plaintiff's contractual relations. The Third Circuit held that plaintiff had failed to "alleg[e] that the Defendants committed one of the state law crimes defined as racketeering activity in § 1961(1)(A)." *Annulli*, 200 F.3d at 199. The court further observed that a state law cause of action like "simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity enumerated in § 1961(1)." *Id.*

*Annulli* is inapposite to this matter. First, it is unclear, from the pleadings alone, whether Plaintiff's alleged assignments are limited to RICO claims that allege only interference with contractual relations or whether the assignments cover RICO claims based on the underlying fraudulent conduct alleged throughout the SAC. *See id.* ¶¶ 28-36. If the former is the case, and Plaintiff has only yet received assignments of legal claims for interference with contractual relations, then Defendants may raise the issue of standing at a later date. In an effort to construe the SAC in the light most favorable to the Plaintiff, this Court will proceed by permitting CPM to bring RICO claims on behalf of the contracting physicians to the extent that it has been assigned those claims and that the assignments in question are not restricted to claims for interference with contractual relations.

Moreover, Defendants mistakenly conflate the harm alleged by Plaintiff with the underlying basis for the SAC's RICO action. The SAC does not allege a cause of action for interference with contract. Instead, it alleges that Defendants (and other insurers) defrauded CPM into believing that they intended to resolve their objections to CPM's bills and liens in good faith, when in fact, they intended to delay repayment, exploit the WCAB process, and ultimately bankrupt CPM. *See* SAC ¶ 28-29. The harm that resulted from this allegedly fraudulent activity includes, but is not limited to, the degradation of CPM's current and prospective contractual relationships with its contracting physicians. *See id.* ¶ 43. In *Annulli*, plaintiff's sole basis for his civil RICO claim was that

defendants had breached their contracts with him, while simultaneously interfering with his existing contractual relations. 200 F.3d at 199.

### C. The *Noerr-Pennington* Doctrine

#### 1. General Applicability of the *Noerr-Pennington* Doctrine

Defendants claim that the SAC's allegations run afoul of the *Noerr-Pennington* doctrine. "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from liability." *Empress LLC v. City and County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) (citing *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000)); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("The *Noerr-Pennington* doctrine ensures that those who petition the government for redress of their grievances remain immune from liability for statutory violations, notwithstanding the fact that their activity might otherwise be proscribed by the statute involved."). The Ninth Circuit has applied the doctrine to protect petitioning activity as well as activity incidental to and in anticipation of petitioning activity. *See Sosa v. DIRECTV*, 437 F.3d 923, 934-35 (9th Cir. 2006) ("[I]n the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine."); *see also Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee Assn.*, 136 Cal. App. 4th 464, 479 (holding that actions taken in anticipation of proceedings before the WCAB were protected by the *Noerr-Pennington* doctrine). The doctrine applies to petitions before both state governments and the federal government. *See Kottle v. Northwest Kidney Ctr.*, 146 F.3d 1056, 1059 (9th Cir. 1998). The doctrine "derives from the First Amendment's guarantee of the 'the right of the people . . . to petition the Government for a redress of grievances.'" *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

The SAC alleges, *inter alia*, that Defendants sent groundless and frivolous boilerplate objections to CPM regarding its bills and liens, consolidated proceedings before the WCAB in order to further delay resolution of CPM's bills and liens, and ultimately filed their state court action against CPM in an effort to avoid paying valid claims. *See* SAC ¶¶ 28-41. Such activity amounts to protected conduct incidental to litigation. *See Sosa*, 437 F.3d 95-26. First, Defendants' alleged objection letters were intended to lay the foundation for eventual recourse to the WCAB process. Second, the WCAB consolidation petitions undeniably represent protected petitioning activity, and CPM's arguments about alleged defects in the way that process functions are both unavailing and inappropriate. The *Noerr-Pennington* doctrine, in relevant part, to prevent courts from interfering with the accessibility and integrity of schemes like the WCAB. Third, to the extent that Plaintiff intends to invoke Defendants' state court lawsuit as relevant to its fraud claims, the *Noerr-Pennington* doctrine bars Plaintiff's claim. *See Kottle*, 146 F.3d at 1059.

However, the SAC additionally avers that Defendants engaged in "lulling" conduct that Plaintiff contends is separate and apart from Defendants' alleged misuse of the WCAB process.

Specifically, the SAC alleges that Defendants induced CPM into believing that they intended to resolve CPM's claims in good faith. SAC ¶ 28(a). The SAC also alleges that Defendants falsely communicated to other carriers and administrators "that CPM was being investigated for fraud or illegal practices." *Id.* ¶ 28(d). Neither allegation necessarily concerns petitioning activity before the WCAB; indeed, the latter concerns fraudulent activity entirely outside the scope of the WCAB. Thus, this Court declines to prospectively apply the *Noerr-Pennington* doctrine to activity that may have been conducted antecedent to and without contemplation of litigation before the WCAB. If the SAC's allegations are taken as true, then Defendants' fraudulent conduct predated their protected petitioning activity, such that the WCAB process was merely a vehicle to effectuate Defendants' scheme. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 506-07, 108 S. Ct. 1931 (1988) ("[T]he mere fact that an anticompetitive activity is also intended to influence governmental action is not alone sufficient to render that activity immune from antitrust liability.").

### 2.    The Sham Litigation Exception

The *Noerr-Pennington* doctrine does not protect "petitioning conduct that, although 'ostensibly directed toward influencing governmental action, is a mere sham to cover what is nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Sosa*, 437 F.3d at 938 (quoting *Easter R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 144, 81 S. Ct. 523 (1961)). As the Supreme Court has stated, "[t]he 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process* - as opposed to the *outcome* of that process - as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380, 111 S. Ct. 1344 (1991) (emphasis in original).

Plaintiff claims that any of Defendants' protected petitioning activities - *i.e.*, objecting to consolidating claims before the WCAB and filing its state court lawsuit - fall under the "sham" exception to the *Noerr-Pennington* doctrine. Moreover, Plaintiff argues that Defendants had no interest in the outcome of the WCAB litigation or the state court lawsuit. SAC ¶ 28-36. Specifically, Plaintiff alleges that Defendants intended only to delay the resolution of CPM's claims long enough to hinder CPM's cash flow and drive it out of business. *Id.*

The fact that Defendants stand to benefit from their alleged dilatory tactics does not mean that they have no interest in the actual outcome of the WCAB litigation. To the contrary, Defendants scheme to defraud and bankrupt CPM is only further advanced by the WCAB's rejection of CPM's ability to recover from Defendants or a state court judgment for Defendants. *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) is instructive here. In that case, the Ninth Circuit affirmed a dismissal of a counterclaim and third-party complaint for failure to sufficiently allege that a lawsuit was a sham. *Oregon Natural Resources Council*, 944 F.2d 532. The counterclaimant alleged that plaintiff's suit against it fell within the sham litigation exception because it was "part of a 'pattern of baseless, repetitive claims'" and because plaintiff had allegedly made "knowing misrepresentations to the court." *Id.* at 534. The counterclaimant further alleged that the

plaintiff only brought suit for the "sole purpose of delaying and impeding" counterclaimant's business. The Ninth Circuit held that even if plaintiff had an interest in delay, it was nonetheless genuinely seeking relief rather than merely abusing judicial process. *Id.* at 535. Here too, Defendants have a strong interest in the actual outcome of the WCAB process and state court litigation, and in fact, their interest is as strong or even stronger than their tangential interest in delaying the resolution of Plaintiff's claims.

Accordingly, to the extent that some or all of the allegations in the SAC are later determined to fall within the scope of *Noerr-Pennington*, the sham litigation exception does not apply.

### D. The *Colorado River* Doctrine

Defendants finally argue that this matter should be stayed pending resolution of Zenith state court lawsuit against CPM. Ordinarily, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246 (1976). The Supreme Court has long recognized, however, that "the circumstances permitting dismissal of a federal suit due to the presence of a concurrent state court proceeding . . . do nevertheless exist." *Id.* at 818. A federal court's decision whether to dismiss or abstain from a case "rest[s] on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.* at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183, 72 S. Ct. 219 (1952)).

The Supreme Court and Ninth Circuit have announced several factors a court should consider in making this decision: (1) which court first assumed jurisdiction over the *res* in dispute; (2) the relative convenience of the forums; (3) the need to avoid piecemeal litigation; (4) the order in which the state and federal actions were filed; (5) whether state or federal law controls; (6) whether the state proceeding is adequate to protect the parties' rights; and (7) whether the federal court proceeding is an instance of forum shopping. *Colorado River*, 424 U.S. at 818 (factors 1-4); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26, 103 S. Ct. 927 (1983) (factors 5-6); *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1367-68 (9th Cir. 1990) (factor 7). "These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a 'mechanical checklist.'" *American Int'l Underwriters, (Phillipines), Inc. v. Continental Ins. Co.*, 843 F.2d 1253, 1257 (9th Cir. 1988) (quoting *Moses Cone*, 460 U.S. at 16).

Zenith claims that its state court lawsuit brings four causes of action, none of which are particularly relevant to CPM's civil RICO claims. *See* Mot. at 3 (summarizing claims in state court for: (1) violation of California's Unfair Competition law; (2) negligent interference with Zenith's economic relationships; (3) intentional interference with Zenith's economic relationships; and (4) CPM's violation of Business and Professions Code § 650.1). Though Defendants argue that CPM can bring a civil RICO counter-claim in state court, they acknowledge that the state court lawsuit was filed nearly nine months ago. In essence, Defendants encourage the Court to stay this matter so that CPM can bring

a cause of action under federal law in a now mature state court lawsuit. The *Colorado River* doctrine does not counsel a federal court's abstention for the mere reason that a state court lawsuit is pending before the same parties. Accordingly, the Court DENIES Defendants' request for a stay pending the resolution of the state court lawsuit.

## IV.  Sur-Reply and Request for Judicial Notice

CPM filed its Motion for Leave to File Sur-Reply to Defendants' Motion on October 12, 2009. The Sur-Reply advances new arguments to rebut Defendants' claim that the SAC failed to allege an "enterprise." CPM's Opposition to Defendants' Motion neglected to advance any arguments on this point, despite the Motion's dedication of an entire section to the topic. CPM's Motion for Leave to File Sur-Reply offered no explanation for its earlier failure to fully address the arguments in the Motion. Accordingly, the Court DENIES CPM's Motion for Leave to File Sur-Reply.

In addition, Defendants' request that the Court take Judicial Notice of the proceedings in state court, the WCAB, and a parallel case pending before this Court. The Court considered none of the documents attached to Defendants' request relevant to its consideration of the present Motion. Accordingly, Defendants' request for Judicial Notice is DENIED.

## IV.  Disposition

For the foregoing reasons, the Court hereby DENIES Defendants' Motion to Dismiss.

The Clerk shall serve this minute order on all parties to the action.