**ORIGINAL**

1    Terree A. Bowers (SBN 89334)
     bowers.terree@arentfox.com
2    **ARENT FOX LLP**
     555 West Fifth Street, 48th Floor
3    Los Angeles, California 90013-1065
     Telephone: (213) 629-7400
4    Facsimile: (213).629-7401

5    Donald G. Norris (SBN 900000)
     dnorris@norgallaw.com
6    NORRIS & GALANTER LLP
     555 West Fifth Street, 31st Floor
7    Los Angeles, California 90013
     Telephone: (213) 996-8465
8    Facsimile: (213).996-8475

9    Paul M. Kaplan (Pro Hac Vice Applicant)
     kaplan.paul@arentfox.com
10   **ARENT FOX LLP**
     1675 Broadway
11   New York, NY 10019
     Telephone: (212) 492-3323
12   Facsimile: (212).484-3990

13   Attorneys for Plaintiff
     California Pharmacy Management, LLC

14

15                  UNITED STATES DISTRICT COURT

16                 CENTRAL DISTRICT OF CALIFORNIA

17   CALIFORNIA PHARMACY              Case No. SACV-09-0242 DOC (ANx)
     MANAGEMENT, LLC,
18                                    [Consolidated with Case No. SACV-09-
                 Plaintiff,           0141 DOC (ANx)]
19
            v.                        **FOURTH AMENDED COMPLAINT
20                                    FOR VIOLATIONS OF:**
     ZENITH INSURANCE COMPANY,
21   a California corporation; and ZNAT  **(1)   FEDERAL RACKETEER
     INSURANCE COMPANY, a                       INFLUENCED AND CORRUPT
22   California corporation;                    ORGANIZATIONS ACT
                                                ("RICO") [18 U.S.C. §1961, ET
23               Defendant.                     SEQ.],**

24                                    **(2)   THE SHERMAN ACT, [15
                                             U.S.C. §1], AND**
25
                                      **(3)   THE CARTWRIGHT ACT,
26                                           [CAL. BUS. & PROF. CODE §§
                                             16700 – 16761]**
27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

## NATURE OF THE CASE

1.     Beginning in approximately March 2007, Zenith Insurance Company and ZNAT Insurance Company (hereinafter collectively "Zenith"), along with the Berkshire Hathaway workers' compensation insurers and claims companies identified in paragraphs 17-23 below (hereinafter collectively "BH"), undertook a scheme to defraud California Pharmacy Management, LLC ("CPM" or "Plaintiff"), through a collusive and systematic campaign of sham litigation, fraudulent objections and dilatory conduct carried out by mail fraud and wire fraud, to avoid payment of valid bills and liens for tens of thousands of needed medications prescribed and dispensed to injured workers in over 800 workers' compensation cases in the California Workers' Compensation Appeals Board ("WCAB"); to destroy CPM as a viable company; and to abuse the process of and defraud the WCAB.

2.     CPM contracted with 164 physicians to assist those physicians with their in-office medication dispensing programs, authorized by California Business and Professions Code Section 4170(a), for injured workers in workers' compensation cases in the WCAB.  Under its contracts, CPM has the responsibility to bill and collect for medications dispensed to injured workers.  CPM submits bills to employers, and to insurers and claims companies like Zenith and BH.  If a bill is not paid, CPM files a lien in the WCAB.  CPM billed for medications at exactly the rate authorized by statute, but Zenith and BH undertook their fraudulent conduct because they did not want to pay the prices legally submitted by CPM.

3.     Zenith and BH strongly dislike the physician in-office medication dispensing programs even though such programs are explicitly authorized by law.  Because CPM is legally able to seek higher prices for medications than Zenith and BH would like to pay, Zenith and BH conspired and engaged in concerted action to devise a scheme to damage CPM and other companies who assist physicians with their in-office medication dispensing programs, and drive CPM and other

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   companies who assist physicians with their in-office medication dispensing

2   programs out of business, thereby maximizing the profits of Zenith and BH.  On

3   information and belief, managers from Zenith even went so far as to meet from time

4   to time with managers from BH and agreed that they, with the assistance of at least

5   one other workers' compensation insurer, Everest National Insurance Company

6   ("Everest"), would engage in concerted action to refuse to deal with CPM and other

7   companies like CPM that assist physicians with their in-office medication

8   dispensing programs.

9       4.       In order to implement their fraudulent scheme to drive CPM and other

10   companies who assist physicians with their in-office medication dispensing

11   programs out of business and to destroy the physician in-office medication

12   dispensing market, Zenith and BH communicated to their agents and

13   representatives the manner in which the scheme to defraud and engage in concerted

14   action was to be implemented.  Zenith, along with BH and at least one other

15   workers' compensation insurer, Everest, instructed their agents and representatives

16   to cease paying claims from CPM and other companies who assist physicians with

17   their in-office medication dispensing programs, regardless of the merit of each

18   individual claim, and to send deceptive objection letters and other communications

19   in order to make it look like the carriers had legitimate objections to the claims.

20       5.       Zenith and BH then instructed their agents and representatives, in

21   concert with each other and at least one other insurance carrier, Everest, to

22   consolidate all CPM lien claims before the WCAB in order to further delay

23   payment and put CPM out of business and destroy the physician in-office

24   medication dispensing market.  Zenith's and BH's resort to the WCAB procedures

25   was not to litigate claims in good faith, but was a subsequent component of its

26   scheme to defraud CPM and other companies who assist physicians with their in-

27   office medication dispensing programs and to destroy the market for in-office

28   medication dispensing.  From the inception of the fraud, Zenith and BH intended

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1   only to use the WCAB *process* to delay payment and destroy CPM and other

2   companies who assist physicians with their in-office medication dispensing

3   programs.  Zenith and BH have never been concerned with the *outcome* of the

4   WCAB process.  The fraud and concerted action was pre-planned with the intent to

5   initially deceive CPM and other companies who assist physicians with their in-

6   office medication dispensing programs into thinking it was simply experiencing

7   legitimate, individual objections to claims, as opposed to a preconceived,

8   comprehensive and collusive plan to put them out of business.

9        6.       Starting in approximately 2007, Zenith and BH began objecting to

10  CPM bills and liens by refusing to pay or negotiate CPM bills and liens with CPM

11  collectors.  Zenith and BH began sending objection letters that did not state the true

12  purposes of their objections: to destroy the physician in-office medication

13  dispensing market and to put CPM and other companies who assist physicians with

14  their in-office medication dispensing programs out of business.  Zenith and BH

15  stopped paying anything on CPM liens in over 800 pending cases, and instructed

16  their agents and representatives to stop all payments to CPM and other companies

17  who assist physicians with their in-office medication dispensing programs.  Zenith

18  and BH used false pretenses to wrongfully withhold from CPM and other

19  companies who assist physicians with their in-office medication dispensing

20  programs premium revenue set aside for and rightfully owed to injured workers and

21  their physicians, revenue which Zenith and BH had a duty to pay.

22       7.       The objection letters that Zenith and BH sent to CPM and other

23  companies who assist physicians with their in-office medication dispensing

24  programs initially appeared to be contesting individual claims as a good faith effort

25  to resolve individual claims over which Zenith and BH had honest, legitimate

26  objections.  (It is not uncommon for insurance carriers to object to claims on a

27  variety of legitimate grounds.)  CPM and other companies who assist physicians

28  with their in-office medication dispensing programs were initially defrauded into

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

1   believing that Zenith and BH were engaged in the normal course of objecting to and

2   litigating individual claims through the WCAB process.  Zenith's and BH's

3   deception cost CPM and other companies who assist physicians with their in-office

4   medication dispensing programs valuable time to react to Zenith's and BH's fraud

5   and served as a lulling activity that created a severe cash flow problem for CPM

6   and other companies who assist physicians with their in-office medication

7   dispensing programs.  When CPM finally ascertained that Zenith and BH were not

8   objecting and litigating in the normal course of business, but had in fact

9   implemented a scheme to defraud CPM into thinking it was business as usual, CPM

10   found itself in a precarious position with threats to its contractual relationships with

11   its contracting physicians and its in-office medication dispensing program in

12   jeopardy.  CPM was forced to hire attorneys and incur other costs to protect itself

13   and recover from the devastating impact of Zenith's and BH's fraud.

14        8.        After several months of objections, and after BH and Zenith, and

15   Everest, sought to consolidate all of their objections (claims) before the WCAB,

16   CPM eventually concluded that it had been defrauded into believing that Zenith and

17   BH had intended to process their objections in good faith using the WCAB

18   procedures in a legitimate manner.  It became apparent to CPM, however, that

19   Zenith and BH had successfully defrauded CPM and other companies who assist

20   physicians with their in-office medication dispensing programs by delaying

21   payments for a significant period of time, thereby endangering the cash flow and

22   the very existence of CPM and other companies who assist physicians with their in-

23   office medication dispensing programs.  It also became apparent that Zenith and

24   BH were defrauding the WCAB, in that Zenith and BH truly had no interest

25   whatsoever in the actual *outcome* of any of their individual objections before the

26   WCAB, but intended to use the WCAB *process* to stonewall CPM and shut off its

27   cash flow.  (WCAB consolidation proceedings can take many months, or even

28   years, to resolve and can cause the demise of a company like CPM.)

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

9.     Zenith's and BH's proceedings before the WCAB were baseless because their objections, as they have eventually been revealed, were based on false assumptions that Zenith and BH knew were false.  CPM fully complied with the law in implementing such programs and is not unlawfully operating a pharmacy.  If CPM had the immediate opportunity to rebut all of Zenith's and BH's unfounded objections, it would prevail, as Zenith and BH well know.  However, Zenith's and BH's objective in their scheme to defraud and engage in concerted action, was to drive CPM, and other companies who assist physicians with their in-office medication dispensing programs, out of business before they have a chance to litigate the bogus objections of Zenith and BH.

10.     Zenith's and BH's intent is and continues to be to delay and avoid payment of CPM bills and liens, to destroy CPM, and to destroy other companies who assist physicians with their in-office medication dispensing programs.  In addition, Zenith and BH seek to interfere with the contractual relationships between CPM and its contracting physicians.

11.     As a result of the scheme to defraud, the extensive and continuing pattern of racketeering activity and through illegal agreement and concerted action, CPM has been injured in its business and property in the millions of dollars in violation of (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (c) and (d), (2) the Sherman Act and (3) the Cartwright Act.  CPM therefore seeks compensatory damages, treble damages and attorneys' fees, and injunctive relief.

## JURISDICTION AND VENUE

12.     The Court has federal question jurisdiction over all federal claims for relief asserted in this complaint pursuant to 18 U.S.C. § 1964(a) and (c); 15 U.S.C. § 15 and § 16; and 15 U.S.C. § 1.  Additionally, the Court has jurisdiction over the state law claim asserted in this action pursuant to 28 U.S.C. § 1367(a), in that the state law claim is so related to the claims over which the Court has federal question

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1  jurisdiction that they form part of the same case or controversy under Article III of
2  the United States Constitution.

3      13.   Venue is proper in the Central District of California because plaintiff
4  resides there and Zenith does business in person and through its agents and
5  representatives there.

6                            **THE PARTIES**

7      14.   CPM is a limited liability company authorized and existing under the
8  laws of the State of California, and headquartered in Newport Beach, California.
9  CPM contracted with 164 physicians to assist those physicians with their in-office
10 medication dispensing programs for injured workers in workers' compensation
11 cases in the WCAB.  Under its contracts, CPM is responsible for the billing and
12 collection for medications prescribed and dispensed by CPM contracting physicians
13 to injured workers in workers' compensation cases.  The physicians pay CPM a
14 management fee for its services.  CPM has suffered injury to its business or
15 property because of Zenith's and BH's interference with the contractual
16 relationships between CPM and its contracting physicians.  CPM also has
17 assignments from its highest volume contracting physicians and expects to have
18 assignments from all or most of its physicians of their RICO causes of action
19 against Zenith and BH for their interference with the contractual relationships
20 between CPM and its physicians.

21     15.   Zenith Insurance Company ("ZIC") is a corporation duly authorized
22 and existing under the laws of the State of California, and headquartered in
23 Woodland Hills, California.  ZIC sells workers' compensation insurance in
24 numerous states.  ZIC is doing business in California as a registered, admitted
25 insurance company.  ZIC is 100% owned by Zenith National Insurance
26 Corporation, a New York Stock Exchange publicly traded company incorporated in
27 the State of Delaware and headquartered in Woodland Hills, California.  ZIC is part
28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

1  of the Zenith Insurance Group, a trade group of Zenith companies selling workers'

2  compensation insurance.

3       16.   ZNAT Insurance Company ("ZNAT") is a corporation duly authorized

4  and existing under the laws of the State of California, and headquartered in

5  Woodland Hills, California.  ZNAT sells workers' compensation insurance in

6  numerous states.  ZNAT is doing business in California as a registered, admitted

7  insurance company.  ZNAT is 100% owned by Zenith National Insurance

8  Corporation, a New York Stock Exchange publicly traded company incorporated in

9  the State of Delaware and headquartered in Woodland Hills, California.  ZNAT is

10  part of the Zenith Insurance Group, a trade group of Zenith companies selling

11  workers' compensation insurance.

12                          **BACKGROUND FACTS**

13  A.    **Other Parties To The Conspiracy**

14       17.   Redwood Fire and Casualty Insurance Company ("Redwood") is a

15  corporation duly authorized and existing under the laws of the State of Nebraska,

16  and headquartered in Omaha, Nebraska. Redwood sells workers' compensation

17  insurance, commercial auto insurance and other insurance products in numerous

18  states. Redwood is doing business in California as a registered, admitted insurance

19  company providing workers' compensation insurance to employers. Redwood is

20  part of the Berkshire Hathaway Homestate Companies ("BlifIC") group of

21  insurance companies, which in turn is part of the Berkshire Hathaway Insurance

22  Group headquartered in Omaha, Nebraska. Redwood is reinsured, in part, by

23  National Indemnity Company, another Berkshire Hathaway.

24       18.   Cypress Insurance Company ("Cypress") is a corporation duly

25  authorized and existing under the laws of the State of California, and headquartered

26  in San Francisco, California. Cypress transacts multiple lines of property and

27  casualty insurance business in several states, including workers' compensation

28  insurance. Cypress is doing business in California as a registered, admitted

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

insurance company providing workers' compensation insurance to employers. Cypress is part of the BHHC group of insurance companies. Cypress is reinsured, in part, by BH affiliates.

19.    Oak River Insurance Company ("Oak River") is a corporation duly authorized and existing under the laws of the State of Nebraska, and headquartered in Omaha, Nebraska. Oak River transacts workers' compensation and commercial auto liability insurance business in numerous states. Oak River is doing business in California as a registered, admitted insurance company providing workers' compensation insurance to employers. Oak River is 100% owned by Berkshire Hathaway Life Insurance Company of Nebraska. Oak River is part of the BHHC group of insurance companies. Oak River is reinsured, in part, by BH affiliates.

20.    American All Risk Insurance Services, Inc. ("AARIS") is a corporation duly authorized and existing under the laws of the State of California, and headquartered in San Francisco. AARIS is an insurance brokerage and adjusts claims as a third party administrator for employers and for Berkshire Hathaway workers' compensation insurers and other insurers as well. AARIS is wholly owned by Columbia Insurance Company. AARIS is part of the National Indemnity Group of Berkshire Hathaway.

21.    American Commercial Claims Companies, Inc. ("ACCA") is a corporation duly authorized and existing under the laws of California, and headquartered in San Francisco. ACCA adjusts claims as a third party administrator for employers and for workers' compensation insurers. ACCA is wholly owned by Columbia Insurance Company. ACCA is part of the National Indemnity Group of Berkshire Hathaway.

22.    National Liability and Fire Insurance Company ("National Liability") is a corporation duly authorized and existing under the laws of the State of Connecticut, and headquartered in Omaha, Nebraska. National Liability transacts property and casualty insurance business in numerous states. National Liability is

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1   doing business in California as a registered, admitted insurance company providing
2   workers' compensation insurance to employers. National Liability is wholly owned
3   by National Indemnity Company, a subsidiary of OBH, Inc. National Liability is
4   part of the National Indemnity Group of Berkshire Hathaway. National Liability is
5   reinsured by BH affiliates.

6         23.    Berkshire Hathaway Homestate Companies ("BHHC") is not a formal
7   legal entity or corporation, but rather is an unincorporated association, within the
8   meaning of Federal Rule of Civil Procedure 17(b)(3)(A). It is comprised of a group
9   of insurance companies, which are part of the Berkshire Hathaway Insurance Group
10  headquartered in Omaha, Nebraska. The companies comprising BHHC sell
11  commercial automobile, commercial property, workers' compensation and other
12  insurance in numerous states.  BHHC has its own officers and staff, and offices in
13  several states - in California, in Pasadena, San Francisco and San Diego. BEIFIC
14  directs, controls, coordinates and participates in the operations of those companies.
15  Rodney Eldred who manages and operates BHHC is also President of five of the six
16  BHHC companies. Robert Darby is President of the sixth BHHC company.  As to
17  the remaining BH entities, the purpose of BHHC was and is to manage and
18  coordinate their claims practices.

19        24.    Zenith and BH, and each of them, have acted and are acting jointly and
20  in concert, and as agents, servants and collaborators of each of the other, and acting
21  within the course and scope of their agency in conspiracy with each other, with the
22  full knowledge and consent, either expressed or implied, of each of the other, as to
23  CPM bills and liens submitted on behalf of its contracting physicians.

24  **B.**    **CPM and Its Contracting Physicians**

25        25.    In California, physicians are authorized by law to dispense
26  medications in their own offices to their own patients under California Business and
27  Professions Code 4170(a).  The California Court of Appeal has ruled that
28  physicians dispensing medications in their own offices to their own patients are not

Arent Fox LLP
Attorneys At Law
Los Angeles

- 10 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1  operating as a retail pharmacy as long as they do not sell drugs to the general

2  public. *Park Med. Pharm. v. San Diego Orthopedic Assocs. Med. Group, Inc.*, 99

3  Cal. App. 4th 247, 260 (Cal. App. Ct. 2002). CPM contracted with 164 physicians

4  to assist them with their in-office medication dispensing programs for injured

5  workers in workers' compensation cases in the WCAB. CPM's contracting

6  physicians do not sell drugs to the general public.

7       26.    Physicians that contract with CPM purchase the medications they

8  prescribe from a third-party wholesaler known as a repackager who takes large

9  volume medications and prepares unit doses of those medications suitable for

10  patient use. The medications are stored and handled in the physician's office and

11  dispensed to patients in the manner required by California law. The wholesaler

12  ships the requested medications directly to CPM contracting physicians. CPM does

13  not purchase drugs and then resell those drugs to its contracting physicians, or take

14  title to or possession of the drugs. More specifically, CPM does not purchase

15  medications at one price and resell those medications to the physicians at another

16  price, and thus cannot be a wholesaler. Again, CPM does not even purchase

17  medications - the physicians do, and CPM has never had any sales of medications

18  to its contracting physicians. It is not a wholesaler.

19       27.    Pharmacy technicians, whom CPM assists contracting physicians in

20  obtaining from third party staffing companies, work for the physicians under their

21  supervision assisting them with their medication dispensing programs. They are

22  not CPM employees, but the physicians' leased employees. The pharmacy

23  technicians do not perform any functions restricted to physicians and pharmacists.

24  They assist the physician in storing and dispensing prescribed medications, and

25  performing nondiscretionary tasks that do not involve professional judgment.

26       28.    Neither CPM nor its contracting physicians have been the subject of

27  any prosecution or discipline by regulatory agencies regarding the medication

28  dispensing programs of CPM contracted physicians.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

C.      **Injured Workers**

29.     Among the patients treated by CPM contracting physicians are injured workers whose rights and those of medical providers who treat them are governed by California workers' compensation law.

30.     CPM contracting physicians undertook to treat injured workers and to purchase medications for them in reliance on the fact that employers through workers' compensation insurance or self-insurance have made funds available to Zenith and BH to pay valid medical claims of injured workers who rightly are entitled to that premium revenue, and on the expectation that Zenith and BH would abide by the rules and procedures of the California workers' compensation system and pay the valid claims of injured workers from premium revenue or from their own resources if premium revenue is insufficient or from employer self-insurance funds.

31.     CPM submits bills and liens for medications for reimbursement to the responsible workers' compensation carriers or to self-insured employers on behalf of CPM contracted physicians.  Pre-2007 medications are billed in accordance with Labor Code Section 5307.1.  That section provides for reimbursement of drugs at 100% of the Medi-Cal fee schedule for drugs and manufacturers in the Medi-Cal database.  CPM, however, obtains the billing information for medications dispensed by contracted physicians from a manufacturer whose NDC number is not in the Medi-Cal base.  When a manufacturer's NDC number is not contained in the Medi-Cal database, Labor Code 5307.1 provides that reimbursement will be at the fee schedule that was in effect on or before December 31, 2003.  That fee schedule authorizes payment for generic drugs at 1.4 times the manufacturer's average wholesale price ("AWP"), plus a $7.50 handling fee.  Brand name drugs are paid at 1.1 times the AWP plus a handling fee of $4.  CPM bills its contracted physicians' pre-2007 medications at exactly the fees so authorized.  (The law regarding

1    reimbursement of medications changed in March, 2007.  A new, much lower

2    amount is specified in the statute, which is not retroactive.)

3        32.    To date, most workers' compensation insurers have paid the

4    medication bills submitted by CPM on behalf of its contracted physicians without

5    incident.

6    **D.    Fraudulent and Illegal Conduct by BH and Zenith's Workers'**

7        **Compensation Entities**

8        33.    All employers in California must obtain workers' compensation

9    insurance or self-insure to obtain limited liability under the workers' compensation

10   system.  Otherwise, injured workers can bring tort claims against their employers in

11   civil court for their work-related injuries.

12       34.    Workers' compensation insurers and claims companies hold

13   themselves out to employers, regulatory authorities and the California workers'

14   compensation system as entities that will adjust and pay valid workers'

15   compensation claims in accordance with California law.  To obtain a certificate of

16   authority as an admitted insurer, Zenith had to explain how it would pay valid

17   claims promptly and fairly.  BH and Zenith signed policy agreements representing

18   to employers that they will pay all valid employers' workers' compensation claims

19   and in exchange for premiums assume the risk that the premium revenue will be

20   insufficient to cover an employer's claims.  Zenith and BH also serve as third party

21   administrators, assuming no risk, for employers who self-insure and for Zenith's

22   and BH's own insurers, contracting to pay valid claims.  Employers pay premiums

23   to Zenith and BH and rely on Zenith and BH to adjust and pay valid workers'

24   compensation claims in accordance with California law.

25       35.    California Labor Code Section 4603.2 requires payment of bills for

26   medical treatment, including payment for medications, within 45 days of receipt.

27   Any objection to a bill must be sent within 30 days of its receipt.  An explanation of

28

Arent Fox LLP
Attorneys At Law
Los Angeles

- 13 -

1   the basis for any objection is required under California Code of Regulations, tit. 8,

2   § 9792.5(d)(1).

3      36.    California Code of Regulations, tit. 8, § 10109 imposes on insurers and

4   third-party companies a duty to investigate (beyond preparing objections and

5   defenses) and to deal fairly and in good faith with all claimants, including lien

6   claimants.  California Code of Regulations, tit. 8, § 10888 requires a good faith

7   attempt to resolve outstanding liens when the underlying case in chief of the

8   individual workers settles.

9      37.    Zenith and BH have always disliked the physician in-office medication

10  dispensing business because Zenith and BH do not want to pay the full amount of

11  the legally-valid claims administered by CPM and other companies who assist

12  physicians with their in-office medication dispensing programs.  Because Zenith

13  and BH wanted to destroy the physician in-office medication dispensing business

14  and intend to put CPM, and other companies who assist physicians with their in-

15  office medication dispensing programs, out of business, Zenith and BH devised a

16  scheme to defraud CPM and engage in concerted action by:

17          (a)    initially lulling CPM into believing that Zenith and BH

18  had legitimate objections to individual claims, had investigated the claims in good

19  faith, and were communicating their objections in order to resolve claims in good

20  faith, when in truth and in fact as Zenith and BH knew, Zenith and BH simply

21  intended to destroy CPM, other companies who assist physicians with their in-

22  office medication dispensing programs and the physician in-office medication

23  dispensing market;

24          (b)    initially lulling CPM into believing that Zenith and BH

25  were invoking the WCAB procedures in good faith to resolve claims, when in truth

26  and in fact as Zenith and BH knew, Zenith and BH simply intended to destroy

27  CPM, other companies who assist physicians with their in-office medication

28  dispensing programs and the physician in-office medication dispensing market; and

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -
FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1  (c)  defrauding the WCAB by pretending to use the WCAB

2  procedures and consolidation process in order to resolve lien disputes, when in truth

3  and in fact as Zenith and BH knew, Zenith and BH were not interested in the actual

4  *outcome* of WCAB proceedings or lien disputes, but were simply interested in

5  abusing the *process* of the WCAB to delay payments and destroy CPM, other

6  companies who assist physicians with their in-office medication dispensing

7  programs and the physician in-office medication dispensing market.

8  38.  BH and Zenith conspired and engaged in concerted effort with each

9  other and with other insurance carriers such as Everest to ultimately put CPM, and

10  other companies who assist physicians with their in-office medication dispensing

11  programs, out of business.

12  39.  An informant has been the source of much information that is

13  contained in this complaint.

14  40.  Beginning in or about 2007, managers of BH, Zenith and Everest

15  began discussing how they intended to put CPM, and other companies who assist

16  physicians with their in-office medication dispensing programs, out of business.

17  For instance, on information and belief, Scott B. Marshall, vice president of claims

18  at American Commercial Claims Administrators, Inc. ("ACCA") and later a vice

19  president in the claims department at Berkshire Hathaway Homestate Companies

20  ("BHHC"), Matt Hopkins, Director of the Special Investigations Unit ("SIU") at

21  BHHC, Jenna Conner, member of the SIU at BHHC, Linda Stettler, claims

22  supervisor at ACCA and then at BHHC, and Andre Cinco, claims manager at

23  Everest, conducted meetings or otherwise regularly communicated about their

24  dislike of the repackaged medication business and about their animosity for

25  companies who were smart enough to repackage medications.  On information and

26  belief, William Reynolds, Senior Healthcare Investigator at Zenith, and head of

27  Zenith's SIU, periodically met or otherwise communicated with his counterpart at

28  BHHC, Hopkins.  On information and belief, Marshall, Hopkins, Conner, Stettler,

Cinco, and Reynolds, among others, made an agreement to ultimately put these companies out of business by utilizing tactics in concert with other carriers, such as improperly denying and delaying payment to them for bills submitted and wrongfully refusing to pay their liens.

41.    On information and belief, these individuals agreed and pledged to engage in the conduct described herein, in a concerted effort, because they believed that a single insurance company acting alone might not be able to ultimately put companies like CPM out of business.  On information and belief, they agreed to carry out a consistent, systematic and uninterrupted program of objecting to and opposing the bills and liens of CPM and other companies who assist physicians with their in-office medication dispensing programs, with or without probable cause and regardless of the merits of each lien.

42.    In or about 2007, managers at BHHC and ACCA began developing a list of "blocked vendors" whom they vowed to ultimately put out of business because they did not like the fact that companies, such as CPM, were successful in the business of assisting physicians with their in-office medication dispensing programs.  The block list included most, if not all, of the vendors (including CPM) engaged in the business of assisting physicians with their in-office medication dispensing programs for injured workers in workers' compensation cases before the WCAB.  Once a vendor was included on the block list, the claims examiners no longer had the authority to pay bills and liens submitted by that vendor.  If a blocked vendor's tax identification number was entered by the claims examiner into the BHHC/ACCA system, that system automatically blocked payment to the blocked vendor unless the block was overridden by a supervisor like Jenna Connor.  Plaintiff CPM was on this block list.  Thus, rather than investigate in good faith the individual claims submitted by CPM and the other blocked vendors, BHHC and ACCA instituted a policy of automatically and presumptively denying in full all claims submitted by the blocked vendors without conducting any good faith

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  investigation into the merits of the individual claims themselves.   This block list

2  was updated periodically to include additional companies and, on information and

3  belief, the list or its content was distributed to other workers' compensation carriers

4  so as to effectuate and implement the group boycott/concerted refusal to deal.

5  Although additional vendors were periodically added to the block list, upon

6  information and belief, once a vendor was added to the block list, it was never

7  removed.

8        43.    When numerous companies like CPM, that are engaged in business of

9  assisting physicians with their in-office medication dispensing programs are placed

10  on the block list, the group boycott/concerted refusal to deal disadvantages

11  competitors and competition.   By implementing such a discriminatory payment

12  policy, Zenith and BH have effectively discouraged doctors from doing business

13  with CPM and similar companies.   Not only do such practices discourage doctors

14  from engaging CPM and other competitors, but such practices will ultimately put

15  CPM and others on the block list out of business.

16        44.    The block list was given to BHHC and ACCA managers and claims

17  personnel, including a confidential informant, the managers and claims personnel

18  were instructed not to pay any claim submitted by CPM or any other vendor

19  appearing on the block list.

20        45.    On information and belief, which belief is based upon the activity of

21  Reynolds, the conduct described above, and the informant's experience within the

22  workers' compensation insurance industry and as an employee at BHHC and

23  ACCA during the time period in which BHHC and ACCA developed their block

24  list and held multiple meetings with Zenith, Zenith may have developed a similar

25  block list.   In addition, Zenith stopped paying all claims submitted by CPM at or

26  around the same time that BH stopped paying all claims submitted by CPM.

27        46.    On information and belief, Zenith and BH were aware of each other's

28  efforts because of communications between Hopkins and Reynolds, or others.   On

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

1    information and belief, sometime in 2009 Reynolds left Zenith and began to work

2    for BHHC.

3          47.    On information and belief, Zenith and BH believed that other

4    insurance carriers would learn about which medical providers were on their block

5    lists and would also begin to wrongly object and cease to pay CPM and other

6    companies who assist physicians with their in-office medication dispensing

7    programs, in order to choke off their cash flow and ultimately drive them all out of

8    business.

9          48.    Robert Darby, president of American All Risk Insurance Services, Inc.

10   ("AARIS") and ACCA, and, on information and belief, who heads up BHHC in

11   San Francisco, wanted BHHC to be like Zenith and to emulate the Zenith model of

12   doing business.  The Zenith model of doing business consists of providing spurious

13   objections as a means to deny payment for valid bills and liens.  On information

14   and belief, Darby was intimately familiar with these methods, because he either

15   worked with and/or knew Stanley Zax, the Chairman and President of Zenith.

16         49.    Starting in approximately 2007-2008, adjustors for Zenith and BH

17   systematically began denying CPM charges, violating their above-described duties

18   on a massive scale and offering fraudulent explanations for denying all CPM bills

19   and liens for medications dispensed to injured workers in over 800 currently

20   pending WCAB cases.  Zenith's and BH's adjustors sometimes refused to speak

21   with CPM collectors and, when they did, offered to pay $0 or $1, or referred CPM

22   collectors to outside attorneys who claimed not to have the file and who never

23   called back.  Zenith and BH were initially engaged in a concerted, blanket denial of

24   valid bills and liens submitted by CPM on behalf of its contracted physicians for

25   tens of thousands of needed medications dispensed to over 800 injured workers;

26   however, Zenith and BH gave the fraudulent impression that it was business-as-

27   usual and that they were simply objecting to individual claims on a variety of

28   grounds, including failure to obtain appropriate signatures, among others, with the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1    intent of resolving the objections in good faith.  In truth and in fact as Zenith and

2    BH well knew, all of the initial objections were part of a preplanned scheme and

3    concerted action to defraud CPM and other companies who assist physicians with

4    their in-office medication dispensing programs, and to destroy the physicians' in-

5    office medication dispensing market.  Zenith's and BH's classic lulling activity

6    disguised the group boycott of/concerted refusal to deal with CPM and other

7    companies who assist physicians with their in-office medication dispensing

8    programs as a legitimate, routine evaluation of claims, and bought Zenith and BH

9    considerable time in delaying payment, while lulling CPM into a serious cash flow

10    crunch which jeopardizes its existence, the existence of other companies who assist

11    physicians with their in-office medication dispensing programs and the market for

12    physician in-office medication dispensing programs.

13         50.      Zenith and BH are wrongfully withholding millions of dollars in

14    workers' compensation premium revenue set aside for and rightfully owed to

15    injured workers and their physicians and that Zenith and BH have a legal duty to

16    pay, on false pretenses.  CPM's annual collection on Zenith claims has been

17    reduced from a 70% recovery to the most recent annual rate of 14%.  CPM's annual

18    collection on BH claims has been reduced from a 76.3% recovery to the most recent

19    annual rate of 0.05%.  Such a catastrophic collection shortfall jeopardizes CPM's

20    existence, as well as the existence of other companies who assist physicians with

21    their in-office medication dispensing programs and the market for physicians' in-

22    office medication dispensing programs.

23         51.      Zenith's and BH's adjustors for the most part have refused to discuss

24    CPM bills and liens with CPM collectors.  On the few occasions when CPM

25    collectors got Zenith's and BH's adjustors to discuss CPM bills and liens, Zenith's

26    and BH's adjustors offered $0 or $1 and claimed that they will take all CPM bills

27    and liens to trial.  Only recently, in response to this action, did Zenith start making

28    higher payments on a limited number of CPM claims.  The California workers'

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1   compensation system is a very slow moving system that does not have the

2   resources to try every one of the thousands of CPM bills and liens.  It relies on

3   settlement and on the duty of insurers and claims companies to negotiate injured

4   worker claims in good faith.  By refusing to pay or negotiate, Zenith and BH delay

5   resolution of CPM bills and liens for years in an attempt to avoid payment

6   altogether.  Zenith and BH are deliberately making collection of CPM bills and

7   liens cost-prohibitive and are deliberately hindering CPM and other companies who

8   assist physicians with their in-office medication dispensing programs' cash flow in

9   order to avoid payment and to ultimately drive CPM and other companies who

10   assist physicians with their in-office medication dispensing programs out of

11   business.  Zenith and BH also have the benefit of retaining the money for a longer

12   period of time and, thus, reaping the time-value of the money, including interest, to

13   which they are not entitled.  By delaying and avoiding payment of lawful bills and

14   liens, Zenith and BH have withheld premium revenue based on false pretenses that

15   they were objecting and negotiating in good faith, had investigated in good faith

16   and were seeking resolution in the WCAB proceedings in good faith, when in truth

17   and in fact, they were not.

18          52.     Zenith and BH have no genuine interest in obtaining speedy resolution

19   of their objections.  If they did, they could litigate those objections promptly in any

20   single WCAB case.  Zenith's and BH's objective is delay.  BH entities ACCA and

21   BHHC have been the claims administrator for Everest's claims.  As alleged above,

22   Zenith filed a petition in the WCAB to consolidate and to stay all CPM liens with

23   Zenith based on issues never presented in Zenith objection letters.  Everest did the

24   same thing as Zenith.  Zenith's and Everest's objections stated in their

25   consolidation petitions were frivolous and based on facts not reasonably open to

26   dispute which it would have known are false if Zenith,  and ACCA or BHHC

27   adjustors had not refused to speak with CPM collectors.  BH filed a petition for

28   joinder in Zenith's and Everest's petitions for consolidation, seeking to stay all

1    CPM liens with BH entities, yet the issues it sought to raise were never raised by

2    BH in its objection letters.  The Zenith/Everest/BH petitions prove that their

3    objection letters in individual cases were a sham.

4          53.    The Zenith/Everest/BH petitions for consolidation were and are

5    completely frivolous and based on obvious misrepresentations of fact.  (When CPM

6    is able to actually get its case heard before the WCAB, it generally prevails at 100%

7    of the fee schedule).  The Zenith/Everest/BH petitions claimed that CPM is

8    operating a pharmacy but completely failed to acknowledge that California

9    specifically authorizes physician in-office medication dispensing drugs, which

10   California courts have held is not operating a retail pharmacy that would require

11   licensing by the Board of Pharmacy.  As already noted, CPM's licensing status is

12   not a valid objection to physician liens.  Zenith/BH/Everest were not injured by

13   CPM's licensing status and had no standing to assert an objection based on CPM's

14   licensing status.  The Zenith/Everest/BH petitions alleged that CPM sold drugs to

15   its physicians but CPM neither purchased drugs (its contracting physicians did) nor

16   resold drugs to its physicians and thus could not be a wholesaler.  The

17   Zenith/Everest/BH petitions asserted that CPM was a repackager and wholesaler

18   but CPM physicians purchased their medications from a third-party wholesaler, not

19   from CPM, and those medications were delivered directly to the physicians, not to

20   CPM which never took title to or possession of the drugs, and did not package or

21   repackage anything.  The Zenith/Everest/BH petitions asserted that CPM

22   employees dispensed medications but the pharmacy technicians were not CPM

23   employees; they were the physicians' leased employees from a third-party registry.

24   The Zenith/Everest/BH petitions say that the pharmacy technician does not notify

25   or allow patients to obtain their prescriptions elsewhere but every patient receives

26   the notice required by law.  The Zenith/Everest/BH petitions accused CPM of price

27   gouging but CPM charged exactly the price authorized by statute.  The

28   Zenith/Everest/BH petitions asserted illegal referral and kickback arrangements, but

1    there was no referral and a percentage compensation arrangement is a standard

2    arrangement authorized by California Business and Professions Code Section

3    650(b).  The assertion that physicians may not profit from the sale of drugs is

4    frivolous – California Business and Professions Code Section 4170(a) and

5    California courts applying that statute specifically have held that physicians may do

6    so.

7           54.    Zenith/Everest/BH knew that their allegations in their petitions were

8    frivolous and either knew that the factual premises are plainly false or would have

9    learned that these facts are false if they had not refused to speak with CPM

10   collectors, in violation of their duty to investigate and their duty to deal fairly with

11   claimants.  Zenith/Everest/BH were not interested in the truth or even in resolution

12   of the issues presented in their petitions.  They filed their petitions for delay and to

13   destroy CPM.  They win by delay even if its objections ultimately are rejected or

14   there is no resolution at all.

15          55.    There was also no physician self-referral violation as to CPM because

16   there was no pharmacy and there was no referral and all patients were advised in

17   writing that they can obtain their prescriptions elsewhere.  There was no legal

18   requirement that its contracted physicians obtain prior authorization before

19   dispensing medications to injured workers who need them.  There was no

20   requirement that the physician or CPM be licensed by the Board of Pharmacy -

21   physicians are authorized by law to dispense medications to their own patients in

22   their own offices pursuant to California Business and Professions Code Section

23   4170(a).  Neither CPM nor its contracted physicians were selling medications to the

24   general public or operating a pharmacy; they therefore did not need to be licensed

25   as a pharmacy.  CPM contracted physicians are governed by the California Medical

26   Board, not the Board of Pharmacy.  Everything done by CPM or by pharmacy

27   technicians was done under the supervision of the contracting physician.  CPM did

28   not purchase medications (its contracting physicians did) or resell medications to its

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

contracting physicians.  Zenith's and BH's unlicensed pharmacy contentions were also frivolous and irrelevant because CPM's licensing could have no effect on the validity of physician liens.  That would be like saying a physician cannot recover for X-rays because the company that sold the machine did not have a business license.  CPM's licensing status caused no injury to Zenith or BH because it did not affect the price or necessity of medications.  Thus, Zenith and BH plainly had no standing to assert their unlicensed pharmacy objection as an objection to the bills and liens of CPM contracting physicians.

56.     Zenith and BH were and are fully aware that CPM bills and liens for medications are lawful because they are reserving CPM bills and liens for significant amounts that affect the premiums of their contracting employers while maintaining that CPM bills and liens are valueless.  Zenith and BH have also offered to pay drastically reduced amounts on certain claims which show Zenith's and BH's knowledge that their claims of illegality concerning the physician in-office medication dispensing program are bogus.  There is no legal or factual basis for Zenith and BH's group boycott of/concerted refusal to deal with CPM bills or liens, and the grounds stated in objection letters and in WCAB proceedings are not the true reasons for the refusal to pay or negotiate.  The true reason is that Zenith and BH are working in concert to withhold premium revenue for as long as possible and to avoid payment altogether, and to destroy CPM; the in-office medication dispensing programs of its contracting physicians; other companies that assist physicians with their in-office medication dispensing programs; and the market for physician in-office medication dispensing programs.  Zenith and BH claim companies do the same with self-insured customers to retain their business.

57.     Consolidation proceedings in the WCAB take years and can result in the bankruptcy of providers and/or their management companies without ever achieving any resolution.  Other insurers aware of a consolidated proceeding may seek to join and stay payment of all their liens too, which further jeopardizes a

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1    provider's economic viability.  Still other insurers simply delay and refuse to pay in

2    hopes that the provider and/or management company will go under.  In one recent

3    case, a consolidated proceeding was reversed on appeal by a WCAB panel after *five*

4    *years*.  Insurers are aware of the leverage given to them by consolidated

5    proceedings and regularly seek to abuse that process.  The WCAB requires no

6    showing of likelihood of success, declarations or evidence before ordering a

7    consolidation or stay.  Simply a listing of common issues by insurers will do.  The

8    Zenith/Everest/BH petitions conjure up every conceivable theory without regard to

9    the merits because they know that, because the issues raised will take years to

10   resolve, the process itself will destroy CPM and Zenith/Everest/BH will avoid

11   payment altogether.

12          58.    Zenith has been acting in concert with Everest and BH, to put CPM,

13   and other companies who assist physicians with their in-office medication

14   dispensing programs, out of business.  Zenith and BH also hoped and expected that

15   other workers' compensation insurers and administrators would begin to object to

16   CPM bills, and to those of other companies who assist physicians with their in-

17   office medication dispensing programs.  It is no coincidence that BH too began

18   objecting to CPM bills and liens around the same time that Zenith began doing so

19   and on the same basis.  As discussed above, Zenith filed a petition to consolidate

20   CPM liens and to stay all its CPM liens, raising essentially the same issues as

21   Everest, and BH joined in those petitions.  Zenith's petition simply lists issues.  The

22   California Supreme Court, in upholding antitrust and RICO claims against

23   conspiring insurers, declared that no insurance company has a legitimate interest in

24   the claims of another insurance company.  *Charles J. Vacanti, M.D., Inc. v. State*

25   *Comp. Ins. Fund*, 24 Cal. 4th 800 (Cal. 2001).  Zenith's collaboration with BH and

26   Everest in this case is illegal under *Vacanti* and yet another example of more

27   litigation misconduct.

28   //

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

59.     *Vacanti* is testament to the high level of insurer abuse at the WCAB. In that case, insurers conspired together to create a hit list of providers to be destroyed through a sham litigation campaign of fraudulent objections, and succeeded in their objective.  Zenith was a defendant in a companion case alleging the same conduct.

60.     In addition to filing a petition for consolidation in the WCAB to litigate the same issues raised by Everest/BH, Zenith also has filed a Los Angeles Superior Court suit seeking restitution of $2.3 million already paid on CPM liens and avoidance of payment on the $1 million in pending liens, on the same issues. Zenith, in other words, is attempting to litigate the same issues in two different forums at the same time.  Zenith's Superior Court lawsuit is barred because the WCAB has exclusive jurisdiction over lien claims, and no restitution is permitted. This is yet another example of Zenith using frivolous litigation to destroy a lien claimant that has been "put in play."

61.     Zenith and BH are intent on CPM's destruction because they believe that, if they succeed in destroying CPM, they also will succeed in ending all physician in-office medication dispensing programs for injured workers in workers' compensation cases.  Zenith, along with other insurance companies such as BH and Everest, then, use the *process* of litigation, rather than its *outcome*, to achieve an unlawful objective, which constitutes a fraud on the WCAB, as well as CPM.

### Harm to Competition and Harm to Consumers

62.     As outlined above, the financial effect of Zenith's and BH's fraudulent conduct is devastating to the cash flow of CPM, and to other companies that assist physicians with their in-office medication dispensing programs.  In reliance on the fraudulent objections of Zenith and BH, CPM has hired attorneys and incurred substantial attorneys' fees.  Also, CPM and its contracting physicians now carry longstanding receivables that must be financed at considerable interest expense because of Zenith's and BH's blanket refusals to pay.  The outstanding balance on

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

1   all combined CPM bills and liens with Zenith and BH is in the millions of dollars.

2   The inability to collect on bills and liens makes it more difficult to borrow for

3   ongoing operations and reduces the value of the company.  Success of Zenith's and

4   BH's scheme to withhold payment on CPM bills and liens on false pretenses could

5   severely damage the future of not only CPM, but every other company that assists

6   physicians with their in-office medication dispensing programs.  Destruction is

7   Zenith's and BH's unlawful objective - to delay payment as long as possible and

8   ultimately avoid payment altogether, regardless of merit.  Zenith and BH do not like

9   the in-office medication dispensing business and are engaging in concerted action

10  with other carriers to destroy CPM and any other companies like CPM.

11      63.    CPM and other companies that assist physicians with their in-office

12  medication dispensing programs are not the only parties injured as a result of BH

13  and Zenith's concerted action.  BH and Zenith's actions are intended to injure, and

14  have the effect of injuring, physicians as well as the patient-workers who require

15  mediation.  The physicians are harmed because they no longer will have the option

16  of offering an in-house medication dispensing program needed by their patients.

17  The physician's ability to provide prompt, responsive treatment to injured workers

18  is compromised and obstructed.  The patient-workers are harmed by BH and

19  Zenith's action because, in the absence of the in-office medication dispensing

20  program, those patient-workers are deprived of their statutory right to choose

21  between obtaining their needed mediations from either their doctor or from a

22  pharmacy.  Those worker-patients are forced to patronize the pharmacies, which

23  may be difficult to access.  Many pharmacies do not accept workers' compensation

24  claims.  As such, BH and Zenith's actions will have the effect of severely crippling

25  or eliminating access to medications for worker-patients.  In addition, many injured

26  workers who require medication under the workers' compensation program have

27  limited mobility, rendering the in-office medication dispensing program an

28  essential option for them.  Finally, the actions of BH and Zenith may force injured

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1 | worker patients to obtain medications from only one source – mail order

2 | pharmacies owned and/or controlled by the insurance industry, including, on

3 | information and belief, BH and Zenith.

4 |      64.    Zenith and BH have enormous resources and are using those resources

5 | in major assault on physician in-office medication dispensing programs authorized

6 | by California Business and Professions Code 4170(a).  The massive violations of

7 | California workers' compensation law by Zenith and BH undermine and are

8 | contrary to California public policy in favor of treating and relieving the

9 | occupational injuries of workers.

10 | **E.**    **RICO Enterprises**

11 |      65.    At all relevant times herein, Zenith and BH, and each of them, engaged

12 | in a pattern of racketeering activity (mail fraud and wire fraud) through a number of

13 | different "enterprises" within the  meaning of 18 U.S.C. § 1961(4) in violation of

14 | 18 U.S.C. §§ 1962(a), (c) and (d):

15 |         a.    Each employer engaged in interstate commerce or whose

16 | activities affect interstate commerce contracting with a BH defendant or Zenith

17 | defendant to conduct and participate in their workers' compensation affairs either as

18 | an insurer or a third party administrator is a RICO enterprise.

19 |         b.    Each defendant is a RICO enterprise.

20 |         c.    The persons with decision-making power at each employer

21 | contracting with a BH entity to conduct their workers' compensation affairs and the

22 | persons with decision-making power at each contracting BH entity together form an

23 | association-in-fact enterprise for RICO purposes.

24 |         d.    The persons with decision-making power at each employer

25 | contracting with a Zenith defendant to conduct their workers' compensation affairs

26 | and the persons with decision-making power at each contracting Zenith defendant

27 | together form an association-in-fact enterprise for RICO purposes.

28 |

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -

1        e.     Each employer and contracting BH entity together form an

2 association in fact enterprise, and each employer and contracting Zenith defendant

3 together form an association in fact enterprise.

4        f.     Redwood, Cypress and Oak River, together with three additional

5 non-defendant carriers, form an association-in-fact enterprise for RICO purposes, to

6 wit, defendant BHHC.

7        g.     BH and AARIS, ACCA and National Liability, together with at

8 least seven additional non-defendant carriers, form an association-in-fact enterprise

9 for RICO purposes known as the National Indemnity Group, which is not a formal

10 legal entity or corporation. The companies comprising the National Indemnity

11 Group enterprise sell excess and reinsurance contracts, commercial multi-peril,

12 medical malpractice, aircraft, commercial auto, workers' compensation and other

13 insurance in numerous states and worldwide. In addition to selling insurance,

14 members of the National Indemnity Group provide insurance brokerage and claims

15 administration services to employers and to BH IC and other Berkshire Hathaway

16 entities. The National Indemnity Group has its offices, employees, and agents

17 in many states - in California, in San Francisco, Valencia, Clovis, Fresno and

18 Stockton. The National Indemnity Group directs, controls, coordinates and

19 participates in the operations of the companies within the Group. Donald Wurster

20 who manages and operates the Group's commercial insurance and general liability

21 operations is also President of several of the insurance companies within the Group,

22 including defendant National Liability. Robert Darby is President and manager of

23 several of the non-insurance companies within the National Indemnity Group,

24 including BH and Zenith AARIS and ACCA, which provide services to the

25 National Indemnity Group and BHHC.

26        h.     All of BH, and the larger BH association in fact enterprise

27 groups to which they belong, are part of an association in fact enterprise known as

28 the Berkshire Hathaway Insurance Group, which is not a  legal entity or

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1  corporation.  The companies comprising the Berkshire Hathaway Insurance Group

2  sell many forms of property and casualty, workers' compensation and excess and

3  reinsurance business throughout the United States and abroad.  The members of the

4  Berkshire Hathaway Insurance Group collected $15 billion in direct premiums in

5  2007.  The Berkshire Hathaway Insurance Group directs, controls, coordinates and

6  participates in the operation of all BH insurance entities and groups, including the

7  workers' compensation operations of those entities and groups.  The administrative

8  affairs of the Berkshire Hathaway Insurance Group and its members are managed

9  by, among others, Rodney Eldred and Donald Wurster.  The headquarters of

10  Berkshire Hathaway Insurance Group is located in Omaha, Nebraska.

11          i.      Defendants ACCA and/or BHHC, on the one hand, and Everest

12  National Insurance Company, on the other, for which ACCA and/or BHHC has

13  served as a third-party claims administrator, together constitute and association-in-

14  fact enterprise.

15          j.      The BH entities and Defendant insurers Zenith Insurance

16  Company and ZNAT Insurance Company together constitute an association-in-fact

17  enterprise

18          k.      ZIC and ZNAT form an association in fact enterprise known as

19  Zenith Insurance Group ("ZIG") which is not a legal entity or corporation.  ZIG is

20  led by ZIC.  ZIG directs, controls, coordinates and participates in the operations of

21  ZIC and ZNAT.

22          l.      Zenith, Everest and BH together constitute an association-in-fact

23  enterprise.

24          66.     Each of the enterprises described above operate in and affect interstate

25  commerce.  Defendants are national in scope and operation, as are the groups in

26  which each is a member.  Defendants also sold and adjusted claims for workers'

27  compensation insurance to interstate and international companies, many of which

28  do business in other states and countries, or to California companies doing business

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

interstate and internationally.  Defendants and the enterprises through which they

conduct their pattern of racketeering activity routinely transfer funds to banks

located outside of California.

## FIRST CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c) By All

### Defendants - Mail Fraud And Wire Fraud)

67.    Plaintiff CPM hereby incorporates by reference as though fully set

forth in full herein, paragraphs 1 through 66 of the Fourth Amended Complaint,

inclusive.

68.    At all relevant times, Zenith and BH, and each of them, were persons

within the meaning of U.S.C. § 1961(3).

69.    At all relevant times herein, Zenith and BH, and each of them, have

carried out a scheme to defraud CPM, its contracting physicians and the WCAB by:

(a)    initially lulling CPM into believing that Zenith and BH

had legitimate objections to individual claims, had investigated the claims in good

faith, and were communicating their objections in order to resolve claims in good

faith, when in truth and in fact as Zenith and BH well knew, Zenith and BH simply

intended to destroy CPM, and other companies that assisted physicians with their

in-office medication dispensing programs;

(b)    initially lulling CPM into believing that Zenith and BH

were invoking the WCAB procedures in good faith to resolve claims, when in truth

and in fact as Zenith and BH well knew, Zenith and BH simply intended to destroy

CPM, and other companies that assisted physicians with their in-office medication

dispensing programs;

(c)    defrauding the WCAB by pretending to use the WCAB

procedures and consolidation process in order to resolve lien disputes, when in truth

and in fact as Zenith and BH well knew, Zenith and BH were not interested in the

actual *outcome* of WCAB proceedings or lien disputes, but simply interested in

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

1   abusing the *process* of the WCAB to delay payments and destroy CPM, and other

2   companies that assisted physicians with their in-office medication dispensing

3   programs.

4          70.    Zenith and BH, and each of them, conducted, operated, managed,

5   directed, controlled and participated in the workers' compensation activities of the

6   enterprises described in paragraph 41 through a pattern of racketeering activity

7   within the meaning of 18 U.S.C. § 1961(B) and (5) and 18 U.S.C. § 1962(c), by

8   multiple related acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud

9   in violation of 18 U.S.C. § 1343, amounting to or posing a threat of continuing

10  criminal activity

11         71.    At all relevant times, all named defendants committed repeated and

12  continuing acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1341 and §

13  1343 through the legal and association-in-fact enterprises alleged above in

14  paragraph 41.  Zenith and BH put forth their objections to CPM bills and liens in

15  writing through the U.S. mails or by telephone, and communicated with each other

16  in writing through the U.S. mails and electronically in carrying out their fraudulent

17  scheme to delay and deny payment of CPM bills and liens submitted on behalf of

18  its contracting physicians.  These acts of mail fraud and wire fraud constitute a

19  pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

20         72.    At all relevant times, the above-described fraudulent scheme and

21  illegal predicate acts in furtherance of that scheme toward CPM is an ongoing

22  pattern of racketeering activity so that there is a continuing threat that they will in

23  the future engage in similar predicate acts in furtherance of their fraudulent scheme

24  and in the operation, management and direction of all the enterprises and the

25  conduct of their affairs, as to CPM.

26         73.    By reason of the violation of 18 U.S.C. § 1962(c) described above,

27  CPM has been and will continue to be injured in its business and property in an

28  amount in excess of this Court's jurisdiction to be determined at trial.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

## SECOND CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(d)

### By All Defendants – Conspiracy)

74.     Plaintiff CPM hereby incorporates by reference as though fully set forth in full herein, paragraphs 1 through 73 of the Fourth Amended Complaint, inclusive.

75.     By virtue of the conduct described above, Zenith and BH, and each of them, conspired with each other to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  At all relevant times, the above-described fraudulent scheme and reliance on illegal predicate acts in furtherance of that scheme toward plaintiff is an ongoing pattern of racketeering activity so that there is a continuing threat that they will in the future engage in similar predicate acts in furtherance of their fraudulent scheme and in the operation, management and direction of all the enterprises and the conduct of their affairs, as to plaintiff.

76.     By reason of the violation of 18 U.S.C. § 1962(d) described above, CPM has been and will continue to be injured in its business and property in an amount in excess of this Court's jurisdiction to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act By All Defendants - Conspiracy)

77.     Plaintiff CPM hereby incorporates by reference as though fully set forth in full herein, paragraphs 1 through 76 of the Fourth Amended Complaint, inclusive.

78.     For purposes of antitrust analysis, the relevant market is the in-office medication dispensing market in the State of California; and additionally, or in the alternative, the relevant market is the market that includes (a) traditional pharmacies that dispense medication to injured workers in workers' compensation cases, and (b) pharmacy management companies like CPM that assist physicians

79.    with their in-office medication dispensing programs for injured workers in workers' compensation cases (collectively, the "Pharmacy/Pharmacy Management Market").

80.    Defendants possess a dominant market position and influence and direct the conduct of all carriers in the workers' compensation field.

81.    Beginning at the time the precise date of which is unknown to Plaintiff and continuing up to and including the date of this Fourth Amended Complaint, Zenith and BH have engaged in a horizontal combination and conspiracy the purpose of which was and is an unlawful or improper group boycott or concerted refusal to deal with Plaintiff and others in the same business as Plaintiff, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

82.    Zenith's and BH's unlawful combination and conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), or in the alternative, violates Section 1 under a Rule of Reason analysis.

83.    As part of the combination and conspiracy to illegally fix payment terms and/or engage in a concerted refusal to deal with Plaintiff and others in the same business as Plaintiff, Zenith and BH have agreed upon and implemented, *inter alia*, the following practices:

a.    Developing block lists comprised of numerous companies that they vowed to destroy by way of a group boycott/concerted refusal to deal because they did not like the fact that these companies, such as CPM, were successful in the business of assisting physicians with their in-office medication dispensing programs;

b.    Uniformly changing payment policies by refusing to pay and announcing they will not pay in a timely manner the legitimate bills and liens of Plaintiff and others in the same business as Plaintiff for tens of thousands of needed medications prescribed and dispensed to injured workers, in departure from BH and Zenith's previous practices and from general industry practice, in order to increase

1   the costs of Plaintiff and others in the same business as Plaintiff, inflict severe

2   financial injury and ultimately drive them out of business;

3              c.      Uniformly making sham or pretextual objections to bills and

4   liens for medication submitted by and through Plaintiff and others in the same

5   business as Plaintiff and characterizing the bills and liens as false or fraudulent,

6   without justification, individual investigation or knowledge of the merits of the bills

7   or liens.

8              d.      Adopting virtually identical policies to the effect that

9   communications with Plaintiff and others in the same business as Plaintiff

10  regarding their bills and liens could only be made in writing and not by telephone

11  or by referring calls to outside attorneys who claimed not to have the file and who

12  never called back.  This is a significant departure from BH and Zenith's previous

13  practices and from general industry practice, and is calculated to increase the costs

14  of doing business for Plaintiff and others in the same business as Plaintiff, delay the

15  negotiation and payment of legitimate bills and liens, inflict severe financial injury

16  and ultimately drive Plaintiff and others in the same business as Plaintiff out of

17  business, in that Plaintiff and others in the same business as Plaintiff historically

18  have obtained the greater portion of their revenues from negotiations by telephone

19  with BH and Zenith's claim personnel;

20             e.      Significantly changing historic patterns of litigation of claims

21  before the WCAB by uniformly stating that all cases would be taken to court, by

22  significantly increasing the number of cases challenged or litigated, and by making

23  the WCAB litigation more expensive and burdensome in an effort to financially

24  harm Plaintiff and others in the same business as Plaintiff and ultimately drive them

25  out of business;

26             f.      Seeking to encourage other insurers and employers such as

27  Everest to join in BH and Zenith's illegal practices, including BH and Zenith's

28  refusals to settle liens, talk to, or deal with Plaintiff and others in the same business

1  as Plaintiff, and delay payment of or refuse to pay their bills and liens, in order to

2  substantially harm them;

3          g.     Seeking to encourage other insurers and employers such as

4  Everest to join in BH and Zenith's illegal practices, including BH and Zenith's

5  refusals to settle bills and liens, talk to, or deal with Plaintiff and others in the same

6  business as Plaintiff, by threatening, engaging in, and encouraging sham litigation

7  and its attendant publicity, which will seriously burden the administrative law and

8  judicial systems and is calculated to harm Plaintiff and others in the same business

9  as Plaintiff and ultimately drive them out of business;

10          h.     Seeking to encourage other insurers and employers such as

11  Everest to join in BH and Zenith's illegal practices, including refusals to settle bills

12  and liens, talk to, or deal with Plaintiff and others in the same business as Plaintiff,

13  by falsely and maliciously stating that Plaintiff and others in the same business as

14  Plaintiff are engaged in illegal or fraudulent business practices, which is calculated

15  to substantially harm Plaintiff and others in the same business as Plaintiff and

16  ultimately drive them out of business; and

17          i.     Communicating among BH and Zenith and with other insurers

18  and employers such as Everest through various means, concerning non-payment or

19  delayed payment as to Plaintiff and others in the same business as Plaintiff and

20  similar injurious activities.

21          84.    Plaintiff is informed and believes that BH and Zenith's actions are

22  directed at Plaintiff and others in the same business as Plaintiff, *inter alia*, the

23  following:

24          a.     With the intent to destroy the market for companies that assist

25  physicians with in-office medication dispensing programs, the California workers'

26  compensation insurance industry and various insurers, including BH and Zenith,

27  have engaged in substantial campaigns under the guise of attacking workers'

28  compensation "fraud," which have a significant chilling effect on legitimate

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 35 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1    workers' compensation claims to the substantial detriment of workers suffering

2    from injuries requiring medication and to the substantial detriment of Plaintiff and

3    others in the same business as Plaintiff who bill and collect for medication

4    dispensed to injured workers;

5              b.    BH/Everest and Zenith filed petitions in the WCAB to

6    consolidate and stay all Plaintiff's liens with the intent that prolonging resolution of

7    these liens in a consolidation proceeding for the indefinite future would cause

8    substantial prejudice to Plaintiff by choking off Plaintiff's cash flow and to

9    ultimately drive it out of business;

10             c.    Zenith filed a Superior Court suit raising the same issues raised

11   in their WCAB petition to consolidate which not only causes Plaintiff to incur

12   additional legal costs defending this frivolous lawsuit, but with the intent to

13   creating a significant chilling effect on Plaintiff and others in the same business as

14   Plaintiff who have been denied payment on valid bills and liens for medication

15   dispensed to injured workers; and

16             d.    Zenith and BH attempted to persuade law enforcement agencies

17   throughout the United States to investigate Plaintiff and others in the same business

18   as Plaintiff as part of a plan to intimidate them and ultimately drive them out of

19   business.

20        85.    Zenith's and BH's combination and conspiracy has been undertaken

21   for the purpose, and has had the effect of injuring competition in the market for

22   companies that assist physicians with in-office medication dispensing programs, as

23   follows:

24             a.    Companies that assist physicians with in-office medication

25   dispensing programs are important competitors in the market for specialized

26   medical services.  By engaging in an illegal agreement to refuse to deal with and to

27   fix the terms of payments to Plaintiff and others in the same business as Plaintiff,

28   BH and Zenith have substantially weakened said companies as competitors in the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 36 -

1    above-referenced market and have caused a substantial reduction in the output of

2    services provided by said companies in that market.  BH and Zenith's illegal

3    conduct threatens to eliminate Plaintiff and others in the same business as Plaintiff

4    as competitors and thereby further reduce the output of services in the market for

5    specialized medical services;

6              b.      Pursuant to their illegal agreement, BH and Zenith similarly are

7    refusing to deal with and are fixing the payment terms to others in the same

8    business as Plaintiff that specialize in assisting physicians with their in-office

9    medication dispensing programs.  In furtherance of this scheme, BH and Zenith

10   have filed sham litigation and pleadings containing false charges against several of

11   the largest of these companies that specialize in assisting physicians with their in-

12   office medication dispensing programs.  These companies have been substantially

13   weakened as competitors because they have suffered severe financial injury since

14   the conspiracy began and may ultimately be in danger of being driven out of

15   business as a result of BH and Zenith's actions.  These companies also have

16   rendered less assistance to physicians with their in-office medication dispensing

17   programs than they previously rendered, as a result of the illegal actions of BH and

18   Zenith.  This substantial weakening and potential elimination of important

19   competitors and the reduction in the output of services has injured competition in

20   the market for assistance with in-office medication dispensing programs;

21             c.      Many companies that provide assistance to physicians with their

22   in-office medication dispensing programs have experienced a significant reduction

23   in payments from insurers since the conspiracy began.  Several of these companies

24   may have gone out of business and may have been eliminated as competitors since

25   the beginning of BH and Zenith's illegal horizontal combination and conspiracy.

26   Insurers have refused to make payments to these companies in addition to CPM on

27   valid bills and liens and have been told by insurers that they would not negotiate

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 37 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1  regarding required payments of medical-legal liens until the underlying workers'

2  compensation case was settled;

3          d.    The *in terrorem* effect of BH and Zenith's improper actions

4  decreases the willingness of existing companies that assist physicians with their in-

5  office medication dispensing programs to expand their services, and deters potential

6  entrants from entering the market to provide similar services to physicians who

7  seek to set up in-office medication dispensing programs to administer to workers

8  seeking such medication as a result of employment-related injuries;

9          e.    By initiating baseless lawsuits and proceedings against Plaintiff,

10  alleging that Plaintiff is engaged in illegal or fraudulent business practices, BH and

11  Zenith are deterring other companies in the same business as Plaintiff from

12  submitting legitimate bills and liens because of the implicit threat that seeking

13  payment will result in the company being named as a defendant in a similar lawsuit;

14  and

15          f.    This injury to competition directly benefits BH and Zenith by

16  reducing the total number of legitimate bills and liens filed to which BH and Zenith

17  must make payments.  BH and Zenith also benefit from their illegal activities by

18  significantly strengthening their bargaining position in negotiations with companies

19  that assist physicians with in-office medication dispensing programs concerning

20  payments of bills and liens, due to the implicit threat that failure to accept offered

21  by BH and Zenith could result in the company becoming a victim of BH and

22  Zenith's concerted refusal to deal or conspiracy to fix payment terms, and by BH

23  and Zenith being able to attract additional business based on the small amounts they

24  are paying in claims.

25      86.    Additionally, or in the alternative, BH and Zenith's combination and

26  conspiracy has been undertaken for the purpose, and has had the effect, of injuring

27  competition in the market for workers' compensation insurance in the State of

28  California.  BH's and Zenith's illegal agreement constitutes a horizontal

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 38 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

1  combination among competitors at one level to influence coercively the trade

2  practices of companies that assist physicians with in-office medication dispensing

3  programs.  In the absence of the horizontal agreement and concerted effort, insurers

4  would compete with each other, subject to the market forces, by attempting to make

5  economically efficient decisions regarding the payment, compromise, or litigation

6  of bills and liens submitted to them by companies that assist physicians with in-

7  office medication dispensing programs.  In absence of illegal concerted behavior,

8  insurers would be subject to these market forces of competition, creating incentives

9  for them to pay proper bills and liens submitted by Plaintiff and other similarly

10  situated companies, to compromise other bills and liens and to incur the cost of

11  litigating only relatively few liens.  The illegal horizontal agreement among

12  insurers has the effect of suppressing competition among them with respect to

13  decisions regarding payment, negotiation and litigation of workers' compensation

14  medical bills and liens.  If the illegal horizontal agreement and concerted refusal to

15  deal were not in place, then carriers would compete with each other for business as

16  companies would want to sign policies with insurers that have a reputation for

17  paying promptly on claims.  BH and Zenith's illegal horizontal combination and

18  conspiracy is shown by, *inter alia*, the matters alleged above.

19      87.     Additionally, or in the alternative, for the same reasons identified in

20  the foregoing paragraphs, BH and Zenith's combination and conspiracy has been

21  undertaken for the purpose, and has had the effect, of injuring competition in the

22  market Pharmacy/Pharmacy Management Market.  BH and Zenith's combination

23  and conspiracy is intended to and has the effect of ensuring that CPM and similar

24  companies cannot compete with licensed pharmacies.  Under BH and Zenith's

25  combination and conspiracy, not only will CPM suffer, but doctors and patients will

26  be injured because the in-office medication dispensing program will be eliminated

27  and they will have no choice but to obtain needed medications from traditional

28  pharmacies.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 39 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

88.     Thus, the actions taken by BH and Zenith to exclude CPM and similar companies from the market do not enhance competition or promote efficiency or innovation within the market.  Instead, those actions reduce competition and are not justified or justifiable by any possible pro-competitive effect.

89.     By reason of the violation of 15 U.S.C. § 1 described above, CPM has been and will continue to be injured in its business and property in an amount in excess of this Court's jurisdiction to be determined at trial.

90.     As a further result of the foregoing, CPM is entitled to treble damages, attorneys' fees, costs and interest pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15).

## FOURTH CLAIM FOR RELIEF

### (Violation of the Cartwright Act By All Defendants - Conspiracy)

91.     Plaintiff CPM hereby incorporates by reference as though fully set forth in full herein, paragraphs 1 through 89 of the Fourth Amended Complaint, inclusive.

92.     Pursuant to Sections 16700 – 16761 of the Business and Professions Code of the State of California ("Cartwright Act"), as a claim supplemental to Claim Three of this Complaint, Plaintiff brings this Fourth Claim to obtain damages and injunctive relief from Zenith pursuant to Section 16750 of the Business and Professions Code, as hereinafter alleged.

93.     By reason of the violation of the Cartwright Act described above, CPM has been and will continue to be injured in its business and property in an amount in excess of this Court's jurisdiction to be determined at trial.

94.     As a proximate result of all of the above-described conduct of defendants, and each of them, CPM's business has been severely damaged and may be ultimately destroyed, and CPM has sustained severe emotional distress and has incurred attorney's fees, all to CPM's damage.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

- 40 -

FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]

## PRAYER FOR RELIEF

WHEREFORE, plaintiff CPM prays for judgment against defendants and each of them, as to all causes of action as follows:

1.      Compensatory damages, according to proof at trial;

2.      Treble damages;

3.      Permanent injunctive relief;

4.      Costs and expenses of suit;

5.      Interest;

6.      Reasonable attorneys' fees;

7.      Such other and further relief as the Court may deem just and proper.


Dated:  June 21, 2010                              Respectfully submitted,

                                                   **ARENT FOX LLP**
                                                   Terree A. Bowers

                                                   **NORRIS & GALANTER LLP**
                                                   Donald G. Norris


                                   By:    _Terree A. Bowers_
                                          Terree A. Bowers
                                          Attorneys for Plaintiff
                                          California Pharmacy Management, LLC

**FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL RACKETEER INFLUENCE AND CORRUPT
ORGANIZATIONS ACT, SHERMAN ACT AND CARTWRIGHT ACT - [Case No. SACV-09-0242 DOC (ANx)]**

California Pharmacy Management v. Zenith Insurance Company, et al.
USDC,Central District, Santa Ana Division
Case No. SACV 09-0242 DOC (ANx)

**PROOF OF SERVICE**

I am a citizen of the United States. My business address is ARENT FOX LLP, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013.  I am employed in the county of Los Angeles where this service occurs.  I am over the age of 18 years, and not a party to the within cause.

On the date set forth below, according to ordinary business practice, I served the foregoing document(s) described as:

**FOURTH AMENDED COMPLAINT FOR VIOLATION OF:  (1) FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"); (2) THE SHERMAN ACT; AND (3) THE CARTWRIGHT ACT**

**(BY FAX)** by transmitting via facsimile from facsimile number (213) 629-7401 the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.  A statement that this document was successfully transmitted without error is hereby attached to this Proof of Service.

X  **(BY MAIL)**  I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and that practice is that correspondence is deposited with the U.S. Postal Service the same day as the day of collection in the ordinary course of business.  On this date, I placed the document(s) in envelopes addressed to the person(s) listed below, or as stated on the attached service list and sealed and placed the envelopes for collection and mailing following ordinary business practices.

**(BY PERSONAL SERVICE)**  On this date, I delivered by hand envelope(s) containing the document(s) to the persons(s) listed below or as stated in the attached service list.

- 1 -

1

2

3

4

(BY OVERNIGHT DELIVERY)  On this date, I placed the documents in envelope(s) addressed to the person(s) listed below or as stated on the attached service list, and caused those envelopes to be delivered to an overnight delivery carrier, with delivery fees provided for, for next-business-day delivery to whom it is to be served.

5

6

**SEE ATTACHED SERVICE LIST**

7

8

9

**X**    (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under the penalty of perjury under the laws of the United States of America that the above is true and correct.

10

Executed on June 21, 2010, at Los Angeles, California.

11

12

13

14

Gwendolyn West

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>SERVICE LIST</u>

| | |
|---|---|
| Peter Roan, Esq.<br>proan@lockelord.com<br>Matthew B. McClendon, Esq.<br>mmcclendon@lockelord.com<br>Locke Lord Bissell & Liddell LLP<br>300 South Grand Avenue<br>Suite 2600<br>Los Angeles, CA 90071<br><br>(213) 485-1500<br>FAX: (213) 485-1200 | Dean Hansell, Esq.<br>dhansell@dl.com; eserrano@dl.com<br>Ella R. Serrano, Esq.<br>Dewey & Leboeuf LLP<br>333 South Grand Avenue<br>Ste. 2600<br>Los Angeles, CA 90071<br><br>(213) 621-6000<br>FAX: (213) 621-6100 |
| Lary Alan Rappaport, Esq.<br>lrappaport@proskauer.com<br>Proskauer Rose LLP<br>2049 Century Park East, 32nd Floor<br>Los Angeles, CA 90067<br><br>(310) 557-2900<br>FAX: (310) 557-2193 | |

- 3 -

PROOF OF SERVICE

ARENT FOX LLP
ATTORNEYS AT LAW
WASHINGTON

LA/262001.1