LARY ALAN RAPPAPORT (SBN 87614)
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, California 90067-3206
Tel:  (310) 557-2900 Fax:  (310) 557-2193
lrappaport@proskauer.com

DEAN HANSELL (SBN 93831)
ELLA R. SERRANO (SBN: 228216)
DEWEY & LEBOEUF LLP
333 South Grand Avenue, Suite 2600
Los Angeles, California  90071-1530
Tel:  (213) 621-6000 Fax:  (213) 621-6100
dhansell@dl.com; eserrano@dl.com

Attorneys for Defendants **ZENITH INSURANCE
COMPANY** and **ZNAT INSURANCE COMPANY**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA PHARMACY MANAGEMENT, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> ZENITH INSURANCE COMPANY, a California corporation; and ZNAT INSURANCE COMPANY, a California corporation, <br><br> Defendants. | Case No.  SA CV 09-0242 DOC(ANx) (Consolidated with Case No. SAC 09-141 DOC (ANx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION BY DEFENDANTS ZENITH INSURANCE COMPANY AND ZNAT INSURANCE COMPANY TO DISMISS THE THIRD AND FOURTH CLAIMS FOR RELIEF OF THE FOURTH AMENDED COMPLAINT** <br><br> Date:  August 23, 2010 <br><br> Time:  8:30 a.m. <br><br> Place:  Courtroom 9-D <br>            (Santa Ana) |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  STATEMENT OF FACTS.......................................................................4

    A.   The Complaint And First Amended Complaint.................................4

    B.   CPM Files A Second Amended Complaint After This Court
        Grants The BH Defendants' Motion To Dismiss In The
        Consolidated Action ......................................................................4

    C.   The November 5, 2009 Order .........................................................5

    D.   The Third Amended Complaint ......................................................6

    E.   The Fourth Amended Complaint ....................................................7

III. ARGUMENT ........................................................................................9

    A.   CPM's Antitrust Claims Are Barred by the *Noerr-Pennington*
        Doctrine.......................................................................................9

    B.   The Third And Fourth Claims For Relief Should Be Dismissed
        Because CPM Has Failed To State A Group Boycott Claim.… ..........11

        1.   CPM fails to adequately allege an antitrust agreement .............12

        2.   CPM fails to adequately allege antitrust injury and
            standing.................................................................................17

            a.   CPM fails to allege antitrust injury flowing from
                harm to competition in the WCI market. .......................18

            b.   CPM fails to allege antitrust injury flowing from
                harm to competition in the IOMD market. .....................20

            c.   CPM fails to allege antitrust injury flowing from
                 harm to competition in the purported P/PM market. .....201

IV.  CONCLUSION ...................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Amarel v. Connell*
  102 F.3d 1494 (9th Cir. 1997)............................................................... 17

*American Ad Mgmt., Inc. v. GTE*
  190 F.3d 1051 (9th Cir. 1999)...............................................12, 17, 19, 21

*Ashcroft v. Iqbal*
  -- U.S. --, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).......................2, 12, 13, 16

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*
  459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983) ................................ 17

*Atlantic Richfield Co. v. USA Petroleum Co.*
  495 U.S. 328, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990) ........................... 17, 18

*Bell Atlantic Co. v. Twombly*
  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .................2, 12, 13, 16

*Bhan v. NME Hosps., Inc.*
  929 F.2d 1404 (9th Cir. 1991)............................................................... 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
  429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) ........................... 11, 17

*California Pharm. Mgmt., LLC v. Zenith Ins. Co.*
  669 F. Supp. 2d 1152 (C.D. Cal. 2009).................................................... 5

*California Pharm, Mgmt., LLC v. Redwood and Cas. Ins. Co., et al.*
  No. SACV 09-141 DOC (ANx), 2009 U.S. Dist. LEXIS 105770 (C.D. Cal.
  Oct. 26, 2009) ...................................................................................... 5

*Cargill, Inc. v. Monfort of Colo., Inc.*
  479 U.S. 104, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986) ................................. 17

*Cement Mfrs. Protective Ass'n v. U.S.*
  268 U.S. 588, 45 S. Ct. 586, 69 L. Ed. 1104 (1925) .................................... 16

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.,*
  555 F.3d 1188 (10th Cir. 2009)............................................................. 13

*E & L Consulting, Ltd. v. Doman Indus., Ltd.,*
  472 F.3d 23, 28 n.3 (2d Cir. 2006) ........................................................ 23

*Evac, LLC v. Pitaki,*
  89 F. Supp. 2d 250, 261 (N.D.N.Y. 2000) ............................................... 23

*Glen Holly Entm't, Inc. v. Tektronix Inc.*
  352 F.3d 367 (9th Cir. 2003) ........................................................... 12, 17

*In re Elevator Antitrust Litig.*
   502 F.3d 47 (2d Cir. 2008) .......................................................................... 13

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*
   647 F. Supp. 2d 1250 (W.D. Wash. 2009) ........................................... 13, 15

*In re Travel Agent Comm'n Antitrust Litig.*
   583 F.3d 896 (6th Cir. 2009) ....................................................................... 13

*International Healthcare Mgmt. v. Hawaii Coalition For Health*
   332 F.3d 600 (9th Cir. 2003) ....................................................................... 16

*Jefferson Parish Hosp. Dist. v. Hyde*
   466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) .................................... 19

*Kendall v. Visa U.S.A., Inc.*
   518 F.3d 1042 (9th Cir. 2008) ..................................................................... 13

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.,*
   39 F.3d 951 (9th Cir. 1994) .................................................................. 17, 19

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*
   -- U.S. --, 129 S. Ct. 1109, 172 L. Ed. 2d 836 (2009) ............................... 13

*Paladin Assoc., Inc. v. Montana Power Co.*
   328 F.3d 1145 (9th Cir. 2003) ..................................................................... 23

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*
   467 F.3d 283 (2d Cir. 2006) .................................................................. 20, 21

*Perry v. Rado*
   343 Fed. App'x 240 (9th Cir. 2009) ............................................................ 13

*Person v. Google, Inc.*
   No. 07-16367, 2009 WL 3059092 (9th Cir. Sept. 24, 2009) ........................ 13

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*
   890 F.2d 139 (9th Cir. 1989) ....................................................................... 17

*Sheridan v. Marathon Petrol. Co., LLC*
   530 F.3d 590 (7th Cir. 2008) ....................................................................... 13

*United States v. Jones*
   712 F.2d 1316 (9th Cir. 1983) ..................................................................... 11

*United States v. Lo*
   231 F.3d 471 (9th Cir. 2000) ....................................................................... 10

*United States v. Maze*
   414 U.S. 395, 94 S. Ct. 645, 38 L. Ed. 2d 603 (1974) ................................ 11

*United States v. Sampson*
   371 U.S. 75, 83 S. Ct. 173, 9 L. Ed. 2d 136 (1962) .................................... 11

iii

**CALIFORNIA CASES**

*Marin County Bd. of Realtors, Inc. v. Palsson*
  16 Cal. 3d 920 (1976)................................................................................3

*Roth v. Rhodes*
  25 Cal. App. 4th 530 (1994).......................................................................3

**OTHER AUTHORITIES**

California Department of Justice, Office of the Attorney General, *Antitrust
  Compliance in the Insurance Industry* (1990)......................................16

ABA Section of Antitrust Law, Insurance Antitrust Handbook (2d ed. 2006) ......18

Defendants Zenith Insurance Company and ZNAT Insurance Company (collectively "Zenith") hereby submit their memorandum of points and authorities in support of their motion to dismiss the Fourth Amended Complaint's Third and Fourth Claims for Relief for, respectively, purported violations of Section 1 of the Sherman Act and California's Cartwright Act.

## I.    INTRODUCTION

Plaintiff California Pharmacy Management, LLC ("CPM") filed this lawsuit to retaliate for Zenith's litigating against CPM before the Workers' Compensation Appeals Board (the "WCAB") and in state court.  In the first three versions of its pleading, CPM alleged that, by engaging in such constitutionally protected activity, Zenith committed mail and wire fraud and engaged in a pattern of racketeering activity in furtherance of a RICO enterprise.

Zenith moved to dismiss the Second Amended Complaint's two RICO claims. In its November 5, 2009 Order, this Court *agreed* with Zenith that the following alleged conduct was protected activity that could not form the basis for a claim against Zenith: (i) objecting to CPM's lien claims; (ii) defending against CPM's lien claims before the WCAB; (iii) petitioning to consolidate lien claims before the WCAB; and (iv) filing an unfair competition lawsuit against CPM in the Los Angeles County Superior Court.  (Nov. 5, 2009 Order at pp. 6, 7 and 13.)

However, this Court denied Zenith's motion to dismiss on a narrow ground: CPM had alleged that Zenith "engaged in 'lulling' conduct that [CPM] contends is separate and apart from [Zenith's] alleged misuse of the WCAB process."  (Nov. 5, 2009 Order at 13.)  The so-called "lulling communications" consisted of Zenith's "alleged representation that their objections were 'business-as-usual' and that [Zenith] intended to 'resolv[e] the objections in good faith."  (Nov. 5, 2009 Order at p. 5.)

CPM obtained leave to amend its complaint a fourth time to add claims for alleged violations of Section 1 of the Sherman Act and the Cartwright Act.  The

gravamen of the Third Amended Complaint's antitrust claims was that Zenith and other insurers jointly decided to stop paying CPM's bills and lien claims in a purported "group boycott" that cut off CPM's "cash flow" and threatened to put CPM out of business. Zenith moved to dismiss the antitrust claims that CPM had added in the Third Amended Complaint. In response to Zenith's motion, CPM requested leave to file yet another amended pleading to "clean up" the defects in its antitrust claims challenged in Zenith's motion. As discussed below, the most recent amendment fails to cure those defects and the Fourth Amended Complaint's Third and Fourth Claims for Relief should be dismissed on three independent grounds.

First, the antitrust claims are based upon the same alleged conduct that this Court previously ruled is protected petitioning activity under the *Noerr-Pennington* doctrine. CPM simply reasserts that Zenith objected to CPM's bills and lien claims, defended at the WCAB, petitioned for consolidation and filed an unfair competition lawsuit, and adds that Zenith engaged in this protected activity as part of a nebulous agreement with other insurers to harm CPM's business. Adding allegations that Zenith engaged in protected activity pursuant to an agreement does not strip the conduct of its *Noerr-Pennington* protection. CPM also cannot fall back upon its allegations of "lulling" conduct that this Court found saved CPM's RICO claims from dismissal. So-called "lulling" activity is immaterial to an antitrust claim.

Second, CPM's allegations that Zenith agreed to an illegal course of conduct with other insurers are insufficient to carry its heavy pleading burden. The allegations are at least as susceptible to being interpreted as innocuous parallel conduct based on independent decision-making as they are to being concerted action pursuant to some type of agreement. After *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), CPM cannot survive a motion to dismiss with allegations that, while consistent with liability, do not raise CPM's right to relief above the speculative level.

2

Third, CPM has not adequately alleged antitrust injury in any relevant antitrust market and therefore lacks standing to bring an antitrust claim.  Antitrust injury is not merely harm caused by the alleged unlawful conduct, but harm that is a direct effect of the defendant's conduct and stems from the competition-reducing aspect or effect of that conduct.  CPM fails to identify a relevant market in which it suffered antitrust injury primarily because any injury allegedly suffered by CPM would, at best, be an *indirect* effect of Zenith's conduct.  According to the Fourth Amended Complaint, Zenith failed to pay *medical providers* for dispensing drugs, thereby purportedly interfering with CPM's contractual relationship with the providers who CPM alleges pay CPM for management, billing and collecting services.  (Fourth Amended Complaint ("FAC") at ¶ 14.)  Such an alleged indirect injury will not support an antitrust claim.

CPM is unable to rely upon the portion of the November 5, 2009 Order finding that CPM had alleged an injury for purposes of RICO standing.  The Court there was addressing Article III standing, not antitrust standing, and expressly based its finding upon CPM's allegation in paragraph 12 of the Second Amended Complaint that CPM "soon expects to have assignments from all or most of its physicians of their RICO causes of action."  Although that allegation is realleged in the Fourth Amended Complaint (¶ 14), CPM does not allege that it received any assignment of the physicians' antitrust claims.  Nor could CPM make such an allegation as the physicians themselves do not have an antitrust claim to assign.

CPM brings its antitrust claims under both Section 1 of the Sherman Act and California's Cartwright Act.  The basis for CPM's Cartwright Act claim is identical to its Sherman Act claim.  (*See* FAC ¶¶ 91-94.)  California law recognizes that the Cartwright Act substantively mirrors the Sherman Act and Sherman Act authority is persuasive in interpreting the Cartwright Act.  *Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976) ("A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have

their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."); *see also Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994). Accordingly, the reasons for dismissal of the Sherman Act claim apply equally to CPM's Cartwright Act claim.

## II.    STATEMENT OF FACTS

### A.    The Complaint And First Amended Complaint

CPM filed its Complaint in this action on February 26, 2009. The Complaint alleged that Zenith committed mail and wire fraud in violation of the RICO laws by filing a civil lawsuit in Superior Court asserting that CPM had violated California's Unfair Competition Law, objecting to and defending against CPM's lien claims and petitioning the WCAB to consolidate CPM's claims before one judge.

On April 23, 2009, after Zenith indicated its intention to move to dismiss the Complaint, CPM filed a First Amended Complaint. The First Amended Complaint failed to correct the defects in CPM's Complaint and, on July 23, 2009, Zenith filed a motion to dismiss.

### B.    CPM Files A Second Amended Complaint After This Court Grants The BH Defendants' Motion To Dismiss In The Consolidated Action

Zenith's motion to dismiss the First Amended Complaint was scheduled for hearing on August 17, 2009. However, on July 29, 2009, this Court granted a motion to dismiss the second amended complaint in the action that CPM filed against Redwood Fire and Casualty Insurance Company and other affiliated Berkshire Hathaway companies (collectively the "BH Defendants") in the related RICO lawsuit that this Court later consolidated with this action.

The second amended complaint against the BH Defendants alleged that, by defending at the WCAB against CPM's lien claims and filing a petition to consolidate with the WCAB, the BH Defendants engaged in predicate acts of mail fraud and wire fraud in violation of the RICO laws. In its July 29, 2009 Minute Order, this Court found that CPM's RICO claims were "subject to dismissal . . . due

to the application of the *Noerr-Pennington* doctrine and [CPM's] failure to adequately allege the sham litigation exception." The Court also found that CPM failed to state a claim for mail or wire fraud and the alleged injury to CPM was too speculative to support a RICO claim.

After reviewing the Court's July 29, 2009 Minute Order, Zenith and CPM believed that this Court would likely grant Zenith's pending motion to dismiss and give CPM leave to amend. Accordingly, Zenith and CPM stipulated that Zenith would withdraw its motion and CPM could have leave to amend.

CPM filed its Second Amended Complaint on August 18, 2009. CPM again alleged that Zenith engaged in a "collusive and systematic campaign of sham litigation, fraudulent objections and dilatory conduct carried out by mail fraud and wire fraud." The focus of CPM's RICO claims remained Zenith's filing of the Superior Court lawsuit and consolidation petition, and defense against CPM's lien claims before the WCAB. Zenith moved to dismiss CPM's Second Amended Complaint on several grounds, including CPM's failure to allege fraudulent conduct or a scheme to defraud and CPM's improper attempt to impose liability based on Zenith's protected petitioning and litigation conduct.

**C.    The November 5, 2009 Order**

On November 5, 2009, this Court issued its Order denying Zenith's motion to dismiss CPM's Second Amended Complaint. In reaching its decision to deny Zenith's motion to dismiss, the Court held that many of the Second Amended Complaint's allegations against Zenith could not support a fraud-based RICO claim as a matter of law.[1]

---

[1] The November 5, 2009 Order is reported at *California Pharm. Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152 (C.D. Cal. 2009). On October 26, 2009, this Court issued a similar ruling in connection with the BH Defendants' motion to dismiss the Third Amended Complaint that CPM had filed against them. *California Pharm. Mgmt., LLC v. Redwood and Cas. Ins. Co., et al.*, No. SAC 09-141 DOC (ANx), 2009 U.S. Dist. LEXIS 105770 (C.D. Cal. Oct. 26, 2009).

Among other things, this Court held that Zenith's alleged sending of "groundless and frivolous boilerplate objections to CPM regarding its bills and liens," petitioning to consolidate "proceedings before the WCAB in order to further delay resolution of CPM's bills and liens" and filing of a "state court action against CPM in an effort to avoid paying valid claim" is alleged "activity [that] amounts to protected conduct incidental to litigation" protected by the *Noerr-Pennington* doctrine."  (Nov. 5, 2009 Order at pp. 6, 7 and 13.)

The Court allowed CPM to proceed with the RICO claim on a narrow ground: the allegation that Zenith "engaged in 'lulling' conduct that [CPM] contends is separate and apart from [Zenith's] alleged misuse of the WCAB process." (Nov. 5, 2009 Order at p. 13.)  The so-called "lulling communications" allegedly consisted of Zenith's "alleged representation that their objections were 'business-as-usual' and that [Zenith] intended to 'resolv[e] the objections in good faith." (Nov. 5, 2009 Order at p. 5.)

**D.    The Third Amended Complaint**

CPM subsequently informed Zenith of its intention to seek leave to file a fourth pleading adding federal and state antitrust claims.  Rather than litigate whether CPM should be allowed to amend again, Zenith stipulated that CPM could file a Third Amended Complaint subject to Zenith's right to challenge it.

The alleged conduct attributed to Zenith in the Third Amended Complaint remained essentially unchanged: CPM alleged that Zenith is liable for its objecting to CPM's bills and its petitioning activity in state court and the WCAB.  The difference between the Second Amended Complaint and the Third Amended Complaint was the Third Amended Complaint's addition of allegations that Zenith engaged in such protected activity as part of a nebulous agreement with other insurers to harm CPM's business in violation of Section 1 of the Sherman Act and the Cartwright Act.  CPM alleged that Zenith, together with the BH Defendants, engaged in what it termed "an unlawful or improper group boycott or concerted

6

refusal to deal" with CPM and an unknown number of unnamed others in the same business as CPM, with the alleged purpose of putting those companies out of business.

**E.      The Fourth Amended Complaint**

Zenith moved to dismiss the Third Amended Complaint's antitrust claims and moved to strike allegations that Zenith is liable to CPM or protected activity (i.e. objecting to bills and lien claims, defending at the WCAB, petitioning the WCAB for consolidation and filing a civil lawsuit in Superior Court).  CPM did not oppose the motions, instead requesting that Zenith stipulate to the filing of yet another amended complaint that CPM stated would "clean up" the deficiencies addressed in the motions.  Zenith stipulated that CPM could file a Fourth Amended Complaint subject to Zenith's right to challenge its sufficiency.

The alleged conduct that the Fourth Amended Complaint attributes to Zenith is essentially unchanged from its previous complaints.  CPM again reasserts that Zenith is liable to CPM for engaging in the same conduct, identified above, that the Court held in the November 5, 2009 Order constitutes protected activity.  (*See, e.g.*, FAC ¶¶ 4-7, 9, 37, 38, 49, 83.)

CPM's allegations of a purported agreement among Zenith and the BH Defendants remain tenuous and highly speculative at best.  For example, after alleging that the BH Defendants "blocked" certain "vendors," including CPM, from payment (FAC ¶ 42), CPM alleges "[o]n information and belief," that "Zenith *may* have developed a similar block list."  (FAC ¶ 45 (emphasis added).)

CPM again alleges that Zenith slowed or reduced payment to the physicians with whom CPM contracted by objecting to CPM's lien claims, defending at the WCAB, pettioning to consolidate lien claims, and filing the Superior Court lawsuit as part of a purported agreement with the BH Defendants.  CPM claims that Zenith thereby indirectly interfered with its contractual relationships by slowing or reducing payments to physicians who, in turn, pay CPM:

CPM contracted with 164 physicians to assist those physicians with their in-office medication dispensing programs for injured workers in workers' compensation cases in the WCAB.  Under its contracts, CPM is responsible for the billing and collection for medications prescribed and dispensed by CPM contracting physicians to injured workers in workers' compensation cases. The physicians pay CPM a management fee for its services. CPM has suffered injury to its business or property because of Zenith's and BH's interference with the contractual relationships between CPM and its contracting physicians. CPM also has assignments from its highest volume contracting physicians and expects to have assignments from all or most of its physicians of their RICO causes of action against Zenith and BH for their interference with the contractual relationships between CPM and its physicians.

(FAC ¶ 14.)

The Fourth Amended Complaint differs from the Third Amended Complaint in essentially three respects.  First, CPM added an allegation that its information about a BH "block list" was provided by an unidentified "informant."  (FAC ¶ 39.) Second, CPM added allegations that Zenith's alleged conduct harmed physicians and "worker-patients" in addition to harming CPM.  (FAC ¶ 63.)  Third, CPM purports to identify an additional relevant market, the "Pharmacy/Pharmacy Management Market," in which CPM, physicians, and patients are alleged to be injured, and competition is alleged to have been harmed.  (FAC ¶¶ 78-80, 87-88.) For the reasons discussed below, the additional allegations do not state a claim for relief under the Sherman Act or the Cartwright Act and CPM's Third and Fourth Claims for Relief should be dismissed.

# III.   ARGUMENT

**A.     CPM's Antitrust Claims Are Barred By The *Noerr-Pennington* Doctrine.**

This Court already has held that Zenith's alleged sending of "groundless and frivolous boilerplate objections to CPM regarding its bills and liens," petitioning to consolidate "proceedings before the WCAB in order to further delay resolution of CPM's bills and liens," and filing of a "state court action against CPM in an effort to avoid paying valid claim" is alleged "activity [that] amounts to protected conduct incidental to litigation" protected by the *Noerr-Pennington* doctrine."     (Nov. 5, 2009 Order at 13.)

As this Court explained:

> "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from liability." *Empress LLC v. City and County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) (*citing Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000)); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("The *Noerr-Pennington* doctrine ensures that those who petition the government for redress of their grievances remain immune from liability for statutory violations, notwithstanding the fact that their activity might otherwise be proscribed by the statute involved."). The Ninth Circuit has applied the doctrine to protect petitioning   activity as well as activity incidental to and in anticipation of petitioning activity. *See Sosa v. DIRECTV*, 437 F.3d 923, 934-35 (9th Cir. 2006) ("[I]n the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the Noerr-Pennington doctrine."); *see also Premier Med. Mgmt. Sys., Inc. v. California Ins. Guarantee*

1    *Assn.*, 136 Cal. App. 4th 464, 479 (holding that actions taken in

2    anticipation of proceedings before the WCAB were protected by

3    the Noerr-Pennington doctrine). The doctrine applies to

4    petitions before both state governments and the federal

5    government. *See Kottle v. Northwest Kidney Ctr.,* 146 F.3d

6    1056, 1059 (9th Cir. 1998). The doctrine "derives from the First

7    Amendment's guarantee of the 'the right of the people . . . to

8    petition the Government for a redress of grievances.'" *Sosa v.*

9    *DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

10   (Nov. 5, 2009 Order at 13.).

11       The Court denied Zenith's motion and allowed the RICO claims to proceed

12   on a narrow ground: while most of CPM's allegations improperly attempted to

13   impose liability against Zenith based upon protected activity (i.e., objecting to lien

14   claims, defending at the WCAB, petitioning for consolidation and filing a lawsuit),

15   CPM also had alleged that Zenith "engaged in 'lulling' conduct that [CPM]

16   contends is separate and apart from [Zenith's] alleged misuse of the WCAB

17   process." (*Id.* at 13.) The so-called "lulling communications" allegedly consisted of

18   Zenith's "alleged representation that their objections were 'business-as-usual' and

19   that [Zenith] intended to 'resolv[e] the objections in good faith." (*Id.* at 5.)

20       While this Court found that those allegations of "lulling" conduct, repeated in

21   the Fourth Amended Complaint (¶ 37), were sufficient for the RICO claims to

22   withstand a motion to dismiss, such allegations cannot save the new antitrust claims

23   from dismissal. So-called "lulling" activity is immaterial to CPM's antitrust claim.

24   The same "lulling" cases cited by CPM in its opposition to Zenith's motion to

25   dismiss the Second Amended Complaint (Opp. to Mot. to Dismiss at 7-8) show that

26   "lulling" is classically used to cover up or delay discovery of a fraud, and most often

27   arises in the mail fraud context.

28

10

Indeed, each of the cases cited in CPM's opposition to Zenith's motion to dismiss the Second Amended Complaint involved criminal prosecutions for mail fraud, not purported anticompetitive conduct. *See United States v. Maze*, 414 U.S. 395, 94 S. Ct. 645, 38 L. Ed. 2d 603 (1974) (reasoning that there can be no conviction for mail fraud where the use of the mails was not shown to be in furtherance of the fraudulent scheme); *United States v. Sampson*, 371 U.S. 75, 83 S. Ct. 173, 9 L. Ed. 2d 136 (1962) (holding that defendant's use of mails to lull victims into believing everything was fine after defrauding the victims sufficiently alleged mail fraud); *United States v. Lo*, 231 F.3d 471 (9th Cir. 2000) (finding that there was sufficient evidence to sustain defendant's conviction for mail fraud because the facts showed that, although the mailings occurred after the defendant had obtained her fee, the mailings were, nonetheless, "part of the execution of the scheme" and designed to lull the victims into thinking no wrongdoing had occurred), *abrogated in non-relevant part by United States v. Larson*, 495 F.3d 1094, 1100 (9th Cir. 2007); *United States v. Jones*, 712 F.2d 1316 (9th Cir. 1983) (affirming defendants' convictions for mail fraud where they caused a bank to mail notices of lease payments which reassured the investors that all was well, thereby discouraging them from investigating and uncovering the fraud).

By contrast, the antitrust laws were enacted to prevent harm to competition (*see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)), and do not concern fraudulent conduct unless that conduct also harms competition. CPM, however, does not allege any harm to competition caused by Zenith's purported "lulling" activity. As discussed above, to the extent Zenith is alleged to have harmed competition, it is only through conduct protected by *Noerr-Pennington*. Application of *Noerr-Pennington* dictates that Zenith's motion be granted and the Third and Fourth Claims for Relief dismissed.[2]

---

[2] This Court previously held that the Second Amended Complaint did not allege facts sufficient to establish application of the sham litigation exception to the

11

**B.** **The Third And Fourth Claims For Relief Should Be Dismissed Because CPM Has Failed To State A Group Boycott Claim.**

The essential elements of a claim under Section 1 of the Sherman Act are: (i) an agreement, conspiracy, or combination between two or more entities; (ii) an unreasonable restraint of trade under either a *per se* or rule of reason analysis; (iii) restraint affecting interstate commerce; and (iv) antitrust injury. *See Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) ("Only those who meet the requirements for 'antitrust standing' may pursue a claim . . . ; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust injury.'") (citing *American Ad Mgmt., Inc. v. GTE*, 190 F.3d 1051, 1054-55 (9th Cir. 1999)).

The Third and Fourth Claims for Relief should be dismissed because they fail to state a group boycott claim for two independent reasons. First, the allegations that Zenith agreed to an illegal course of conduct with other insurers are insufficient to meet CPM's heavy pleading burden under *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("*Iqbal*"). Second, CPM fails to allege antitrust injury and therefore lacks standing to bring its claims.

**1.** **CPM fails to adequately allege an antitrust agreement.**

The Third and Fourth Claims for Relief should be dismissed because CPM has failed to meet its heavy pleading burden under *Twombly* and *Iqbal*. *Twombly* requires dismissal where a complaint does not allege "enough facts to state a claim to relief that is plausible on its face." A plaintiff's "[f]actual allegations must be enough to raise the right to relief above the speculative level;" the claim must be "plausible" rather than merely "possible." *Twombly*, 550 U.S. at 555, 570. *Iqbal*

---

*Noerr-Pennington* doctrine. (Nov. 5, 2009 Order at 15.) The Fourth Amended Complaint does not plead any new or different facts to change that conclusion.

holds that "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"   *Iqbal*, 129 S. Ct. at 1949.   While courts must assume the truth of all well-pleaded facts, conclusory statements and legal conclusions are entitled to no deference.   *Id.* at 1949-50.

These pleading requirements are significant because courts serve an important gate-keeping function.   Antitrust discovery is enormously expensive.   Careful review of antitrust complaints at the motion to dismiss stage prevents antitrust defendants from incurring this expense in response to allegations that are consistent with lawful business conduct.   *See, Twombly*, 550 U.S. at 558-59.   After *Twombly*, dismissals of deficient antitrust claims have become common.[3]

In order to survive a motion to dismiss after *Twombly*, antitrust complainants must allege agreements with specificity.   *See, e.g., In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1256-57 (W.D. Wash. 2009) ("A distinguishing factor between [complaints surviving motions to dismiss after *Twombly* and those that have not] has been the inclusion of specific allegations concerning time, place, and person versus general allusions to 'secret meetings,' 'communications,' or 'agreements.'").   An agreement may not be inferred from "allegedly conspiratorial actions [that] could equally have been prompted by lawful, independent goals."   *Twombly*, 550 U.S. at 556-57 (quoting *Kramer v. Pollock-*

---

[3]   *See, e.g., In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1194 (10th Cir. 2009); *Person v. Google, Inc.*, No. 07-16367, 2009 WL 3059092, at *1 (9th Cir. Sept. 24, 2009); *Perry v. Rado*, No. 07-35684, 343 Fed. App'x 240, 241, 2009 WL 2562739, at *1 (9th Cir. Aug. 6, 2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047-48 (9th Cir. 2008); *Sheridan v. Marathon Petrol. Co.*, LLC, 530 F.3d 590, 595 (7th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-52 (2d Cir. 2008); *see also Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, -- U.S. --, 129 S. Ct. 1109, 1123, 172 L. Ed. 2d 836 (2009) (rejecting *Conley v. Gibson* pleading standard as "too lenient," reversing denial of defendants' motion for judgment on the pleadings, and remanding for further proceedings consistent with *Twombly*).

*Krasner Foundation,* 890 F. Supp. 250, 256 (S.D.N.Y. 1995)).  "[P]arallel conduct or interdependence, without more" is not enough to support an inference of conspiratorial agreement because, while it might be "consistent with conspiracy," it can be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554.

CPM's allegations of an illegal agreement fail to meet this heavy pleading burden.  CPM simply (i) alleges instances of parallel conduct that stop well short of the line between possibility and plausibility of entitlement to relief; and (ii) generally alludes to unspecified meetings and communications.  Applying *Twombly*, these allegations are deficient because they fail to raise CPM's right to relief above the speculative level.

CPM's allegations of a purported agreement among Zenith and the BH Defendants are tenuous and highly speculative.  For example, after alleging that the BH Defendants had "blocked" certain "vendors," including CPM, from payment (FAC ¶ 42), CPM alleges, "[o]n information and belief," that "Zenith *may* have developed a similar block list" (*id.* at ¶ 45).  (Emphasis added.)  CPM cannot, in good faith, allege that Zenith *did* develop such a list.  The "information" on which CPM bases its speculative "belief" that Zenith "may have developed a similar block list" are allegations that: (a) an unidentified "informant" exists, who had "experience within the workers' compensation insurance industry"; (b) after this litigation was commenced, one of Zenith's investigators, William Reynolds, left Zenith and became employed with a BH Defendant; and (c) it is possible that Reynolds, while at Zenith, communicated with his future employers at BH and American Commercial Claims Administrators, Inc.  (FAC ¶¶ 45-46.)  Such conspiracy theory speculation is grossly insufficient to properly plead an antitrust claim, particularly where there are reasonable and permissible explanations for the alleged conduct.

CPM further speculates that: (i) "[i]t is no coincidence" that Zenith and the BH Defendants began objecting to CPM bills and liens "around the same time . . .

14

and on the same basis"; and (ii) Zenith and the BH Defendants "hoped and expected that other workers' compensation insurers and administrators would begin to object to CPM bills, and to those of other companies who assists physicians with their in-office medication dispensing programs."  (FAC ¶ 58.)  Here, too, such conjecture cannot support an antitrust claim.  It is at least equally likely that Zenith's objections, as well as objections by other insurers, were motivated by lawful, independent decisions.  Indeed, two equally plausible explanations appear on the face of the pleading:

- CPM alleges that California law regarding payment for dispensed medications and the fee schedule governing such payments was amended effective March 1, 2007 – the same time that Zenith and the BH Defendants allegedly "began objecting to CPM bills and liens."  (FAC ¶¶ 31 and 58.)

- CPM alleges that an officer of BH purportedly was "familiar with" and wanted to "emulate the Zenith model of doing business."  (FAC ¶ 48.)

Thus, CPM's own allegations provide legitimate reasons why Zenith and the BH Defendants may have made independent, lawful decisions to object that are at least as plausible as CPM's conjecture about an illegal agreement.  After *Twombly*, such allegations do not suffice.  *See, e.g., In re Hawaiian & Gumanian*, 647 F. Supp. 2d at 1256-57 (holding that the complaint "pleads nothing more than 'parallel conduct and a bare assertion of conspiracy,' which *Twombly* teaches is insufficient to survive a Rule 12(b)(6) motion to dismiss").

Similarly, information and belief allegations that Zenith investigators may have communicated with their counterparts at the BH Defendants (FAC ¶¶ 38, 40) are consistent with lawful acts and independent goals.  As California's Attorney General has explained, "collaboration among insurers to detect and prevent fraud is both lawful and desirable" and does not evidence an unlawful boycott:

> **Fraud Detection and Prevention:** Collaboration among insurers to detect and prevent fraud is both lawful and desirable.

15

> The enormous cost of insurance fraud ultimately is borne by consumers.  Insurance firms may lawfully share their resources and data in joint efforts to combat these unlawful practices, since competition is not harmed and may be promoted.  The Attorney General's Office is committed to assisting industry efforts to prevent insurance fraud.  While it is lawful for insurers to work jointly to identify perpetrators of fraud, it is illegal for them to agree to boycott anyone.  Each insurer must independently decide whether and on what terms to insure an applicant, unless the law itself makes that determination (such as for good drivers seeking automobile insurance).

California Department of Justice, Office of the Attorney General *Antitrust Compliance in the Insurance Industry* (1990) at p. 6.[4]

Moreover, the law is clear that insurers are privileged to gather and disseminate information for the purpose of detecting unlawful conduct, such as fraud, so long as there is no agreement between them on actions taken, if any, in response to the information.  *See Cement Mfrs. Protective Ass'n v. U.S.*, 268 U.S. 588, 604, 45 S. Ct. 586, 69 L. Ed. 1104 (1925); *see also Int'l Healthcare Mgmt v. Hawaii Coalition For Health*, 332 F.3d 600, 608 (9th Cir. 2003) ("Disseminating information that fosters rational business decisions is pro-competitive.") (citing *Maple Flooring Mfrs.' Ass'n v. U. S.*, 268 U.S. 563, 582-83, 45 S. Ct. 578, 69 L. Ed. 1093 (1925)).  CPM offers no allegations supporting the conclusory allegation that Zenith and the BH Defendants agreed to an illegal course of conduct.  The alleged conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.

CPM has failed to meet its heavy pleading burden under *Twombly*, 550 U.S.

---

[4] A true and correct copy of the booklet is attached and marked as Exhibit 1.

544, and *Iqbal*, 129 S. Ct. 1937, for alleging an illegal antitrust agreement. Accordingly, the Third and Fourth Claims for Relief should be dismissed.

### 2. CPM fails adequately to allege antitrust injury and standing.

To bring an antitrust claim for damages, a private plaintiff must plead antitrust standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 and nn. 5-6, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986). Antitrust standing is distinct from Article III standing; a plaintiff who satisfies the constitutional requirement of injury-in-fact is not necessarily a proper antitrust plaintiff. *American Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999). To be the proper plaintiff to bring an antitrust claim, CPM must allege and prove "antitrust injury." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530-35, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983); *see also Glen Holly Entm't*, 352 F.3d at 371 ("Only those who meet the requirements for 'antitrust standing' may pursue a claim . . . ; and to acquire 'antitrust standing,' a plaintiff must adequately allege and eventually prove 'antitrust *injury*.'") (citing *American Ad. Mgmt.*, 190 F.3d at 1054-55).

Antitrust injury is not merely harm caused by some unlawful conduct in the market; rather, the injury must "'flow[ ] from that which makes defendants' acts unlawful.'" *Atlantic Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors*, 459 U.S. at 534. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield*, 495 U.S. at 344. "[T]he private plaintiff must link its own injury to the *anticompetitive* aspect of the defendants' conduct." *Legal Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co.*, 39 F.3d 951, 954 (9th

Cir. 1994) (citing *Atlantic Richfield*, 495 U.S. at 339).

CPM claims to have suffered antitrust injury from harm to competition in a "workers' compensation insurance market in the State of California" (the "WCI market"), an "in-office medication dispensing market in the State of California" (the "IOMD market"), and what CPM calls the "Pharmacy/Pharmacy Management Market" (the "P/PM market").[5]   (FAC ¶ 78-79, 86.)   CPM's Third and Fourth Claims for Relief should be dismissed because CPM has failed to allege antitrust injury stemming from harm to competition in any market.

### a. *CPM fails to allege antitrust injury flowing from harm to competition in the WCI market.*

CPM's claim that it suffered antitrust injury from harm to competition in the WCI market fails for two reasons.   First, CPM fails to identify any harm to competition in the WCI market that is capable of causing antitrust injury to CPM. CPM claims that Zenith and the BH Defendants agreed not to compete "regarding the payment, compromise, or litigation of bills and liens submitted" by CPM and unidentified "others."  (FAC ¶ 86.)  Zenith and the BH Defendants, however, do not compete regarding claims for benefits submitted to insured employers with whom they already have contracts.  *See* ABA Section of Antitrust Law, *Insurance Antitrust Handbook* at 114 (2d ed. 2006) (citing *UNR Indus. v. Cont'l Ins. Co.*, 607 F. Supp. 855, 860-61 (N.D. Ill. 1991) ("since defendants' conduct toward [insureds] is fixed by each defendant's contract, there is no role for competition to play")).

The only possible effect on competition is *prospective* – if Zenith and the BH Defendants compete for future contracts based on the quality of their claims service, then an agreement not to compete on that basis could (subject to certain conditions)

---

[5]   CPM's allegations with respect to the purported WCI and IOMD markets are essentially unchanged from its Third Amended Complaint; its allegations concerning the purported P/PM market are new.   Curiously, however, when introducing its Third Claim For Relief in the Fourth Amended Complaint, CPM identifies, "for the purpose of antitrust analysis," only two purported relevant markets, the IOMD market and the P/PM market. (FAC ¶¶ 78-79.)  In the course of setting forth its claims, however, CPM repeats the allegations with respect to the purported WCI market it previously made in its Third Amended Complaint.

reduce competition in the WCI market in the future.[6]   *Id*. at 114-15.  There is, however, no allegation supporting the conclusion that an insurer's reputation for paying claims promptly is desired by employers.  Indeed, employers may well prefer to contract with insurers that have a reputation for aggressively challenging workers' compensation claims in an effort to fight fraud, which CPM alleges is Zenith's stated reason for challenging bills and liens submitted by CPM.  (FAC ¶ 53.)  Moreover, even if CPM had alleged harm to future competition in the WCI market, that *future* harm could not have caused CPM's *current and past* alleged injuries.  To borrow a phrase from the Ninth Circuit, "[t]he difficulty with [CPM's] case is that its injury does not match either the mischief about which it complains or the markets in which it occurred."  *Legal Econ. Evaluations*, 39 F.3d at 954.  CPM has not alleged any harm to competition in the WCI market and, therefore, has not alleged harm to competition capable of causing antitrust injury.

Second, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *American Ad Mgmt.*, 190 F.3d at 1057.  CPM does not participate in the WCI market.  Therefore, even assuming that CPM suffered injury from Zenith's and the BH Defendants alleged conduct, and that their conduct restrained trade in the WCI market, CPM cannot have suffered antitrust injury because CPM is not alleged to participate in that market.

---

[6]  To allege even future harm to competition in the WCI market, CPM would have to allege *inter alia* that Zenith and the BH Defendants have sufficient market shares to affect competition in the WCI market.  *Cf. Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (unless plaintiff pleads facts capable of showing that the challenged conduct has had anticompetitive effects, plaintiff must "delineate a relevant market and [allege] that the defendant plays enough of a role in that market to impair competition significantly"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29-30, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), *overruled in non-relevant part by Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006).

19

### b. *CPM fails to allege antitrust injury flowing from harm to competition in the IOMD market.*

CPM also fails to allege antitrust injury from harm to competition in the so-called IOMD market. According to CPM, its role is to handle "the billing and collection for medications prescribed and dispensed . . . by physicians." (FAC ¶ 14.) The bills and liens that CPM submits to Zenith and BH do not seek reimbursement for amounts paid *by CPM* for medications; rather, they seek reimbursement for amounts paid *by the physicians* for whom CPM bills Zenith. (*See, e.g.*, FAC ¶ 26.) CPM contends that, in turn, "[t]he physicians pay CPM a management fee for its services." (FAC ¶ 14.) Any purported harm to CPM necessarily would be a direct consequence of the physicians' failure to pay CPM, and, at most, *indirectly* caused by Zenith's alleged failure to pay the physicians.

Numerous courts have refused to find antitrust injury when the defendant's conduct is an *indirect* cause of the plaintiff's harm. In *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), for example, the plaintiff, Paycom, was, much like CPM, a "payment processor" or "agent" for its customers. *Paycom Billing*, 467 F.3d at 287, 291. Paycom's customers used payment services offered through MasterCard, a joint-venture among certain banks. *Id.* at 285-86. On behalf of its customers, Paycom submitted "consumers' MasterCard transactions for authorization and payment" from MasterCard member banks; Paycom then would credit the accounts of its customers when the banks made payments, and take a fee for its role in the transaction. *Id.* at 287. Paycom filed an antitrust suit against the MasterCard joint venture complaining that MasterCard levied certain fines and penalties on banks, which then passed on those charges to Paycom. *Id.* at 288-89. The court ruled that Paycom lacked standing to bring an antitrust claim against MasterCard because its injury was only indirectly caused by MasterCard's fines and penalties. *Id.* at 291-92. MasterCard imposed the fines and penalties, in the first instance, on the banks from whom Paycom sought payment on behalf of consumers.

The banks, in turn, charged Paycom the amount of the MasterCard fines and penalties. Because Paycom was only an "indirect payor" of the fines and penalties, it suffered no antitrust injury and lacked antitrust standing. *Id*. at 292.

Similarly here, CPM's allegations claim indirect injury: Zenith failed to pay the physicians who, in turn, failed to pay CPM under their contractual arrangements. The antitrust laws do not permit recovery for indirect harm, and cannot be used to shift responsibility to Zenith for risks CPM chose to assume.

This Court's November 5, 2009 Order finding that CPM had alleged an injury for purposes of RICO standing does not save CPM's antitrust claims. (Nov. 5, 2009 Order at 11-12.) First, the Court there was addressing Article III standing, not the further requirements of antitrust standing. *Cf. American Ad Mgmt.*, 190 F.3d at 1054 n.3 ("Antitrust standing is distinct from Article III standing. A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action."). Second, the Court expressly based its finding upon CPM's allegation that CPM "soon expects to have assignments from all or most of its physicians of their RICO causes of action" (SAC ¶ 12). Although that allegation is realleged in the Fourth Amended Complaint (¶ 14), CPM does not allege that it received any assignment of the physicians' antitrust claims. Nor could CPM make such an allegation as the physicians themselves do not have an antitrust claim: There is no allegation that Zenith or the BH Defendants has refused to deal with the physicians, and there is no market in which the physicians compete that is alleged to have suffered harm to competition capable of causing antitrust injury.[7]

### c. *CPM fails to allege antitrust injury flowing from harm to competition in the purported P/PM market.*

In response to Zenith's motion to dismiss, the Fourth Amended Complaint adds an additional purported market which CPM labels the "P/PM market." CPM

---

[7] CPM's new allegations of harm to physicians and patients (FAC ¶ 63) cannot, of course, repair CPM's defective claim because CPM does not have standing to assert any claim based on harm to others.

alleges that it suffered antitrust injury as a result of harm to competition in the P/PM Market. CPM's claim fails because, according to CPM's own allegations, there can be no such market capable of suffering harm to competition.

According to CPM, the relevant "P/PM market" "includes (a) traditional pharmacies that dispense medication to injured workers in workers' compensation cases, and (b) pharmacy management companies like CPM that assist physicians . . . with their in-office medication dispensing programs for injured workers in workers' compensation cases . . ." (FAC ¶¶ 78-79.) CPM posits this hybrid market in response to arguments in Zenith's previous motion to dismiss that CPM had failed to identify any market in which both (i) there has been a harm to competition, and (ii) CPM's own alleged injury flows from that harm to competition. By purporting to identify a market that includes both pharmacy management companies (like CPM) and "licensed pharmacies," CPM has enabled itself to portray its injury as one that flows from harm to competition in that market. As recast, CPM's alleged injury, that it lost money because it "cannot compete with licensed pharmacies," is purported to flow from an overall reduction of competition in the purported P/PM market. (FAC ¶ 87.) CPM's allegations, however, make clear that so-called pharmacy management companies like it do not compete, and never have, with "licensed pharmacies," so there can be no such hybrid P/PM market.

CPM is in the business of contracting with physicians to assist them in the *administration* of their in-office medication dispensing programs. (*See, e.g.*, FAC at ¶¶ 2, 14.) CPM's clients are physicians, not patients in need of medications. CPM claims that it "sells" administrative services, not medications. According to CPM, its responsibility is to handle "the billing and collection for medications prescribed and dispensed . . . by physicians" for which "[t]he physicians pay CPM a management fee for its services." (FAC ¶ 14.) CPM goes to great lengths to emphasize that it does not purchase or sell medications to anyone. (FAC ¶¶ 26, 55.)

1    Of course, CPM claims that it is the *physicians*, not CPM, who sell

2    medications to patients.  (FAC ¶¶ 26, 27.)   Accepting CM's allegations at face

3    value, if anyone competes with licensed pharmacies in the sale of medications to

4    patients, it is the physicians who dispense medications through in-office programs,

5    not CPM.  Even if one assumes there is a relevant market that includes both in-

6    office dispensaries and licensed pharmacies,[8] there certainly is not a relevant market

7    that includes both pharmacy *management* companies and licensed pharmacies.

8    For antitrust purposes, a relevant market consists of products or services that

9    have "reasonable interchangeability."  *Paladin Assoc., Inc. v. Montana Power Co.*,

10   328 F.3d 1145, 1163 (9th Cir. 2003).  Based on CPM's own allegations, no service

11   CPM or other so-called pharmacy management companies provides is even

12   remotely interchangeable with the medication-selling services of a "traditional"

13   pharmacy.  Because the alleged P/PM market is "facially unsustainable," CPM's

14   antitrust claims are subject to dismissal.  *Newcal Indus., Inc. v. Ikon Office Solution*,

15   513 F.3d 1038, 1045 (9th Cir. 2008).  Where there is no market, there can be no

16   harm to competition, and no antitrust injury flowing from harm to competition.  *See,*

17   *e.g., E & L Consulting, Ltd. v. Doman Indus., Ltd.*, 472 F.3d 23, 28 n.3 (2d Cir.

18   2006) (upholding dismissal of Section 1 claim on 12(b)(6) motion, noting that "a

19   party cannot establish antitrust injury without establishing a violation of the antitrust

20   laws, which, under Section 1, must involve an injury to competition").  CPM's

21   failure to identify a relevant market is fatal to its antitrust claims.  *See, e.g., Evac,*

22   *LLC v. Pitaki*, 89 F. Supp. 2d 250, 261 (N.D.N.Y. 2000) ("Because [plaintiff] fails

23   to define a relevant product market, it lacks standing to bring the instant claim.").

24

25   [8]   Whether such a market exists is questionable.  Indeed, CPM markets in-
26   office pharmacies as filling a void in the pharmacy market: dispensing medication to
     injured workers on a lien basis.   The stated justification for in-office pharmacies is
27   the contention that "licensed pharmacies" are unwilling, or reluctant, to dispense
     medication to injured workers because the "licensed pharmacies" would then have
28   to seek payment in the workers' compensation system by a request for the allowance
     of a lien on the injured worker's compensation.

23

1

**IV.   CONCLUSION**

2          WHEREFORE, for the foregoing reasons, Zenith respectfully requests that

3    this Court grant its motion and dismiss the Fourth Amended Complaint's Third and

4    Fourth Claims for Relief in their entirety and with prejudice.

5

6    DATED:  July 13, 2010                    PROSKAUER ROSE, LLP

7                                             DEWEY & LEBOEUF, LLP

8

9                                            By: _____/s/_____

                                                Lary Alan Rappaport

10                                           Attorneys for Defendants
                                             ZENITH INSURANCE COMPANY

11                                           AND ZNAT INSURANCE COMPANY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Antitrust

# Compliance

# in the

# Insurance

# Industry

**California Department of Justice**
**John K. Van de Kamp, Attorney General**

EXHIBIT 1
Page 25

## A Message from the Attorney General _____

*The passage of Proposition 103 fundamentally changed the rules for insurers.  One of those changes is repeal of the insurance industry's immunity from the Cartwright Act, California's antitrust law.  Insurance companies and their employees are now fully subject to the rules of the competitive market that other businesses are expected to follow.*

*This is good news for all of us.  For nearly a century, our economy has flourished and our people prospered in free and open markets.  Ultimately, businesses and consumers alike benefit.*

*But the insurance industry, facing momentous changes in the way it does business, is understandably concerned about extension of the antitrust laws, with which it is unfamiliar. This booklet is part of the Department of Justice's program to assist the industry's efforts to observe the new law.*

*The purpose of this booklet is to give people at working levels of the insurance industry an overview of what the law expects of them and to alert them when they may be encountering an antitrust problem.  The reader should understand the limits of this document.  Antitrust law can be complex, and this booklet is not intended as a full statement of the law, nor as an explanation of those areas where the law may be unclear.  My office is separately issuing Antitrust Guidelines for the Insurance Industry, which discusses the legal issues more fully. Firms are urged to consult their own attorneys when evaluating a practice in light of the antitrust laws.*

*This booklet discusses application of California antitrust law to the insurance industry.  As of this writing, federal law continues to contain a partial immunity from the U.S. antitrust laws. Whether that immunity should remain in the law is being addressed by Congress.  But that debate is over in California.  The voters have spoken, and California antitrust laws will be enforced.  The Department of Justice will continue its efforts to assist the industry in achieving as smooth a transition as possible.*

_____ JOHN K. VAN DE KAMP
                                                        *Attorney General*

                                                        *March 1990*

EXHIBIT 1
Page 26

- **THE BASICS OF ANTITRUST COMPLIANCE**

California's antitrust law prohibits agreements among competitors that restrain free and open competition. The law, now fully applicable to insurance, forbids:

- <u>Price-fixing:</u> It is illegal for <u>any</u> competitors to agree to raise, stabilize, or otherwise affect prices—even to agree to <u>lower</u> prices.

  * The agreement need not set specific prices to be unlawful; any agreement affecting prices (e.g., percentage change, ratio of prices, formulas for calculating prices) violates the law.

  * The agreement need not be in writing, and no special words need be used. Even an informal, tacit understanding on prices among competitors is illegal. An exchange of price information can be illegal where surrounding circumstances suggest the exchange is part of an agreement to fix prices.

  * The agreement need not be by any particular officials of the companies. Anybody who may influence pricing can make himself or herself and his or her company liable for price-fixing. Anybody who knowingly acts as a messenger for such an agreement is likewise liable.

  * In a competitive bidding situation, any agreement between bidders that affects bids or outcome of the bidding—for example, on how much to bid, to take turns winning bids, not to bid on certain contracts—amounts to price-fixing and is illegal.

- <u>Allocation of business:</u> It is illegal for competing firms to agree not to compete for certain customers, products, or territory. For example, an agreement by two agents not to try to win away the other's clients would be unlawful.

- <u>Boycott agreements:</u> Any agreement among competing firms not to do business with certain customers or suppliers, not to do certain kinds of business, or not to do business except under certain terms is considered an agreement to boycott and is illegal. Each firm is entitled to decide with whom and under what circumstances it will do business, but no firm is entitled to influence the same decision by a competitor.

EXHIBIT 1
Page 27

- **Tying:** Sellers sometimes require a buyer to purchase a product the buyer does not want in order to be allowed to buy a product he or she does want.   Such requirements are called "tying arrangements."   Tying is generally illegal when the seller has some degree of power over the market for the product the buyer wants.

- **Unreasonable restraints:**   Any other conduct may be unlawful if it unreasonably restrains trade.  A restraint of trade is illegal if, under the circumstances, competition is more harmed than benefitted by the arrangement.

Businesses are sometimes tempted to resort to unlawful agreements like these to avoid the consequences of "cutthroat, ruinous competition," "unstable prices," "undisciplined markets," or the like.  These are no excuse for illegal agreements.  If economic forces create instability, if a market is over-saturated, if prices seem too low to sustain the business, the antitrust laws look for correction in the free play of open markets, not in agreements among competing firms.

Of course, agreements among persons within the same firm are not agreements between competitors.  And under California insurance law, two insurers that have the same owners (such as the typical insurance group of companies) are treated as a single entity, so discussions between them are not subject to antitrust review.

- **THE ROLE OF REGULATION**

Proposition 103 simultaneously repealed the insurance immunity to the antitrust laws and enacted a strict system of prior-approval ratemaking.  The fact that rates are merely proposed by the insurer, subject to approval of the Insurance Commissioner, does not relieve an insurer of the obligation to make pricing decisions independent of competitors.  And the mere fact that a rate may subsequently be approved does not absolve a company of antitrust liability if that rate was decided in advance through consultation with competitors.

California law requires the Insurance Commissioner to approve a rate filing if the proposed rate is not excessive, inadequate, unfairly discriminatory, or otherwise unlawful.  Between rates so high as to be excessive and so low they are inadequate lies a zone of reasonableness, within which insurers are free to set rates according to their own business objectives.   Private collaboration between insurers that deprives consumers of competition within that zone violates the antitrust laws.

2

EXHIBIT 1
Page 28

Insurers are free to participate in public hearings on other companies' rates, and to seek to influence the Insurance Commissioner's decision on other companies' applications.

- **POOLS, JOINT UNDERWRITING, AND REINSURANCE**

  - <u>Statutory Pools:</u>  Competitors are sometimes specially authorized by law jointly to underwrite a given class of risks—for example, the California Automobile Assigned Risk Plan.   Those statutes contemplate that the participating firms will agree on prices to propose to the Insurance Commissioner, and no antitrust liability can result from such an agreement. However, such organizations pose serious dangers of communications involving the respective participants' voluntary-market business, which could well support the inference of an illegal agreement.   Accordingly, such discussions should be strictly excluded.

  - <u>Voluntary Pools:</u>  Ordinarily companies are free to form underwriting pools to underwrite jointly risks they cannot write singly.   Such pools are evaluated under the antitrust "rule of reason," which permits an arrangement that promotes, more than it restrains, competition.  However, such an arrangement may not be used to allocate business among firms that could readily write such business individually, thereby depriving the market of competition.   Firms in a dominant position in a given market should exercise particular caution in considering joint underwriting, and consultation with antitrust counsel is particularly appropriate.

    Again, discussions among participants must be strictly limited to the joint undertaking and must exclude discussions of voluntary-market business. For example, participants in a pooling arrangement for a certain class of liability insurance may agree that the premiums charged will increase next policy period by a factor of 6%; however, if the same firms then raise all their liability insurance prices by a like amount, a price-fixing agreement will be inferred.

  - <u>Reinsurance:</u>  An agreement between a primary insurer and a reinsurer to reinsure a given risk is not prohibited by the antitrust laws.   However, particularly in tight markets, decisions to exclude certain business from the reinsurance agreement have the potential unlawfully to effect a boycott of primary-insurance customers.  The underwriting rules should be based on sound actuarial considerations, not be arbitrary, and not become a vehicle for coercion of insurers or consumers.

3

EXHIBIT 1
Page 29

- **Who Is Exempt?**

  - Proposition 103 extended California antitrust law (as well as the laws governing unfair business practices and civil rights) to nearly all property and casualty insurance.

  - Outside the property/casualty field, the Cartwright Act already applied to any line or class of insurance not specifically exempted. Thus, for instance, life and health insurance remain subject to state antitrust law.

  - Special exemptions from the Cartwright Act remain for workers compensation, title, and certain disability insurance, and other classes specified by statute.

- **Frequent Problem Areas**

  - <u>Trade Association Meetings</u>

    Like any other business persons, members of the insurance industry are entitled to meet in trade associations. However, trade association activities bring people from competing firms together, creating opportunities for agreements that violate the law. For example, exhortations about prices being too low, followed by price movement by several firms, may well support an inference of an unlawful agreement to raise prices. Similarly, urgings that certain business is too risky to insure, followed by withdrawal of capacity, invite the same inference.

    Insurers should implement safeguards used in other industries to prevent illegal conduct at such meetings: consistently using written agendas and minutes for all meetings, excluding topics that competing firms should not agree on (e.g., prices, business plans, territories of operation, policy terms or exclusions), including antitrust counsel at meetings where issues posing antitrust concerns may arise, and including antitrust compliance materials in the prepared materials. If a meeting encroaches on illegal topics, the best protection is to leave.

    It does not matter <u>where</u> the meeting takes place. You cannot comply with California's antitrust laws by breaking them in another state or country. If the effects are felt in California, California law applies.

4

EXHIBIT 1
Page 30

- Public Statements and Publications

  Public statements that urge price changes from competitors, and which succeed in their objective, are illegal. A company that feels prices are too low should raise its own prices; it may not suggest that competitors do likewise. Speeches, articles, news releases that call for "discipline" in industry pricing, or that warn other firms of dire consequences of their own business decisions, invite the inference of illegality.

  Similarly, statements about a firm's future marketing strategy given to the trade press may, in limited circumstances raise antitrust concerns. These statements are most troublesome where they are not intended or likely to reach buyers, where the intent is to induce competitors to adopt a similar strategy, and where the result is a lessening of competition.

- Exchanging Marketing Information

  Competing firms should not exchange or disclose to one another their prospective marketing strategies. Whether in public or private communications, such exchanges raise serious antitrust concerns. It is, of course, lawful to advertise price or other marketing strategies to the consuming market; it is not permissible to disclose the same information to competing sellers privately in a communication that is not intended to reach buyers.

- **UNDERWRITERS**

  Underwriting presents special problems of antitrust compliance. Because underwriting rules and guidelines determine product availability, agreements between insurers about them may have the same effect as an agreement to boycott any excluded business, in violation of the law. Obviously, the decision of any one company on underwriting rules or guidelines will not ordinarily present a problem. But consultation and collaboration among insurers raises serious questions.

- Exercising Market Power:  The fundamental problem is the exercise of market power. If an insurer possesses power—for example, because of a tight market, or because few firms write a given type of insurance—any underwriting decision bears greater scrutiny.

- Forms Development:  Many industries and professions employ standardized forms, including standard contracts for the sale of goods or provision of services. Forms standardization can help consumers'

5

EXHIBIT 1
Page 31

comparative shopping and does not, in and of itself, violate the antitrust laws. However, agreement on a standard form tends, in effect, to be an agreement on products to sell, often to the exclusion of any competing products that differ from the standard form.

- <u>Bundling and Tying:</u>  Tying—both the bundling of distinct products into one and the tied sale of separate products for certain buyers—is unlawful if it unreasonably restrains trade in the market for the tied product.  In determining the lawfulness of packaging two products, an important factor will be whether the bundling attracts, rather than forces, buyers to purchase the tied products. If buyers desire the products separately, and their freedom to purchase them separately is limited, as a practical matter, the tying arrangement is probably unlawful.

- <u>Fraud Detection and Prevention:</u>  Collaboration among insurers to detect and prevent fraud is both lawful and desireable.  The enormous cost of insurance fraud ultimately is borne by consumers.  Insurance firms may lawfully share their resources and data in joint efforts to combat these unlawful practices, since competition is not harmed and may be promoted. The Attorney General's Office is committed to assisting industry efforts to prevent insurance fraud.  While it is lawful for insurers to work jointly to identify perpetrators of fraud, it is illegal for them to agree to boycott anyone.  Each insurer must independently decide whether and on what terms to insure an applicant, unless the law itself makes that determination (such as for good drivers seeking automobile insurance).

- **ACTUARIES**

The most familiar antitrust problems involve pricing, typically the domain of actuaries in the insurance industry.  While insurers employ a different vocabulary and often think of their product as altogether different from all others in commerce, the rules of a competitive market have clear application to this industry as well.

- <u>Pooling Historical Costs:</u>  Insurance pricing begins with the compilation of historical data on past loss experience.  By pooling historical losses, companies can obtain a more statistically reliable body of data.  General antitrust law, and a specific provision of Proposition 103, authorize such pooling of historical loss data.

- <u>Loss Development and Trending:</u>  Actuaries extrapolate from incomplete claims experience their estimates for ultimate payouts on policies—a process known as "loss development."  From there, they project future

6

EXHIBIT 1
Page 32

trends—how experience on new policies will vary from past experience, called "trending." Both these processes are subject to individual judgments that produce diversity and competition for consumers. Because loss development and trending relate directly to premiums, collaboration on these processes is a form of price-fixing and is illegal.

- Price Leadership:   The antitrust laws prohibit agreements between competitors. However, the law condemns price fixing whether or not the participants expressly agree to the arrangement. A tacit understanding among insurers to follow the price leadership of a particular firm is just as unlawful as a written agreement to increase prices by a fixed amount. Agreements to follow one firm's price leadership may be inferred from circumstances, such as pressures brought to bear upon firms that deviate from the price structure of the leader or from communications among the group concerning prices. Nevertheless, nothing prohibits one company from unilaterally deciding to follow the price of another.

- **BROKERS AND AGENTS**

  - Discounts and Rebates:  Proposition 103 lifts restrictions on agents' and brokers' discounting and rebating in those lines that are covered by the initiative.  This does not mean that agents or brokers are required to rebate.  Furthermore, an insurer acting on its own may decline to do business with agents and brokers who discount or give rebates.  An insurer may not, however, agree with its agents and brokers, or with other insurers, that it will not sell through firms that rebate or discount.  Insurers that use their own employees as their sales force may lawfully require or prohibit rebates or discounts.

  - Passing Information Among Insurers:  The antitrust laws prohibit certain types of agreements among insurers.  These agreements may be tacit rather than express, and may be based upon exchanges of information about prices or other marketing strategies.  Brokers and agents who pass information among insurers for unlawful purposes may be held liable for the unlawful results.   Normally, an agent may pass to insurers any information that is reasonably necessary for the broker's negotiation of coverage for a particular risk.  Where such placements repeatedly raise similar issues, the broker may also discuss general market conditions with insurers.  However, information that may not lawfully be exchanged by insurers may also not be passed among them by brokers if doing so unreasonably restrains trade.  The agent should limit discussions with insurers to those matters that are reasonably related to his or her placement of coverages, and should avoid systematically passing along

7

EXHIBIT 1
Page 33

information which has no reasonable relationship to the placements, or in a manner concerted by insurers.

- **MANAGEMENT'S RESPONSIBILITIES**

Antitrust compliance begins with a clear statement by the firm's management to all responsible personnel that it is <u>company policy</u> to comply with the antitrust laws.    The    statement    should    communicate    management's commitment to comply with both the <u>spirit</u> and the <u>letter</u> of the law.  Some firms combine this statement with a broader company commitment to ethical business conduct and corporate good citizenship.  The statement must not be undermined by managerial comments that the policy is "for the record," or that it's something "we've got to put out."  Likewise, attorneys can subvert the policy with remarks about the "technicalities" of the law or counseling to get around the rules.  Employees are entitled to know that violations of the antitrust laws are <u>felonies</u>, treated as a serious form of <u>stealing</u> from consumers.

Management is well advised to develop an antitrust compliance program, including specific written guidelines, identifying clearly prohibited conduct and requiring consultation with legal counsel when the antitrust law may be implicated.  Formal training is especially important when an industry formerly exempt from the law becomes subject to its strictures.  Antitrust counsel can assist a firm in developing an antitrust audit program, which has proven an effective way to prevent antitrust problems.

EXHIBIT 1
Page 34

Additional copies of this booklet, and of *Antitrust Guidelines for the Insurance Industry*, may be ordered from:

Department of Justice
Public Inquiry Unit
1515 K Street, Suite 550
Post Office Box 944255
Sacramento, California 94244-2550
(800) 952-5225

EXHIBIT 1
Page 35

EXHIBIT 1
Page 36