1   Terree A. Bowers (SBN 89334)
    bowers.terree@arentfox.com
2   Matthew J. Kitson (SBN 254246)
    kitson.matthew@arentfox.com
3   ARENT FOX LLP
    555 West Fifth Street, 48th Floor
4   Los Angeles, CA  90013-1065
    Telephone:  213.629.7400
5   Facsimile:   213.629.7401

6   Donald G. Norris (SBN 90000)
    dnorris@norgallaw.com
7   NORRIS & GALANTER LLP
    555 West Fifth Street, 31st Floor
8   Los Angeles, CA  90013
    Telephone:  (213) 996-8465
9   Facsimile:   (213) 996-8475

10  Paul M. Kaplan (SBN 2408540)
    kaplan.paul@arentfox.com
11  ARENT FOX LLP
    1675 Broadway
12  New York, NY 10019
    Telephone: 212.492.3323
13  Facsimile:   212.484.3990

14  Attorneys for Plaintiff
    CALIFORNIA PHARMACY
15  MANAGEMENT, LLC

16              UNITED STATES DISTRICT COURT

17            CENTRAL DISTRICT OF CALIFORNIA

18  CALIFORNIA PHARMACY              Case No.  SACV 09-0242 DOC (ANx)
    MANAGEMENT, LLC, a California
19  limited liability company,       (Consolidated with SAC 09-141 DOC
                                     (ANx))
20            Plaintiff,
                                     Honorable David O. Carter
21       v.
                                     **PLAINTIFF CALIFORNIA
22  ZENITH INSURANCE                 PHARMACY MANAGEMENT,
    COMPANY, a California            MOTION TO WITHDRAW ITS
23  corporation; and ZNAT            OPPOSITION FILED ON AUGUST
    INSURANCE COMPANY, a             4, 2010 AND SUBSTITUTE THE
24  California corporation,          OPPOSITION ATTACHED AS
                                     EXHIBIT A**
25            Defendants.
                                     Date:     August 23, 2010
26  _____      Time:     8:30 a.m.
    AND CONSOLIDATED ACTION.         Place:    Courtroom 9-D (Santa Ana)
27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES          LA/310020.1

**I.    CPM SEEKS LEAVE OF COURT TO WITHDRAW ITS PREVIOUSLY FILED OPPOSITION AND SUBSTITUTE THE OPPOSITION ATTACHED AS EXHIBIT A**

On August 4, 2010, CPM filed its opposition to the motion to dismiss filed by Redwood Fire and Casualty Insurance Company, Cypress Insurance Company, Oak River Insurance Company, American All-Risk Insurance Services, Inc., American Commercial Claims Administrators, Inc., and National Liability and Fire Insurance Company ("BH").  On August 5, 2010, the Court entered an Order granting CPM's previously filed motion for leave to late-file its opposition.  The Court's Order provided that CPM serve and file its opposition by August 5, 2010, and BH serve and file its reply, if any, by August 11, 2010.

Before the Court's August 5 Order, CPM did not know the status of either the stipulation that was filed July 29, 2010, or its motion for leave to late-file, which was filed on August 3, 2010.  Consequently, CPM's objective was to file its opposition as quickly as possible, which it did late in the evening of August 4, 2010.  After receiving the Court's August 5 Order, CPM realized that its previously filed opposition contained language that may prove confusing to the Court and to the Parties, and CPM wishes to make minor revisions to avoid any confusion.  CPM therefore proposes, with the Court's permission, to withdraw its previously filed opposition to BH's motion to dismiss, and substitute the opposition that is attached to this motion as Exhibit A.  The opposition attached to this motion is substantially identical to the opposition previously filed on August 4, 2010.  Minor grammatical changes were made on pages 1 through 6, and minor changes were made concerning the description of the in-office medication dispensing program on pages 11 and 18 of the opposition.  In all other respects, the attached exhibit is identical to the opposition previously filed on August 4, 2010.  CPM respectfully requests the Court enter an Order providing that the Court and Parties disregard CPM's previously filed opposition and instead consider the document attached as Exhibit

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/310020.1                                    - 1 -                          CPM'S MOTION TO WITHDRAW ITS
PREVIOUSLY FILED OPPOSITION TO
BH'S MOTION TO DISMISS
AND SUBSTITUTE ATTACHED

1    A to be CPM's opposition.

2    Dated:  August 5, 2010                    ARENT FOX LLP

3

4                                             By: _Terree A. Bowers_____

5                                                 Terree A. Bowers
                                                  Attorneys for Plaintiff
6                                                 CALIFORNIA PHARMACY
                                                  MANAGEMENT, LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES
                                   - 2 -          CPM'S OPPOSITION TO BH'S MOTION TO
                                                                            DISMISS
                                                            SACV 09-0242 DOC (ANx)

# EXHIBIT A

1  Terree A. Bowers (SBN 89334)
   bowers.terree@arentfox.com
2  Matthew J. Kitson (SBN 254246)
   kitson.matthew@arentfox.com
3  ARENT FOX LLP
   555 West Fifth Street, 48th Floor
4  Los Angeles, CA  90013-1065
   Telephone:  213.629.7400
5  Facsimile:   213.629.7401

6  Donald G. Norris (SBN 90000)
   dnorris@norgallaw.com
7  NORRIS & GALANTER LLP
   555 West Fifth Street, 31st Floor
8  Los Angeles, CA  90013
   Telephone:  (213) 996-8465
9  Facsimile:   (213) 996-8475

10 Paul M. Kaplan (SBN 2408540)
   kaplan.paul@arentfox.com
11 ARENT FOX LLP
   1675 Broadway
12 New York, NY 10019
   Telephone: 212.492.3323
13 Facsimile:   212.484.3990

14 Attorneys for Plaintiff
   CALIFORNIA PHARMACY
15 MANAGEMENT, LLC

16         UNITED STATES DISTRICT COURT

17        CENTRAL DISTRICT OF CALIFORNIA

18 CALIFORNIA PHARMACY                  Case No.  SACV 09-0242 DOC (ANx)
   MANAGEMENT, LLC, a California
19 limited liability company,           (Consolidated with SAC 09-141 DOC
                                        (ANx))
20            Plaintiff,
                                        Honorable David O. Carter
21       v.
                                        **PLAINTIFF CALIFORNIA
22 ZENITH INSURANCE                     PHARMACY MANAGEMENT,
   COMPANY, a California                LLC'S OPPOSITION TO
23 corporation; and ZNAT               DEFENDANT BERKSHIRE
   INSURANCE COMPANY, a                HATHAWAY'S MOTION TO
24 California corporation,              DISMISS; MEMORANDUM OF
                                        POINTS AND AUTHORITIES;
25            Defendants.               EXHIBIT**

26 ─────────────────────────
                                        Date:    August 23, 2010
27 AND CONSOLIDATED ACTION.            Time:    8:30 a.m.
                                        Place:   Courtroom 9-D (Santa Ana)
28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES        LA/309553.1

CPM'S OPPOSITION TO BH'S MOTION TO
DISMISS
SACV 09-0242 DOC (ANx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................1

FACTUAL BACKGROUND .................................................................3

ARGUMENT ..........................................................................................6

I.     CPM's Complaint Is Facially Plausible And BH's Motion To
       Dismiss Should Be Denied.........................................................6

II.    CPM Has Adequately Alleged An Antitrust Injury ..............10

III.   CPM Has Adequately Alleged Several Relevant Markets..............14

IV.    CPM Has Article III Standing And The Court Has Subject
       Matter Jurisdiction To Deny BH's Motion To Dismiss......................16

CONCLUSION .....................................................................................20

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CPM'S OPPOSITION TO BH'S MOTION TO
DISMISS
SACV 09-0242 DOC (ANx)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................................7

*Assoc. General Contractors of Cal. Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) .............................................................................10

*Atlantic Richfield v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ....................................................................... 10, 12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................7

*Blue Shield of Virginia v. McCready,*
    457 U.S. 465 (1982) ....................................................................... 17, 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) .............................................................................13

*California Pharmacy Management, LLC v. Redwood and Casualty Ins. Co.,*
    *et al.,* No. SAC 09-141 DOC (C.D. Cal) ..............................................3

*Castaneda v. Burger King Corp.,*
    597 F. Supp. 2d 1035 (N.D. Cal. 2009) .................................................7

*Illinois Brick Co. v. Illinois,*
    543 U.S. 720 (1977) .............................................................................10

*In re Flash Memory Antitrust Litigation,*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ......................................... 10, 17

*Newcal Indus. Co. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008) ........................................................ 14, 15

*Sprint Commc'ns Co. v. APCC Servs. Inc.,*
    128 S. Ct. 2531 (2008) ........................................................................19

*Starr v. Sony BMG,*
    592 F.3d 314 (2d Cir. 2010) ..................................................................8

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ..............................................14

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1

- ii -

CPM'S OPPOSITION TO BH'S MOTION TO
DISMISS
SACV 09-0242 DOC (ANx)

1

**RULES**

2

Fed. R. Civ. P. 9(b) ................................................................................7

3

Fed. R. Civ. P. 12(b)(6) ..........................................................................6

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

CPM'S OPPOSITION TO BH'S MOTION TO DISMISS
SACV 09-0242 DOC (ANx)

1

# **PRELIMINARY STATEMENT**

2

California Pharmacy Management, LLC ("CPM") has filed an Amended

3

Complaint ("Complaint") that contains a paradigm of the allegations required in

4

antitrust actions. CPM's Complaint provides significant grounds for the Court to

5

ascertain the nature of CPM's claims and the relief it seeks. The motion to dismiss

6

filed by Redwood Fire and Casualty Insurance Company, Cypress Insurance

7

Company, Oak River Insurance Company, American All-Risk Insurance Services,

8

Inc., American Commercial Claims Administrators, Inc., and National Liability and

9

Fire Insurance Company ("BH"), on the other hand, is patently void of the grounds

10

which would entitle it to relief, and BH's motion does not provide a basis for the

11

Court to grant the draconian remedy of dismissal. It is axiomatic that a defendant

12

must at least *argue* that a complaint is deficient on its face for the court to even

13

entertain a motion to dismiss. Here, BH skips this elementary requirement entirely,

14

and instead proceeds to argue the facts and apply flawed legal analyses. BH's

15

blunder in failing to even assert that CPM's Complaint is facially deficient is

16

sufficient, by itself, to deny its motion outright. To the extent that BH's motion can

17

overcome this fatal flaw, there are other more than compelling grounds for the

18

Court to deny the motion.

19

First, CPM's Complaint alleges in significant detail the nature of the illegal

20

boycott, the participants, their methods of carrying out the boycott, the purpose of

21

the boycott, the boycott's devastating effects on CPM and other companies, and

22

importantly, the effects the boycott has had on competition in the relevant markets.

23

Even though not legally required, the Complaint establishes the "who, what, when,

24

where, and why" of the antitrust violations in such a way that CPM's claims are

25

elevated from the merely possible to the clearly plausible level. CPM's Complaint

26

"tells a story" that shows how BH and their agents and representatives formed an

27

illegal boycott in violation of the antitrust laws in an effort to drive CPM and other

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                        - 1 -                CPM'S OPPOSITION TO BH'S MOTION TO
                                                                        DISMISS
                                                            SACV 09-0242 DOC (ANx)

1  companies like CPM out of business for anticompetitive reasons.  Such antitrust
2  allegations are sufficient to survive a motion to dismiss.

3       Second, notwithstanding the detailed allegations in CPM's Complaint, BH
4  merely argues facts and substitute their own facts for CPM's allegations, hoping
5  that the Court will reach the merits of the parties' claims at this early stage of the
6  proceedings.  BH misses the appropriate standard and purpose of a motion to
7  dismiss.  A motion to dismiss is simply to test the sufficiency of the Complaint, not
8  to decide the issues.  Under the well-cited standards of *Twombly* and *Iqbal*, and by
9  the FRCP 12(b)(6) standards, CPM alleges facts, which taken as true (as they must
10 be on a motion to dismiss), carry its burden of showing that it is entitled to move
11 forward with discovery.

12      Third, BH essentially proves the sufficiency of CPM's Complaint outright,
13 by spending the first *four* pages of their motion citing to the myriad of facts that
14 CPM alleges in its Complaint.  BH lists CPM's allegations, with references to
15 specific paragraphs within the Complaint, and point out to the Court all the
16 allegations which spell out the nature of the antitrust violations.   In so doing, BH
17 draws attention to CPM's allegations concerning the co-conspirators of the boycott
18 (Motion to Dismiss, p. 3), the unlawful objective of the boycott (Motion to Dismiss,
19 p. 3), and the injury to CPM and competition in the market caused by the illegal
20 boycott (Motion to Dismiss, p. 4-5).  Thus, BH's own arguments show the detail
21 and care with which CPM drafted its allegations, and these arguments highlight the
22 robust allegations of antitrust injury throughout CPM's Complaint.

23      Finally, the breadth of CPM's allegations demonstrate that it is more than
24 entitled to discovery to prove the anticompetitive harm of BH's boycott.  CPM's
25 allegations demonstrate the potential hazard that BH's boycott has for CPM's
26 business and the relevant markets.  CPM alleges that, left unchecked, the boycott
27 will (i) stifle growth of in-office dispensing companies which are already operating;
28 (ii) decrease total output for medication dispensing services; (iii) limit consumers'

1   choice for medication dispensing services; (iv) create barriers to entry for new in-

2   office dispensing companies; and (v) will eventually drive the existing in-office

3   medication dispensing companies out of business. *See* Compl. ¶ 85. These are

4   precisely the types of injuries to competition that the antitrust laws are meant to

5   address.

6       CPM respectfully asks the Court to deny BH's motion and to allow CPM the

7   opportunity for discovery to prove the veracity of its allegations. If CPM is

8   deprived of the opportunity to conduct discovery concerning the harmful nature of

9   BH's illegal boycott, BH and its co-conspirators may succeed in driving CPM and

10   other in-office medication dispensing services out of the market, and destroying the

11   markets altogether.

12                   **FACTUAL BACKGROUND**

13       Given that the Court is already well-versed[1] in the factual and procedural

14   background relating to this litigation, to avoid burdening the Court with extensive

15   and lengthy papers, the following sets forth the key facts relevant to the instant

16   motion. For more detailed background information, we respectfully refer the Court

17   to the Plaintiff's Fifth Amended Complaint filed June 23, 2010, at Docket No. 98

18   (the "Complaint" or "Compl.") and the CPM's consolidated opposition to

19   Defendants' motion to strike, filed on August 2, 2010. CPM also respectfully

20   incorporates by reference its Opposition to Zenith's Motion to Dismiss, filed

21   08/02/10 (Case 8:09-cv-00242-DOC0AN, Doc 110, #1314), and attached hereto as

22   Exhibit A.

23       CPM assists physicians with their in-office medication dispensing ("IOMD")

24   programs for injured workers in workers' compensation cases. (Compl. ¶ 14).

25

26   [1] BH previously moved to dismiss the Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), asserting, *inter alia*, that CPM had failed to state a claim for relief under the RICO statute. The Court rejected BH's claims, holding that CPM's allegations satisfied even the heightened 9(b) pleading standard, and that it was "appropriate to allow Plaintiff to move forward with its 'lulling' allegations." *California Pharmacy Mgmt., LLC v. Redwood and Casualty Ins. Co.*, No. SACV 09-0141 DOC (ANx), 2009 WL 3514571, at *4 (C.D. Cal. Oct. 26, 2009) (Carter, J.).

1   Pursuant to its contracts with physicians, CPM bills and collects for medications
2   prescribed and dispensed by CPM-contracting physicians to injured workers in
3   workers' compensation cases. (Compl. ¶¶ 14, 25-27). BH and its co-conspirators
4   are insurers who sell workers' compensation insurance. (Compl. ¶¶ 15-24). CPM-
5   contracting physicians treated injured workers and purchased medications for them
6   in reliance on the fact that employers, through workers' compensation insurance or
7   self-insurance, have made funds available to BH and its co-conspirators to pay valid
8   medical claims of injured workers who are entitled to that premium revenue.
9   (Compl. ¶ 30). CPM submits medication bills/liens for reimbursement to workers'
10  compensation carriers on behalf of its physicians. (Compl. ¶ 31). If an insurer
11  refuses to pay, CPM can file a lien with the California Workers' Compensation
12  Appeals Board ("WCAB"). (Compl. ¶¶ 2, 37).

13         Beginning in March 2007, BH and its co-conspirators undertook a scheme
14  designed to shut off CPM's cash flow, eliminate CPM's ability to compete in the
15  market, and ultimately to drive it out of the market and out of business. (Compl. ¶¶
16  4, 8). BH's ultimate plan was to destroy the market for companies that assist
17  physicians with IOMD programs in its entirety. (Compl. ¶ 84). CPM has even
18  alleged the motive for BH's scheme, namely, that BH and their co-conspirators
19  "strongly dislike the physician [IOMD] programs" because "they did not want to
20  pay the prices legally submitted by CPM," even though the programs and prices
21  submitted are explicitly authorized by law. (Compl. ¶¶ 3-4).

22         Simply stated, BH stopped paying the claims submitted by CPM and others
23  in its business. This is plainly alleged in the Complaint, along with specific
24  information concerning the number of claims denied over a certain time period.[2]

25

26  _____
    [2] *See, e.g.,* Compl. ¶¶ 6, 49-50 ("adjustors for Zenith and BH systematically began denying CPM
27  charges…and offering fraudulent explanations for denying all CPM bills and liens for
    medications dispensed to injured workers in over 800 currently pending WCAB cases. Zenith's
28  and BH's adjustors sometimes refused to speak with CPM collectors and, when they did, offered
    to pay $0 or $1, or referred CPM collectors to outside attorneys who claimed not to have the file
    and who never called back").

1    To ensure that payments to CPM and others in its business would be denied,
2    BH's co-conspirators developed a list of "blocked vendors" which included most, if
3    not all, of the vendors in CPM's business, including CPM. (Compl. ¶¶ 42, 45).
4    Once a vendor was included on the block list, the claims examiners lost the
5    authority to pay bills/liens submitted by that vendor, which payments were
6    automatically blocked without any investigation into the claim. (*Id.*). Once a
7    vendor was added to that block list, it was never removed. (*Id.*).

8    The block list was given to the managers and claims personnel of BH's co-
9    conspirators, including a confidential informant formerly employed by one of the
10   Defendants in this matter, and those individuals were instructed not to pay any
11   claim submitted by CPM or any other vendor appearing on the block list. (Compl.
12   ¶ 44). BH developed its own block list, and, not coincidentally, stopped paying all
13   claims submitted by CPM at or about the same time its co-conspirators' block list
14   prohibited payments to CPM. (Compl. ¶ 45). BH and its co-conspirators "believed
15   that other insurance carriers would learn about which medical providers were on
16   their block lists and would also begin to wrongly object and cease to pay CPM and
17   other companies who assist physicians with their [IOMD] programs, in order to
18   choke off their cash flow and ultimately drive them all out of business." (Compl. ¶
19   47).[3]

20   Finally, BH used "lulling" communications and conduct to deceive CPM into
21   believing that BH was attempting in good faith to resolve CPM's claims, when in
22   reality, BH had collectively and internally announced its intention not to
23   investigate, negotiate or pay *any* claims submitted by CPM or others in its business.
24   This ensured that BH would continue to collect premiums, while avoiding the
25   payment of benefits. This scheme was thus designed to tie up CPM's cash flow,
26   line BH's own pockets with premiums, and ultimately drive CPM and others out of

27
28
[3] The Complaint also details the secret meetings held between Defendants and their co-conspirators as part of their scheme, providing in detail the "who, what, when and where" of those meetings. *See, e.g.,* Compl. ¶¶ 40-49.

1    the market.  (Compl. ¶ 7, 37, 49, 51).

2           CPM has alleged in great detail and in numerous instances throughout the

3    Complaint how Zenith's and BH's actions harmed it directly while violating the

4    antitrust laws.[4]  Under a heading conspicuously labeled "Harm to Consumers and

5    Harm to Competition," CPM also details the various ways in which BH' illegal

6    group boycott/concerted refusal to deal harmed the physicians and their injured

7    worker-patients.[5]

8                                   **ARGUMENT**

9           CPM's Complaint weaves together a plethora of facts that demonstrate the

10   destructive nature of BH's illegal boycott.  Rather than address the sufficiency of

11   CPM's allegations, BH would rather draw the Court to arguments which only

12   confuse the issues and which are irrelevant on a motion to dismiss.  Because BH

13   fails to even allege that CPM's Complaint is deficient under *Twombly/Iqbal*, and

14   because CPM alleges facts sufficient for an antitrust injury, the motion to dismiss

15   should be denied.

16   **I.    CPM's Complaint Is Facially Plausible And BH's Motion**

17          **To Dismiss Should Be Denied**

18          A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the facial legal

19   sufficiency of a Complaint, and tests whether the allegations entitle the complainant

20   to the relief it seeks.  *Castaneda v. Burger King Corp.*, 597 F. Supp. 2d 1035, 1040

21

22   [4] First, CPM alleges that BH's actions of refusing to pay its submitted claims has injured CPM by
     significantly impairing its cash flow, operations, and business relationships. (Compl. ¶¶ 8, 10, 14,
23   61-62, 83-84).  Second, CPM also alleges how BH created a block list in order to ensure that
     payments to CPM were automatically blocked and to blacklist it among other insurers and to
24   encourage other insurers to discontinue payments to CPM, in the hopes of eventually driving
     CPM out of business.  (Compl. ¶¶ 4-5, 38, 40-49, 58, 83).  CPM also describes how BH used the
25   WCAB process to lull CPM into thinking that BH was operating "business-as-usual" when it fact
     it was engaging in anticompetitive tactics to ultimately drive CPM out of business.  (Compl. ¶¶ 7,
26   37, 49).
     [5] *See* Compl. ¶¶ 62-64.  Plaintiffs further allege, in detail, how Defendants' anticompetitive
27   activity has harmed the injured worker-patients and the physicians by, *inter alia*, eliminating the
     in-office medication dispensing program and thus the patients' ability to obtain needed
28   medications in-office, and leaving doctors and patients with no choice but to obtain needed
     medications from traditional pharmacies.  (Compl. ¶ 85).

1  (N.D. Cal. 2009). In assessing a motion to dismiss, the court takes as true the

2  allegations as pled in the Complaint, and draws all reasonable inferences in favor of

3  the non-moving party. *Id.* In the antitrust context, the sufficiency of a complaint is

4  measured under the *Twombly/Iqbal* standard, which states that a complaint must

5  contain "enough factual matter (*taken as true*) to suggest that an agreement was

6  made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis

7  added). Under this standard, which is based on Fed. R. Civ. P. 8, the plaintiff need

8  not establish definitive proof of all its allegations at the pleading stage, but must

9  only include sufficient facts to spell out the nature of the illegal conduct, and to

10 "allow[] the court to draw the reasonable inference that the defendant is liable for

11 the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

12      A court grants a motion to dismiss in the antitrust context only if the

13 allegations contained in the complaint are insufficient to sustain a cause of action.

14 *Twombly* and *Iqbal* merely require a plaintiff to allege sufficient facts to "raise a

15 right to relief above the speculative level." *Id.* at 545; *Iqbal*, 129 S. Ct. at 1949.

16 The plaintiff need not establish how probable it is to ultimately succeed in proving

17 its claims. The Supreme Court, along with nearly all the circuit courts, has

18 reiterated that the *Twombly/Iqbal* standard is not a *probability* standard—it is a

19 *plausibility* standard. In other words, the plaintiff need not establish how probable

20 or likely it is to ultimately succeed in recovering on its claims. A well-pled

21 complaint can survive a motion to dismiss, even if neither the court, nor the

22 defendant, believes that the plaintiff will eventually prevail on its claims. *Twombly*;

23 *id.* at 1965. The pertinent inquiry concerns the sufficiency of the allegations, not the

24 burden of proof.

25      Notably, the required pleading standard is lower than that required under

26 Rule 9(b). A "plausible" claim, sufficient to withstand a motion to dismiss under

27 *Twombly/Iqbal*, need *not* include the "who, what, when, where and why"

28 supporting the allegations. *See, e.g., Starr v. Sony BMG*, 592 F.3d 314, 325 (2d

1    Cir. 2010).  The *Starr* court specifically held that, under *Twombly*, a plaintiff is "not

2    required to mention a specific time, place or person" to survive a motion to dismiss.

3    *Id.*  Of course, this argument is academic here anyway, since (1) the Court, in

4    evaluating CPM's RICO claim against BH, already held that CPM satisfied even

5    the higher, Rule 9(b) pleading standard; and (2) even though not required under

6    *Twombly/Iqbal*, CPM has pleaded the time, place and persons involved and thus has

7    more than met the lower "plausibility" standard.

8           A motion to dismiss – like BH's motion here – which lacks any reasonable

9    arguments as to why a complaint fails under *Twombly/Iqbal*, is fatally flawed

10   because it does not provide the court with any means to test the sufficiency and

11   facial validity of the Complaint.  BH never even mentions the *Twombly/Iqbal*

12   standard, purportedly in an attempt to impose a higher burden upon CPM.  BH

13   instead argues that CPM has not alleged an antitrust injury, has not alleged a

14   relevant market, and lacks standing to bring an antitrust claim.  However, to support

15   these points, BH presents facts, not legal arguments or standards.  Conspicuously

16   absent is any reference to binding authority demonstrating that the Complaint

17   should be dismissed.  BH's failure to even attempt to meet this standard provides

18   enough justification for the Court to deny BH's motion outright.

19          The correct, applicable legal standards are more than met by CPM's

20   allegations.  CPM has alleged the specific parties involved in the illegal boycott,

21   along with the time and places the parties met, the subject of their conversations,

22   the subject of their boycott, how they implemented the boycott, and the effect the

23   boycott has had on competition in the relevant markets.  Specifically, CPM alleges

24   BH and other insurance companies, along with their agents and representatives,

25   began an illegal conspiracy beginning in March 2007 which continues through

26   today.  Compl. ¶¶ 1, 3-5, 17-24.  CPM further alleges that BH and the other

27   conspirators "conducted meetings or otherwise regularly communicated about the

28   terms of their conspiracy, and on how to injure CPM and other similarly-situated

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                                    - 8 -                CPM'S OPPOSITION TO BH'S MOTION TO
                                                                                    DISMISS
                                                                      SACV 09-0242 DOC (ANx)

1   in-office programs.  Compl. ¶¶ 40-41.  CPM goes so far as to name specific parties

2   who take part in these meetings and communications, along with their relationships

3   to each other, their businesses and positions, and how these parties agreed to ban

4   together because "they believed that a single insurance company acting alone might

5   not be able to ultimately put companies like CPM out of business."  Compl. ¶¶ 40-

6   41.  CPM also alleges throughout the Complaint how the conspirators created

7   "blocked vendor lists" to facilitate their illegal boycott (Compl. ¶¶ 42-48), how they

8   communicated with other industry players to join in on illegally boycotting CPM

9   (Compl. ¶¶ 47-48), and how BH withheld millions of dollars in revenue from CPM

10  and "lulled CPM into a serious cash flow crunch [to] jeopardize[] its existence . . . "

11  Compl. ¶¶ 49-51.

12          These allegations, taken as true, more than satisfy the standard for pleading at

13  this stage of the proceedings.  BH's motion is replete with *factual* arguments and

14  disagreements with how CPM characterizes its market, how it characterizes its

15  business, and how it identifies the harm to itself and to competition.  However, a

16  motion to dismiss is not the proper avenue through which to make factual

17  arguments and to persuade the court of the veracity of the parties' claims.  A

18  motion to dismiss is to test the plaintiff's allegations to ensure that they are

19  sufficient to entitle the plaintiff to discovery.  Only on a motion for summary

20  judgment can the Court assess the factual adequacy of a plaintiff's allegations. Here

21  at the motion to dismiss stage, the Court should ignore BH's factual arguments, and

22  look only to the sufficiency of CPM's allegations, taken as true.  CPM has alleged

23  precisely the types of allegations that demonstrate that its Complaint is plausible,

24  meeting the required standard under *Twombly/Iqbal*.  BH's motion should be

25  denied.

26

27

28

## II.   **CPM Has Adequately Alleged An Antitrust Injury**[6]

1

2    BH argues that CPM has not alleged an antitrust injury because the antitrust

3    laws "do not protect a business model that raises prices." *Motion to Dismiss*, p. 6.

4    This argument is baseless and it is irrelevant to the issue of antitrust injury.  To

5    prevail on an antitrust claim, a plaintiff must allege that it was personally injured by

6    the defendant's tortious conduct, and that it suffered from market injury.  The

7    plaintiff's antitrust injury must be "of the type the antitrust laws are intended to

8    prevent," and must flow directly from the defendant's anticompetitive behavior in

9    such a way that the antitrust laws can address the injury. *Atlantic Richfield v. USA*

10   *Petroleum Co.*, 495 U.S. 328, 334 (1990);  *In re Flash Memory Antitrust Litigation*,

11   643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009).  Thus, a plaintiff must allege that the

12   defendant's actions have directly injured the plaintiff, and that the defendant's

13   actions are harmful to the market in a way that the antitrust laws are intended to

14   address.

15   In addition to showing a personal injury of the type the antitrust laws are

16   meant to address, a plaintiff must also show that the injury directly affects its

17   business "in the market in which the trade is constrained." *Assoc. General*

18   *Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539

19   (1983).   This means that plaintiff must show that its injury is in "the chain of

20   causation" between the predator firm's actions, and the market restraints. *Id.* at

21   541.  This showing makes the injury direct, as opposed to an indirect injury which

22   flows through an intermediary and then to plaintiff, and which is not sufficient for

23   antitrust standing. *See Illinois Brick Co. v. Illinois*, 543 U.S. 720 (1977).  CPM has

24   pled sufficient facts to demonstrate it has suffered an antitrust injury.

25

26   ───────────

[6] CPM has presented claims for violations of the Sherman, Clayton, and Cartwright Acts.  The Sherman and Cartwright Acts purposely mirror each other, so that the allegations of personal injury and harm to competition satisfy the standards under both Acts.  A violation of Section 4 of the Clayton Act requires a showing of injury to the complainant's business or property by "reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15.  CPM's allegations are specific and sufficient to show this type of harm to its business or property, and thus its Complaint satisfies the Clayton Act requirements as well.

27

28

CPM has alleged in great detail and in numerous instances throughout the Complaint how BH's actions harmed it directly while violating the antitrust laws. First, CPM alleges that BH's actions of refusing to pay its submitted claims has injured CPM by significantly impairing its cash flow, operations, and business relationships. Compl. ¶¶ 8, 10, 14, 61-62, 83-84.  Second, CPM alleges that BH created a do not pay "block list" in order to ensure that payments to CPM were automatically blocked, and to blacklist CPM among other insurers by encouraging other insurers to discontinue payments to CPM, in the hopes of ultimately driving CPM out of business.  Compl. ¶¶ 4-5, 38, 40-49, 58, 83.  CPM also provides numerous other examples of how BH misused the WCAB process to lull CPM into thinking that BH was conducting "business-as-usual," when in fact BH was engaging in deceitful tactics designed to ultimately drive CPM out of business. Compl. ¶¶ 7, 37, 49.  All of these allegations taken together are more than enough to satisfy CPM's burden to allege harm to its business for the purpose of antitrust standing.

Additionally, CPM alleges that its injuries flow *directly* from BH's conduct designed to destroy the IOMD market.  CPM connects its status as a provider of IOMD management services directly to the injury it has suffered by BH's bad acts, alleging that BH has "always disliked the physician in-office medication dispensing business," and that BH developed and implemented a scheme to destroy this market, and to ultimately put "CPM and other companies who assist physicians with their in-office medication dispensing programs, out of business . . ."  Compl. ¶¶ 3-4, 6-7, 10, 37-38, 49-50.  CPM also alleges that BH and its co-conspirators schemed to withhold millions of dollars from CPM and drive CPM from the market by refusing to pay on valid claims and by improperly disputing valid claims. Compl. ¶¶ 37-50.  This is a direct injury, and is of the type that the antitrust laws were intended to prevent.  CPM's allegations establish the straight-line connection between BH's actions, and the harm caused directly to CPM's business.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1

- 11 -

CPM'S OPPOSITION TO BH'S MOTION TO DISMISS
SACV 09-0242 DOC (ANx)

1    BH argues that CPM has not alleged an antitrust injury because CPM "raises

2    prices" and the "antitrust laws do not protect conduct that raises prices for

3    consumers." *Motion to Dismiss*, p. 6. This completely misapprehends the facts of

4    this case and the relevant case law. First, CPM does not "raise prices." CPM's

5    pricing mechanism is statutorily-created, and it is by statute that CPM is entitled to

6    charge a certain amount to insurance companies for medical reimbursement.

7    Compl. ¶ 31 (citing California Labor Code Section 5307.1 which entitles CPM to

8    charge 1.4 times the AWP plus a $7.50 handling fee). CPM does not set this price,

9    nor does it raise or lower this price. CPM does not allege that it tried to raise prices,

10   nor does CPM allege that it would be able to charge a higher price if not for the

11   illegal constraint on trade. CPM's allegations are that it cannot obtain the

12   *competitive, and statutorily mandated, price* which it always was able to obtain

13   until the illegal boycott began squeezing its cash flow. The competitive price for

14   CPM's services is the statutorily-created price that the legislature requires CPM to

15   charge. CPM has no incentive (or ability) to raise prices under the statute. CPM

16   would be perfectly happy with the prices it can charge and be reimbursed if the

17   market were competitive and if Defendant did not operate an illegal boycott. This

18   is what CPM alleges and seeks in bringing its antitrust claims—a return to the

19   competitive market so that it can earn the statutorily-fair prices it was once allowed

20   to earn, and so it can compete on a fair basis.

21         Furthermore, BH cites cases which are completely inapplicable or which do

22   nothing to help its claim that CPM does not allege an antitrust injury. *Atlantic*

23   *Richfield* dealt with a vertical, maximum-price-fixing agreement, and held that the

24   practices that ARCO complained of actually helped its business and other

25   competitors, thereby *increasing* competition in the market. *See Atlantic Richfield*

26   *Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (emphasis added). CPM's

27   case is different from *Atlantic Richfield*, because CPM alleges that it, and the

28   market, is being harmed by *anticompetitive practices, not competitive practices*.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                          - 12 -                  CPM'S OPPOSITION TO BH'S MOTION TO
                                                            DISMISS
                                                            SACV 09-0242 DOC (ANx)

1    Additionally, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477

2  (1977) is also distinguishable, and does not help BH's arguments. In *Brunswick*,

3  the plaintiff complained that it suffered because the market *remained* competitive.

4  Brunswick Corp. argued that if a competing manufacturer had not purchased the

5  bowling centers in question, the bowling centers would have gone bankrupt, and

6  therefore Brunswick would have benefitted from the bankruptcy and decline in the

7  number of firms in the competitive market. Thus, the rather awkward situation for

8  the court was that the "sole injury alleged is that competitors continued in business,

9  thereby denying respondents an anticipated increase in market shares." *Id.* at 484.

10  Essentially, Brunswick Corp. complained that competition in the bowling market

11  was saved, thereby injuring its business. The court easily dismissed this argument,

12  explaining that increased competition is the goal of the antitrust laws, and that "it is

13  inimical to the purposes of these laws to award damages for the type of injury

14  claimed [by Brunswick]." *Id.* at 488.

15    In contrast to *Brunswick Corp.*, CPM alleges that its losses in cash flow are

16  the direct result of BH's illegal boycott, and that the illegal boycott *hurts* CPM and

17  it *hurts* competition in the relevant markets. CPM alleges that BH, along with its

18  agents and representatives, began an illegal conspiracy beginning in March 2007

19  which continues through today. *See, e.g.*, Compl. ¶¶ 1, 3-5, 10, 37-38, 49-50. CPM

20  further alleges that Zenith, BH, and the other conspirators "conducted meetings or

21  otherwise regularly communicated about the terms of their conspiracy, and on how

22  to injure CPM and other similarly-situated IOMD programs. Compl. ¶¶ 40-41.

23  CPM also alleges throughout the Complaint how the conspirators created "blocked

24  vendor lists" to facilitate their illegal boycott (Compl. ¶¶ 42-48), how they

25  communicated with other industry players to join the boycott (Compl. ¶¶ 47-48),

26  and how Zenith and BH withheld millions of dollars in revenue from CPM which

27  created a serious cash flow problem. Compl. ¶¶ 49-51. These allegations directly

28  link BH's tortious conduct to CPM's injury.

1   Equally important, CPM has alleged harm to market competition and harm to

2   consumers.  CPM alleges that BH's boycott: (i) stifles growth of in-office

3   dispensing companies which are already operating; (ii) decreases total output for

4   medication dispensing services; (iii) limits consumers' choice for medication

5   dispensing services; (iv) creates barriers to entry for new in-office dispensing

6   companies; and (v) will eventually drive the existing in-office medication

7   dispensing companies out of business.  *See* Compl. ¶¶ 84-85.  CPM also alleges that

8   consumers are hurt by this boycott, because without the illegal constraint, the

9   carriers "would compete with each other for business as companies would want to

10  sign policies with insurers that have a reputation for paying promptly on claims."

11  *Id.*  In addition, CPM alleges that consumers are hurt by the decrease in output

12  caused by BH's boycott, particularly since if CPM and other in-office medication

13  dispensing businesses fail, consumers will have less free choice and options for

14  their prescription medications.  Compl. ¶ 29-30; 87-88.  Thus CPM alleges personal

15  and market injury, and the motion to dismiss should be denied.

16  ### III.   CPM Has Adequately Alleged Several Relevant Markets

17  BH argues that "CPM fails to properly define the relevant market necessary

18  to its assertion for the Antitrust Claims."  *Motion to Dismiss*, p. 9.  BH's argument

19  systematically fails, given the breadth of allegations CPM makes in the Complaint

20  identifying the relevant markets and the harm suffered in those markets. For

21  antitrust purposes, the relevant market includes the subset of interchangeable

22  products or reasonable substitutes based on the cross-elasticity of demand.  *TYR*

23  *Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1129 (C.D. Cal.

24  2009); *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.

25  2008).  Essentially, the cross-elasticity of demand measures consumers' ability to

26  choose among competitors, and it measures the group of sellers and producers who

27  have the "ability to deprive each other of significant levels of business."  *Id.*  Thus,

28  the relevant market definition will identify the product or service, identify

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                          - 14 -                    CPM'S OPPOSITION TO BH'S MOTION TO
                                                              DISMISS
                                                              SACV 09-0242 DOC (ANx)

1    reasonable substitutes for it, and will identify the buyers and sellers who compete

2    against each other for business opportunities.  On a motion to dismiss, a plaintiff's

3    allegations concerning the relevant market are not to be disputed by defendant's

4    arguments to the contrary.  So long as the relevant market is plausible, and the

5    relevant market allegations "do not suffer a fatal defect," then plaintiff has met its

6    pleading burden.  *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d at 1045.

7         CPM begins its relevant market analysis by identifying and defining the

8    markets in which it competes: (1) the "workers' compensation insurance ("WCI")

9    market in the State of California"  (Compl. ¶ 85); (2) the in-office medication

10   dispensing market (Compl. ¶¶ 3-10, 14, 25-27, 31, 37-38, 41-43, 47, 49-51, 56, 61-

11   63, 78, 83); and (3) the Pharmacy/Pharmacy Management ("P/PM") market which

12   includes (a) traditional pharmacies that dispense medication to injured workers in

13   workers' compensation cases, and (b) pharmacy management companies like CPM

14   that assist physicians . . . with their in-office medication dispensing programs for

15   injured workers in workers' compensation cases.  (Compl. ¶¶ 78-79).  These

16   allegations clearly identify and define the relevant markets that CPM claims are

17   harmed by BH's anticompetitive actions.

18        As to the WCI market, CPM alleges that it competes in the WCI market as a

19   main source of prescription medications for injured workers who are covered by

20   California Worker's Compensation Insurance.  Compl. ¶ 29.  Injured workers visit

21   physicians, who in turn have contracted with CPM for their in-office medication

22   dispensing services.  Compl. ¶ 30.  CPM is one of the competing sources for where

23   injured workers can go for their prescription medications, in addition to traditional

24   pharmacies.  Compl. ¶ 63.  Thus CPM identifies the product in this market—*i.e.*,

25   pharmacy services for workers compensation insurance patients—and identifies the

26   participants and consumer options in this market.

27        In terms of the IOMD market, CPM alleges its role and leadership position in

28   this market, explaining that it has a strong relationship with over 164 physicians

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES
LA/309553.1                               - 15 -                    CPM'S OPPOSITION TO BH'S MOTION TO
                                                                    DISMISS
                                                                    SACV 09-0242 DOC (ANx)

1   and that it assists physicians with their in-office medication distribution programs,

2   along with other IOMD companies.  Compl. ¶¶ 3-10, 14, 25-27, 31, 37-38, 41-43,

3   47, 49-51, 56, 61-63, 78, 83.  CPM explains that it, along with other "similarly-

4   situated companies," has relationships with physicians whereby CPM leases

5   workers to the physicians, assists the physicians with shipment and billing, and

6   operates directly in the physicians' offices to aid injured workers.

7        Finally, CPM alleges that it participates in the P/PM market, and explains

8   that it is one of the options injured workers have for filling prescriptions through

9   the Workers' Compensation system.  Compl. ¶¶ 86-88.  Workers can visit

10  physicians' offices, and have their prescriptions filled by technicians there (through

11  CPM), or they can also go to traditional pharmacies for their prescriptions.

12       In all three markets, CPM (1) identifies the market; (2) defines the market;

13  and (3) explains how it operates and provides services in those markets.  BH's

14  motion to dismiss is void of any actual arguments refuting CPM's numerous

15  allegations to the like.  BH simply makes a conclusory allegation that "CPM does

16  not allege what products or services are provided and what other sources exist for

17  those products and services."  BH is simply wrong.  The aforementioned allegations

18  include exactly that—a synopsis of CPM's role as a service provider in each

19  market, coupled with definitive allegations concerning available substitutes and

20  options for consumers.  BH's arguments concerning CPM's definition of relevant

21  markets are fact-based—*not legal-based*.  Missing from BH's motion is any legal

22  reasoning or analysis regarding why CPM's market definition is lacking.  CPM's

23  detailed allegations more than satisfy the relevant market pleading, and BH's

24  motion should be denied.

**IV.   CPM Has Article III Standing And The Court Has Subject Matter Jurisdiction To Deny BH's Motion To Dismiss**

27       BH makes a strained argument that CPM lacks Article III standing to bring

28  its antitrust claims because "it does not have legal title to, or a property interest in,

1    those claims which may rightfully belong to the physicians." *Motion to Dismiss*, p.

2    11. BH again misunderstands the legal standard for standing and for a motion to

3    dismiss.

4         A plaintiff must meet the threshold requirements of standing to seek antitrust

5    damages. This requires that plaintiff have "suffered an antitrust injury"—which is

6    an injury of the type that the antitrust laws are meant to prevent. *In re Flash*

7    *Memory Antitrust Litigation*, 643 F. Supp. 2d at 1135. This requirement also

8    analyzes whether the antitrust victim is within the "class of persons" or whether the

9    victim suffers a "form of injury" which is squarely within the purview of the

10   antitrust laws. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474 (1982).

11   Requiring antitrust standing is a type of gate-keeping function for courts to assess

12   the risk of "duplicative recovery." As long as the plaintiff can allege a specific

13   injury in such a way that eliminates "the slightest possibility of duplicative

14   exaction," then the plaintiff can move forward on its claims. *Id.* at 475.

15        In *McCready*, the court dealt with a group health plan subscriber who

16   brought an antitrust class action suit against her health care insurer and a group of

17   psychiatrists. The plaintiff claimed that her insurer formed an illegal conspiracy

18   with psychiatrists by to exclude and boycott "clinical psychologists from receiving

19   compensation" under the Blue Shield plans. *Id.* at 470. The District Court held that

20   McCready did not have standing to complain of the injury because she was not

21   "within the sector of the economy competitively endangered by the defendant's

22   alleged violations of the antitrust laws." Essentially, the District Court thought

23   McCready's injury was "to [sic] direct and remote to be considered 'antitrust

24   injury.'" *Id.* at 471. The Court of Appeals reversed, and the Supreme Court

25   affirmed the reversal, holding that antitrust remedies are available for "any person

26   who shall be injured in his business or property by reason of anything forbidden in

27   the antitrust laws." *Id.* at 472 (citing Section 4 of the Clayton Act). Because

28   McCready could show that she was a victim of a concerted refusal to deal between

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                              - 17 -                    CPM'S OPPOSITION TO BH'S MOTION TO
                                                                             DISMISS
                                                                 SACV 09-0242 DOC (ANx)

1    two market participants, which deprived her of the services to which she was

2    entitled, then she was in the class that "was clearly foreseeable " and thus had

3    standing. *Id.* at 479.

4         Also important to the court's decision was the fact that McCready was a

5    beneficiary of the Blue Shield plan. Petitioners argued that McCready was only

6    indirectly affected, because she was not directly in the "market" which was affected

7    (*i.e.*, she was not a purchaser of group health plans). The court rejected this

8    argument, and pointed directly to McCready's complaint, and her allegations that

9    the concerted refusal to deal and to reimburse her under the health plan damaged

10   her "within that area of the economy . . . endangered by [that] breakdown of

11   competitive conditions . . . " *Id.* at 480-81. In other words, the court held that

12   McCready, being a subscriber within the group health care system, was within the

13   foreseeable victims of the harm when the group health care system's competitive

14   market broke down because of the concerted refusal to deal.

15        CPM's allegations parallel McCready's allegations. CPM alleges that it is a

16   victim of BH's concerted refusal to deal, and as such, it has suffered because it

17   cannot receive the reimbursement to which it would be entitled if the market were

18   competitive and there were no illegal boycott. This is precisely the same argument

19   that the Supreme Court credited in ruling for McCready. It was McCready's status

20   as a purchaser of market goods that allowed her to claim antitrust injury. Similarly,

21   it is CPM's status as a provider of in-office medication dispensing management

22   services which allows it to claim antitrust injury for the direct harm it has suffered

23   as a result of BH's fraudulent and illegal scheme. CPM has alleged that it is the

24   party to whom the insurers make reimbursement payments, and that when insurers

25   stop making those payments, CPM is the party who is directly injured. CPM is in

26   the direct line of causation to the anticompetitive harm because its business suffers

27   every day that BH and its co-conspirators continue their boycott.

28        Furthermore, despite BH's arguments, it is not only the physicians who feel

1   the effects of BH's illegal boycott.  The physicians have a business relationship

2   with CPM that is separate and apart from the relationship that CPM has with

3   insurers who are statutorily required to reimburse CPM when it submits valid

4   workers' compensation claims.  When the insurers establish a boycott against CPM,

5   CPM suffers the direct effects of that boycott, not the physicians.  And, regardless

6   of whether the physicians have a claim, nothing in the antitrust laws prevents a

7   victim of direct harm by anticompetitive practices from bringing suit for the harm it

8   suffers, particularly when the illegal constraint is an invidious boycott which

9   threatens an entire market of consumer services.

10        BH's "necessary parties" argument already has been rejected by the Court.

11   With its claim that CPM must join all physicians as "necessary parties," BH takes a

12   second bite of an apple already discarded by the Court.  In previous motions to

13   dismiss the preceding RICO complaints, BH and Zenith raised the very same

14   arguments, which the Court rejected.  *See* November 5, 2009 Order, pp. 11-12; *see*

15   *also* October 26, 2009 Order, pp. 9-10.  The Court relied on *Sprint Commc'ns Co.*

16   *v. APCC Servs. Inc.*, 128 S. Ct. 2531, 2542 (2008) to find that CPM, as an assignee

17   for collection (an allegation that the Court must accept as true), has standing to

18   pursue the instant case.

19        CPM has taken and will take all necessary steps to ensure that BH is not

20   subjected "to a substantial risk of incurring double, multiple, or otherwise

21   inconsistent obligations because of the interest" of the non-party physicians.  Fed.

22   R. Civ. P. 19(a)(1)(b)(ii).  There is no such risk to BH because any rights the

23   physicians have, contractually flow through CPM and there is no independent basis

24   for them to individually or collectively seek redress from BH.  CPM will also

25   secure any additional assignments that BH deems necessary.

26        BH chooses to argue the facts and present its disagreements with CPM's

27   allegations, rather than to establish its entitlement to dismissal.  Once again, BH

28   does not explain how CPM's allegations are deficient, nor does BH show that

1    CPM's allegations as to standing and antitrust injury fail to satisfy the

2    *Twombly/Iqbal* standard to allege "enough facts, taken as true, to suggest that an

3    illegal agreement has been made."  BH spends its entire motion arguing with the

4    facts, and substituting its version of the facts for those contained in the Complaint.

5    BH misses the point of a motion to dismiss.  BH cannot successfully challenge a

6    sufficient complaint merely by asserting contrary facts.  The standards are clear and

7    CPM's allegations are more than sufficient to defeat BH's motion.

8                              **CONCLUSION**

9           For the reasons set forth above, Plaintiff respectfully requests that the Court

10   deny BH's motion to dismiss or stay in all respects.

11   Dated:  August 5, 2010                    ARENT FOX LLP

12

13                                         By: _____

14                                            Terree A. Bowers
                                              Attorneys for Plaintiff
15                                            CALIFORNIA PHARMACY
                                              MANAGEMENT, LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

LA/309553.1                              - 20 -                CPM'S OPPOSITION TO BH'S MOTION TO
                                                                            DISMISS
                                                              SACV 09-0242 DOC (ANx)