LOCKE LORD BISSELL & LIDDELL LLP
Peter Roan (137379)
proan@lockelord.com
Ronald Kurtz (195918)
rkurtz@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Tel:  213-485-1500
Fax: 213-485-1200

Attorneys for Defendants
Redwood Fire and Casualty Insurance Company,
Cypress Insurance Company, Oak River Insurance Company,
American All Risk Insurance Services, Inc., American
Commercial Claims Administrators, Inc. and
National Liability and Fire Insurance Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA PHARMACY MANAGEMENT, LLC., a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>ZENITH INSURANCE COMPANY, a California corporation; and ZNAT INSURANCE COMPANY, a California corporation,<br><br>Defendants.<br><br>AND CONSOLIDATED ACTION. | Case No. SACV09-00242-DOC (ANx)<br>Consolidated with Case No. SACV 09-0141 DOC (ANx)<br>Hon. David O. Carter<br><br>**REPLY TO CPM'S OPPOSITION TO THE MOTION TO DISMISS THE FIFTH AMENDED COMPLAINT**<br><br>Hearing: August 23, 2010<br>Time:    8:30 a.m.<br>Court:   9D<br><br>[Filed concurrently with Declaration of Ronald Kurtz In Support Of Defendants' Reply To CPM's Opposition To Defendants' Motion To Dismiss Plaintiff's Fifth Amended Complaint] |

# TABLE OF CONTENTS

                                                                           Page No(s)

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 1

1.  THE FACTUAL ALLEGATIONS OF THE FIFTH AMENDED COMPLAINT ARE INADEQUATE TO SUPPORT THE CLAIMS FOR RELIEF ASSERTED BY CPM ................................................................................. 1

2.  CPM'S ALLEGED LOSS OF ITS SHARE OF HIGHER PRICES CHARGED FOR MEDICATIONS DISPENSED BY ITS CONTRACTING PHYSICIANS DOES NOT CONSTITUTE ANTITRUST INJURY ........................ 2

    A.  The Antitrust Injury Requirement Applies To Alleged Horizontal Agreements And Precludes CPM's Antitrust Claims ....................................................... 2

    B.  CPM's Assertion That It Has Suffered "Direct" Harm Is Legally Flawed And Contradicted By The 5AC ............ 4

    C.  CPM Has Not Alleged An Antitrust Injury .................... 6

3.  CPM'S RELEVANT MARKET ALLEGATIONS ARE CONTRADICTED BY THE FACTS ALLEGED IN THE 5AC ....................................................................................... 7

    A.  CPM Does Not Compete In The WCI Market And Does Not Properly Allege A Reduction Of Competition In That Market .......................................... 8

    B.  CPM Improperly Includes Both Physicians And Billing Service Providers In The Purported "IOMD" Market .......... 9

    C.  The "P/PM" Market Is Not Properly Alleged As A Relevant Market ............................................................. 10

    D.  Because There Is No Allegation Of A Proper Relevant Market Of Interchangeable Products, CPM's Antitrust Claims Should Be Dismissed Under Rule 12(b)(6) ............ 11

4.  THE FIFTH AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE CPM ADMITS IT LACKS NECESSARY ASSIGNMENTS FROM ITS CONTRACTING PHYSICIANS ...................................................................... 12

CONCLUSION ........................................................................................... 15

i

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

# TABLE OF AUTHORITIES

Page No(s)

**Federal Cases**

*Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.,*
141 F.3d 947 (9th Cir. 1998) ..................................................2, 3, 7, 9, 12

*Annulli v. Panikkar,*
200 F.3d 189 (3rd Cir. 1999) ..................................................14

*Ashcroft v. Iqbal,*
129 S.Ct. 1937 (2009) ..................................................1

*Associated General Contractors v. California State Council of Carpenters,*
459 U.S. 519 (1983) ..................................................5, 9

*Atlantic Richfield v. USA Petroleum Company,*
495 U.S. 328 (1990) ..................................................2, 3

*Bassett v. NCAA,*
528 F.3d 426 (6th Cir. 2008) ..................................................7

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 554 (2007) ..................................................1

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ..................................................2, 3, 7

*Illinois Brick v. State of Illinois,*
431 U.S. 720 (1977) ..................................................4

*McGlinchy v. Shell Chem. Co.,*
845 F.2d 802 (9th Cir. 1988) ..................................................12

*Newcal Indus. Inc. v. Ikon Office Solution,*
513 F.3d 1038 (9th Cir. 2008) ..................................................8

*Tanaka v. University of Southern California,*
252 F.3d 1059 (9th Cir. 2001) ..................................................8, 10, 12

*Total Benefits Planning Agency, Inc. v. Anthem,*
552 F.3d 430 (6th Cir. 2008) ..................................................8

*TYR Sport Inc. v. Warnaco Swimwear Inc.,*
679 F.Supp. 2d 1120 (C.D. Cal. 2009) ..................................................8, 11

*Westchester Radiological Associates P.C. v. Blue Cross and Blue Shield, Inc.,*
707 F. Supp. 708 (S.D.N.Y. 1989) ..................................................7

/ / /

/ / /

/ / /

ii

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

**Federal Codes, Statues and Rules**

Fed. R. Civ. P. 8(a) ....................................................................................................1

Fed. R. Civ. P. 12(b)(6) ....................................................................................6, 7, 10

Fed. R. Civ. P. 12(b)(7) .............................................................................................14

Fed. R. Civ. P. 19(a)(1)(b)(ii) ............................................................................13, 15

**State Codes, Statutes and Rules**

Cal. Labor Code § 4902 ............................................................................................14

iii

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071-3119

Introduction

Antitrust claims must make economic sense under a rule of reason analysis, and California Pharmacy Management, LLC's ("CPM") do not. An antitrust injury can only occur when there is harm to competition in a properly defined relevant market. Defendants are not competitors with CPM in any of the three relevant markets that CPM purports to allege in the Fifth Amended Complaint ("5AC"). Even the alleged conspiracy to boycott CPM between Defendants, Zenith and the other unidentified workers compensation insurers could not have reduced competition in any of those markets. In addition, CPM has not alleged a sufficiently direct injury to state an antitrust claim, as it cannot purchase or prescribe the medications at issue – rather, CPM is only a billing agent for physicians that do prescribe and sell them. CPM continues to allege that the conspiracy was motivated by the desire of the insurers not to pay higher prices for drugs dispensed to injured workers. CPM's allegations establish that the alleged conduct did not result in any injury of the type that the antitrust laws are intended to prevent.

CPM has also made fatal admissions that expose CPM's lack of Article III standing to bring its antitrust claims as it now admits that it has yet to procure necessary assignments from its contracting physicians.

Argument

1. THE FACTUAL ALLEGATIONS OF THE FIFTH AMENDED COMPLAINT ARE INADEQUATE TO SUPPORT THE CLAIMS FOR RELIEF ASSERTED BY CPM.

The Opposition misconstrues *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). *Twombly* and *Iqbal* both concern the standard for specificity of factual allegations a plaintiff must meet to satisfy Federal Rule of Civil Procedure 8(a)'s requirement that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." CPM

1

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

has confused the specificity of factual allegations with the legal import of the allegations. As set forth in Defendants' memorandum of points of authorities, CPM has asserted facts that are insufficient to support its claims for relief. Even detailed factual assertions of alleged conduct do not save an antitrust complaint when, as here, the relevant market, antitrust injury, and Article III standing are not properly pled.

### 2. CPM'S ALLEGED LOSS OF ITS SHARE OF HIGHER PRICES CHARGED FOR MEDICATIONS DISPENSED BY ITS CONTRACTING PHYSICIANS DOES NOT CONSTITUTE ANTITRUST INJURY.

With respect to the antitrust injury requirement, CPM's argument is essentially that it is in danger of losing its share of a higher-priced arrangement for dispensing prescription drugs due to the alleged conduct of the Defendants. Despite CPM's contention that Defendants are "withholding millions of dollars" from CPM (Opp. at 11:23-24), the same argument could be made by any supplier that offers a higher-priced product (or the service providers that feed off the higher priced arrangement) where purchasers choose a lower-priced option. The Ninth Circuit has held, however, that loss of revenue to a higher-priced supplier does not automatically constitute antitrust injury – even where the refusal to deal involves an alleged agreement among purchasers to choose the lower-priced supplier. *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947, 950 (9th Cir. 1998) ("APS").

#### A. The Antitrust Injury Requirement Applies to Alleged Horizontal Agreements and Precludes CPM's Antitrust Claims.

Tellingly, CPM fails to distinguish *APS* or even mention it in its opposition, and instead focuses on purported factual differences between CPM's allegations and the *Atlantic Richfield* and *Brunswick* cases which set forth key antitrust injury principles. *Atlantic Richfield,* as CPM concedes, requires an antitrust plaintiff's loss to "stem[] from a competition-*reducing* aspect or effect of the defendant's behavior." 495 U.S.

2

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

328, 344 (1990). Although *Atlantic Richfield* involved a vertical arrangement by which ARCO set maximum prices for its dealers, CPM cites no authority suggesting that the requirement of antitrust injury does not extend to alleged group boycott arrangements, which it clearly does. *APS*, 141 F.3d at 951-52.

CPM's attempts to distinguish *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), are also unavailing. In that case, the plaintiff bowling alley operators claimed that they lost profits because Brunswick's purchase of several competing bowling alleys allowed the competitors to stay in business, and if they had failed the plaintiffs would have reaped greater profits. *Id.* at 479-81. The Supreme Court ruled against plaintiffs and stated that the antitrust laws were "enacted for the protection of competition, not competitors." *Id.* at 488 (citation omitted). That principle remains squarely applicable to CPM's claims.

CPM misconstrues *Brunswick* as requiring that a challenged agreement preserve the status quo as to the cash flow and the number of suppliers of any product at any cost.[1] Opp. at 13:26-27, 14:1-7. *Brunswick* does not stand for any such proposition. Rather, it underscores that CPM's Antitrust Claims, which are based on lost profits that it would have made from the higher-priced medication dispensing arrangement,

---

[1] In fact, CPM's misunderstanding of the *Brunswick* case goes as far as mixing up the plaintiffs and defendant. *See* Opp. at 13:4-11 ("Brunswick Corp. argued that if a competing manufacturer had not purchased the bowling centers in question, the bowling centers would have gone bankrupt . . . . Essentially, Brunswick Corp. complained that competition in the bowling market was saved, thereby injuring its business.") Contrary to CPM's description, Brunswick was actually the defendant/petitioner in the action, not the plaintiff. *Id.* at 477, 479-81 Pueblo was a plaintiff arguing that Brunswick's purchase of bowling centers reduced its profits. *Id.* The other plaintiffs were also bowling center operators, *id.* at 479 and there is no indication that any of them was a "competing manufacturer" to Brunswick as CPM asserts (Opp. at 13:4).

warrant especially close scrutiny to determine if the threshold requirement of antitrust injury has been alleged.[2]

### B. CPM's Assertion that It Has Suffered "Direct" Harm Is Legally Flawed and Contradicted by the 5AC.

CPM incorrectly suggests that it has alleged antitrust injury merely because it is in the "chain of causation" between the alleged conduct by Defendants and its own lost profits. Opp. at 10:19-20. CPM is incorrect for at least two reasons. First, not every possible victim in the chain of causation arising from the alleged violation is a proper antitrust plaintiff. The two cases relied on by CPM make this abundantly clear. In *Illinois Brick*, the Supreme Court *denied* standing to the State of Illinois where it was not the direct purchaser of concrete blocks from their manufacturers, but rather from general building contractors who purchased the block for use in structures sold to the states. *Illinois Brick v. State of Illinois*, 431 U.S. 720, 730-32, 734 (1977) ("[T]he antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every

---

[2] To the extent that CPM is arguing that *Brunswick* is distinguishable because the challenged purchase preserved a greater number of competitors, this is refuted by *Atlantic Richfield*. In that case, the Court noted that a practice may have three possible effects "often interwoven", of reducing competition, increasing competition, or neutral as to competition. 495 U.S. at 342, 343. Only those practices that reduce competition can meet the antitrust injury requirement. As discussed further below, CPM's allegations establish that Defendants' actions cannot affect the price or availability of in-office prescribed medications for parties that wish to enter those transactions, because the reimbursement rates and prices for CPM's services are set by statute. Opp. at 12:5-9. The alleged conduct in this case and its effect on CPM's services are at most neutral in light of the fixed statutory pricing arrangement that CPM alleges. In addition, the alleged conduct is likely procompetitive in the sense that it allows insurers that opt for the lower-priced pharmacy option to cut costs and offer lower rates to consumers. CPM is attempting to use the antitrust laws to force insurers to choose a higher-cost option that would result in higher prescription drug costs, and ultimately in higher costs to consumers.

4

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.").

Even more on point is *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 539 (1983). In that case, the Court upheld the dismissal on the pleadings of an antitrust claim brought by a labor union based on the relationships with non-union contractors. *Id.* at 522-23. The Court held that the union was "neither a consumer nor a competitor in the market in which trade was restrained," and based on this and other factors, had not alleged antitrust injury. *Id.* at 539-46. The Court noted that the union's injuries were "only an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors." *Id.* at 541. Importantly, the Court also noted that the determination of who is a proper plaintiff is subject to the "problems of identifying and apportioning [damages] among directly victimized contractors and subcontractors and indirectly affected employees and union entities." *Id.* at 544-45.

Second, CPM's allegations of purportedly "direct" harm starkly illustrate that the alleged harm it has suffered is not directly caused by Defendants' actions. CPM admits that it does not dispense medication, and that reimbursements for medication are payable to the dispensing physicians, not CPM. 5AC ¶¶ 2, 25-26. From these allegations, it is unclear whether Defendants could be exposed to duplicative actions by physicians and providers of billing services such as CPM, since CPM's business depends on reimbursements that are undisputedly paid to the physicians, not CPM. As in *Associated General*, any harm suffered by CPM is an "indirect result" of the alleged refusal to pay physicians by Defendants. Moreover, it is not clear how damages could be apportioned among CPM, the affected physicians, and any other purported victims – for example, worker-patients who would receive the same medication at a different location, employees at physicians' offices, and other businesses involved in the provision of services to physicians to support the in-office dispensing program. CPM's assertion that it has been "directly" harmed is

contradicted by its own allegations, and does not cure the other deficiencies in its antitrust injury arguments.

### C. CPM Has Not Alleged an Antitrust Injury.

Under ordinary circumstances, a ruling that no antitrust injury has been incurred may depend on factual findings precluding dismissal on a Rule 12(b)(6) motion. Here, CPM's allegations and concessions make such findings unnecessary. First, CPM has alleged that Defendants' motivation for refusing to deal with physicians seeking the higher reimbursement rate (and consequently CPM's share of that markup for providing its billing services to the physicians) is that "CPM is legally able to seek higher prices for medications than Zenith and BH would like to pay." 5AC ¶ 3. Second, CPM has alleged and concedes in its Opposition that the reimbursement rates for in-office dispensed medications are set by statute – and therefore nothing Defendants can do in the marketplace will influence the price for that service or its availability for providers who wish to continue providing it to willing buyers.

There is no allegation, for example, that Defendants' actions and CPM's threatened exit from the billing services marketplace will allow physicians to charge higher or lower prices for medications to the detriment of competition in that market – they cannot because the reimbursement rates are set by statute. Similarly, there is no allegation that physicians will be unable to use the in-office dispensing program and seek reimbursement where other insurers agree to do so. Again, the program will remain available for willing providers and insurers, because the reimbursement rates are set by statute as CPM alleges.[3]

---

[3] CPM's references to a "competitive price" for its services (Opp. at 12:11-15) is a non-sequitur. CPM concedes that it "does not set this price, nor does it raise or lower this price." *Id.* at 12:8-9. Prices for CPM's services, and those of other providers of similar services, cannot change regardless of Defendants' conduct. Nonetheless, forcing insurers to choose a higher-cost option for prescription drugs will ultimately result in higher health care costs to consumers.

The gravamen of CPM's allegations is that Defendants are not willing buyers for the in-office dispensing program and that this decision is affecting CPM's bottom line. This is exactly the type of "injury to a competitor", as opposed to competition, that is not protected by the antitrust laws under *Brunswick*. If it were, the effect would be to force health care providers and other purchasers to purchase set amounts of higher-priced goods or services wherever failure to do so would affect revenue for the higher-priced supplier (and its downstream service providers), just to protect themselves from antitrust liability. This is not and cannot be the intent of the antitrust laws. *See Westchester Radiological Associates P.C. v. Blue Cross and Blue Shield, Inc.*, 707 F. Supp. 708, 714 (S.D.N.Y. 1989) ("[T]o the extent that consumer welfare is the goal of antitrust, a court should be hesitant to extend antitrust law to strike down a system that currently saves consumers about $25 million a year in radiology fees").

The survival of CPM's business model is not guaranteed by the antitrust laws, and if Defendants' decision to choose a lower-priced option for the dispensing of prescription medications affects CPM's profits – even to the extent of its exit from business – nothing alleged in the 5AC imposes antitrust liability on Defendants. This is exactly the type of case that the antitrust injury requirement is intended to filter out, and CPM's own allegations and admissions make it prudent to do so on a 12(b)(6) motion. *APS*, 141 F.3d at 951; *Bassett v. NCAA*, 528 F.3d 426, 434 (6th Cir. 2008) (antitrust claim alleged "only injury to Bassett and does not allege injury to a relevant market"; "Appellant's claim fails to allege an antitrust injury sufficient to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6) and we affirm the district court's holding accordingly.").

3. **CPM'S RELEVANT MARKET ALLEGATIONS ARE CONTRADICTED BY THE FACTS ALLEGED IN THE 5AC.**

CPM's attempt to explain away the flaws in its relevant market allegations underscores their deficiencies. As an initial matter, CPM concedes that a properly

7

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

defined relevant market must include the "subset of interchangeable products or reasonable substitutes." Opp. at 14:20-22, citing *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F.Supp. 2d 1120, 1129 (C.D. Cal. 2009). CPM also acknowledges that an antitrust claim may be dismissed at the pleadings stage where there is a "fatal defect" in the relevant market definition. Opp. at 15:4-6, citing *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also* Defendants' Memorandum of Points and Authorities in Support of Motion ("Mem.") at 9:4-16, citing *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001); *see also Total Benefits Planning Agency, Inc. v. Anthem*, 552 F.3d 430, 437 (6th Cir. 2008). Here, CPM's relevant market allegations are so far removed from a "subset of interchangeable products or services," and any purported relation to the Antitrust Claims, as to be incomprehensible.

### A. CPM Does Not Compete in the WCI Market and Does Not Properly Allege a Reduction of Competition in that Market.

In its Opposition, CPM refers to the "workers compensation insurance ("WCI") market in the State of California" as a possible relevant market. Opp. at 15:7-9, citing 5AC ¶ 85. First, Paragraph 85 does not allege that the WCI market is the relevant market for purposes of antitrust analysis. To the contrary, CPM expressly *deleted* reference to the WCI market as a relevant market in the 5AC after alleging it in the 4AC. *Compare* 5AC ¶ 78 *with* 4AC ¶ 72, removing the sentence that one of the relevant product markets was the "workers compensation insurance market in the State of California".

Second, to the extent the 5AC discussed the WCI market in any respect, CPM does not allege that it is a participant in the WCI market such that it could suffer any injury related to a reduction of competition in that market. To the contrary, CPM alleges that the Defendants are all workers' compensation insurers and that CPM, by contrast, is in the business of assisting physicians with in-office medication dispensing programs. 5AC ¶ 2, 14 and ¶¶ 15-24. If there were any injury alleged to competition

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071-3119

in the WCI market (and there is none), CPM is not a participant, and does not allege any injuries that it incurred that are connected to reduction of competition in the WCI market. CPM is not a proper plaintiff to bring a claim for an injury to competition in that market because it is not a participant and does not base its claims on its purchase of any goods or services in that market. *Assoc. Gen. Contractors*, 459 U.S. 519, 539-541.

Third, CPM's references to a relevant market consisting of workers compensation insurance carriers is contradicted and undermined by CPM's other allegations. For example, CPM alleges that the Defendants distributed the block list to other carriers (5AC ¶ 42), but this alleged action does not make economic sense because it would not force other carriers to pay higher costs. Similarly, if the Defendants' goal was to drive CPM and all companies like it out of business, and destroy the in-office dispensing program entirely, competing carriers would not suffer – rather they would benefit from lower costs for prescription medications, enhancing competition among them. Antitrust claims cannot be based on allegations that are economically irrational. *Adaptive Power Solutions*, 141 F.3d at 952-53 ("Antitrust claims must make economic sense.") The WCI market is not a properly alleged relevant market for purposes of the Antitrust Claims because CPM is not a participant, and CPM does not allege any possible rational basis for a reduction of competition in the WCI market as a result of the alleged agreement.

    B. <u>CPM Improperly Includes both Physicians and Billing Service Providers in the Purported "IOMD" Market.</u>

CPM next refers to an "IOMD" market as a possible relevant market. Opp. at 15:27-16:6; 5AC ¶ 78. CPM makes no attempt to explain how this market is a subset of interchangeable products and reasonable substitutes. The term "IOMD" is not defined in the 5AC, and in CPM's opposition the first reference to IOMD appears to define it as the market for physicians' "in-office dispensing" of medication. Opp. at 3:23-24. But CPM cannot be a participant in this market as it later asserts (*see* Opp. at

9

15:27-16:2 (CPM has a "leadership position" in the IOMD market and referring to other unspecified "IOMD companies")). CPM alleges that it does not and legally cannot dispense medication, as physicians do, and does not take legal title to the medications. 5AC 26. CPM further does not allege or explain in its opposition what the interchangeable products or services are within the market, or what the reasonable substitutes are. For example, are CPM's services interchangeable with those of physicians? What goods or services do the other unspecified "IOMD companies" provide and are they interchangeable with those provided by physicians or CPM? None of these issues can be resolved with reference to CPM's allegations. The purported IOMD market is therefore deficient on it face and cannot be the basis for the Antitrust Claims. *Tanaka*, 252 F.3d at 1063-64 (holding that conclusory assertion that women's soccer program was "'unique' and hence 'not interchangeable with any other program in Los Angeles'" is insufficient and granting 12(b)(6) motion).

      C.    <u>The "P/PM" Market Is Not Properly Alleged as a Relevant Market.</u>

The purported "P/PM" market referred to by CPM is also a confusing combination of services that do not appear to be even remotely interchangeable. CPM alleges that this market includes both "traditional pharmacies" and also "pharmacy management companies like CPM". 5AC ¶ 78. As noted in Defendants' Memorandum, this alleged market contains subgroups that *cannot* take business away from each other, as CPM admits that it is legally precluded from dispensing medication as pharmacies do. Mem. at 10:7-17. CPM makes no attempt to address this contradiction in its Opposition, and devotes all of two sentences to its attempt to explain this market. *See* Opp. at 16:7-11 ("Finally, CPM alleges that it participates in the P/PM market, and explains that it is one of the options injured workers have for filling prescriptions through the Workers Compensation system."). According to Paragraph 78 of the 5AC, the P/PM market included "pharmacy management companies like CPM" – but does CPM fill prescriptions? Do retail pharmacies

10

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

provide goods or services that are interchangeable with, or reasonable substitutes for, CPM's services? These issues cannot be resolved with reference to the 5AC, and CPM's opposition does not point to any allegation of a "subset of interchangeable products" that can be construed as a properly alleged relevant market."[4]

    D.    <u>Because there Is No Allegation of a Proper Relevant Market of Interchangeable Products, CPM's Antitrust Claims Should Be Dismissed under Rule 12(b)(6).</u>

CPM's problem is that if it concedes that the true market in which it competes – the market for providers of billing services to physicians – is the relevant market, then it must also concede the vast array of substitutes and interchangeability with other billing methods (*e.g.*, the physicians' own office staff, other accounting and billing services, outsourced services in other locations, *etc.*). CPM would also be forced to concede that Defendants' alleged conduct has absolutely no antitrust effect on "competition" in this market.

That is the likely reason for CPM's contorted attempts to combine and conflate its services with the prescription dispensing done by physicians, with traditional pharmacies, and with workers compensation insurers for purposes of alleging a relevant market. The resulting confusion gives a specious appeal to the alleged market as more limited in the scope of services provided and geographical area than could ever be the case for the actual services CPM provides. Closer examination of the purported "markets" that CPM has alleged, however, demonstrates that none of

---

[4] On Page 16 of the Opposition, CPM asserts that its relevant market allegations are sufficient because "CPM (1) identifies the market; (2) defines the market; and (3) explains how it operates and provides services in those markets." Opp. at 16:12-13. This "standard" contains no citation to any authority, is apparently made up out of whole cloth, and bears no relation to the proper standard for definition of a relevant market which is stated by CPM earlier in its brief: a "subset of interchangeable products or reasonable substitutes." Opp. at 14:20-25, citing *TYR Sport Inc.*, 679 F.Supp. 2d at 1129.

11

REPLY TO CPM'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
*California Pharmacy Management, LLC v. Zenith Ins. Co., et al.* No. SACV 09-0242 DOC(ANx)

them are a subset of interchangeable products and are not properly alleged relevant markets for antitrust purposes. *Tanaka*, 252 F.3d at 1064 ("[I]t is the impact upon competitive conditions in a *definable relevant market* which distinguishes the antitrust violation from the ordinary business tort. [The] failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings") (emphasis added), citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812-13 (9th Cir. 1988); and *Adaptive Power Solutions*, 141 F.3d at 952. The Antitrust Claims should be dismissed for this additional reason.

### 4. THE FIFTH AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE CPM ADMITS IT LACKS NECESSARY ASSIGNMENTS FROM ITS CONTRACTING PHYSICIANS.

In its ruling nine months ago on Defendants' motion to dismiss the Third Amended Complaint, the Court accepted "for the time being" or "for now" CPM's "vague reference to alleged assignments" in support of CPM's standing to "bring its contracting physicians' RICO claims...." Order Denying Motion to Dismiss, October 26, 2009, at pp. 9-10. CPM's new antitrust claims are likewise undermined by CPM's lack of Article III standing. Nine months have passed since CPM's "vague reference to alleged assignments" was last addressed by the Court, yet as of this writing CPM has yet to come forward with any such assignments or even to identify them.[5] CPM's

---

[5] See concurrently filed Declaration of Ronald D. Kurtz ("Kurtz Decl." Exh. A at 6:17-19 (First Request for Production of Documents to CPM served February 12, 2010); Kurtz Decl. Exh. B at 11:2-20 (CPM Response to First Request for Production of Documents). In its response to the Defendants' request for production of the assignments from physicians to which CPM refers, CPM asserted that it "will produce copies of responsive, non-privileged, non-confidential documents in its possession, custody, or control, if any, that are located after a diligent search." CPM has also failed to identify the existence of any such assignment in its interrogatory responses. Kurtz Decl. Exh. C at 8:23-25 (Defendants' First Set of Interrogatories), Exh. D at 8:27-9:10 (CPM's Responses to Defendants' First Set of Interrogatories). To date,

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071-3119

lack of standing is fatal not only to its antitrust claims, but to CPM's entire action.

CPM baldly claims that "CPM has taken and will take all necessary steps to ensure that BH is not subjected 'to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest' of the non-party physicians. Fed. R. Civ. P. 19(a)(1)(b)(ii)." Opp. at 19:19-21. But CPM does not identify the "necessary steps" it has taken, or those that it promises to take in the future, to make joinder of the non-party physicians unnecessary, and to prevent dismissal for CPM's failure to join those physicians.

Apparently recognizing the gravity of its admission that it has not taken "necessary steps" to establish its ability to proceed on the basis of the allegations in the Complaint, CPM attempts to retract with one hand that it has just offered with the other. Once again without reference to the Complaint, CPM asserts "[t]here is no such risk to BH because any rights the physicians have, contractually flow through CPM and there is no independent basis for them to individually or collectively seek redress from BH." Opp. at 19:22-24. This assurance is illusory because the Complaint makes no such allegation. Instead, the Complaint merely repeats the mantra that CPM has "assignments from its highest volume contracting physicians and expects[6] to have assignments from all or most of its physicians of their *RICO causes of action* against [Defendants] for [their] *interference with the contractual relationships* between CPM and its physicians." 5AC ¶ 14 (emphasis added). There is still no allegation that CPM has title to, or a property interest in the bills and liens that it has submitted "on behalf of" its contracting physicians. 5AC ¶¶ 24, 31, 32, 49, and 71. Without a right

---

CPM has produced no assignments, no contracts with physicians, and no related documents of any kind. Kurtz Decl. at 1:21-25.

[6] In prior iterations of the complaint, CPM stated that it "soon expects" to have the referenced assignments. CPM's confidence in this regard has evidently decreased.

to payment, CPM cannot allege any injury sufficient to establish standing.[7]

Still not satisfied with the results of its foray outside the 5AC, CPM makes the most remarkable statement of all: "CPM will also secure any additional assignments that BH deems necessary." Opp. at 19:24-25. CPM thus promises to undertake future actions, under its apparent control to avoid dismissal. This remarkable representation by CPM about the future demonstrates conclusively that even CPM concedes that it cannot avoid dismissal in the here and now.

CPM's actions to date concerning the assignments have been contrary to its assurances in the Opposition. CPM represents that it "CPM will also secure any additional assignments that BH deems necessary." CPM claims in the Complaint to have "assignments from its highest volume contracting physicians," but CPM has either refused to produce even these or is still conducting a "diligent search" for documents it claims to already have. Even if these assignments do exist, they do not establish standing to pursue these claims as a matter of law. Cal. Labor Code § 4902 (only the provider of services covered under workers compensation may assert liens for payment of health care services).

CPM has elected to oppose Defendants' motion to dismiss with representations and promises about its future conduct concerning the assignments. The motion to dismiss should be granted because CPM has failed to allege facts sufficient to demonstrate its standing to bring its claims. CPM should also be required to join as necessary parties under Rule 19 the physicians with whom it purportedly contracts, or the Complaint should be dismissed for failure to join necessary parties under Rule 12(b)(7). All of CPM's claims are based on its contracting physicians' rights, if any,

---

[7] The alleged assignments from physicians of a RICO action based on the Defendants' alleged interference with contractual relationships between CPM and its contracting physicians is also irrelevant because interference with contractual relations cannot serve as predicate act for a RICO claim. *Annulli v. Panikkar*, 200 F.3d 189, 199 (3rd Cir. 1999).

to receive reimbursement. Unless the physicians are joined, a judgment rendered in their absence would, despite CPM's assurances, "leave an existing party [the Defendants] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest" of the absent physicians. Fed. R. Civ. P. 19(a)(1)(b)(ii).

Conclusion

CPM has not alleged any harm to competition in a properly defined relevant market. CPM has not alleged facts that constitute antitrust injury, and its allegations demonstrate that it cannot do so. CPM's Antitrust Claims should therefore be dismissed as a matter of law. Moreover, CPM's entire action is based on the faulty premise that it has the legal right to payment for workers compensation services provided by its contracting physicians. Because it is apparent that CPM has no legal right to payment for those services, CPM's claims must be dismissed without leave to amend.

Dated: August 11, 2010

LOCKE LORD BISSELL & LIDDELL LLP

By: /s/ Ronald D. Kurtz
Peter Roan
Ronald D. Kurtz
Attorneys for Defendants
Redwood Fire and Casualty Insurance Company, Cypress Insurance Company, Oak River Insurance Company, American All Risk Insurance Services, Inc., American Commercial Claims Administrators, Inc. and National Liability and Fire Insurance Company

# CERTIFICATE OF SERVICE

I, Ronald D. Kurtz, an attorney, do hereby certify that on August 11, 2010, I caused the foregoing to be served through the Court's Case Management/Electronic Case Files (CM/ECF) system upon all persons and entities registered and authorized to receive such service.

Dated: August 11, 2010           By:   /s/ Ronald D. Kurtz
                                       Ronald D. Kurtz

LA 632704v.1