LOCKE LORD BISSELL & LIDDELL LLP
Peter Roan (137379)
proan@lockelord.com
Ronald D. Kurtz (195918)
rkurtz@lockelord.com
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071
Tel: 213-485-1500
Fax: 213-485-1200

Attorneys for Defendants
Redwood Fire and Casualty Insurance Company,
Cypress Insurance Company, Oak River Insurance
Company, American All Risk Insurance Services, Inc.,
American Commercial Claims Administrators, Inc. and
National Liability and Fire Insurance Company

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| CALIFORNIA PHARMACY MANAGEMENT, LLC., a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>ZENITH INSURANCE COMPANY, a California corporation; and ZNAT INSURANCE COMPANY, a California corporation,<br><br>Defendants.<br><br>——————————————<br><br>AND CONSOLIDATED ACTION.<br>—————————————— | Case No. SACV09-00242-DOC (ANx) Consolidated with Case No. SACV 09-0141 DOC (ANx)<br><br>Honorable David O. Carter<br><br>**DECLARATION OF PETER ROAN IN SUPPORT OF REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      November 29, 2010<br>Time:      8:30 a.m.<br>Place:     Courtroom 9-D<br>            (Santa Ana)<br><br>[Filed concurrently with Defendants' Reply to Opposition to Motion for Summary Judgment; Defendants' Objections to Plaintiff's Evidence] |

*Locke Lord Bissell & Liddell LLP*
*300 South Grand Avenue, Suite 2600*
*Los Angeles, CA, 90071*

1

DECLARATION OF PETER ROAN IN SUPPORT OF REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*California Pharmacy v Zenith Insurance Company, et al. - SACV09-00242-DOC (ANx)*

## DECLARATION OF PETER ROAN

I, PETER ROAN, declare:

1.    I am an attorney at law, duly licensed to practice before all the courts of the State of California.  I am a partner with the law firm of Locke Lord Bissell & Liddell LLP ("Locke Lord"), counsel of record for Defendants Redwood Fire and Casualty Insurance Company, Cypress Insurance Company, Oak River Insurance Company, American All Risk Insurance Services, Inc., American Commercial Claims Administrators, Inc., National Liability and Fire Insurance Company and Berkshire Hathaway Homestate Companies (collectively "Defendants") in this matter.  I have personal knowledge of the following facts and if called as a witness herein, I could and would competently testify as set forth below.  I submit this declaration in support of Defendants' Reply to Opposition to Motion for Summary Judgment.

2.    On Thursday, October 28, 2010, I received from Matthew Kitson of Arent Fox LLP, counsel for Plaintiff California Pharmacy Management ("Plaintiff" or "CPM"), an email cover memorandum.   Attached to the email memorandum were nineteen PDF attachments, titled "Financial Asset Agreement" as follows: (1) "Financial Asset Agreement - Valdez, Vincent.pdf"; (2) "Financial Asset Agreement - Allende, Diego-FIRM.pdf"; (3) "Financial Asset Agreement - Anel, Manuel S..pdf"; (4) "Financial Asset Agreement - California Neurological & Spinal Associates.pdf"; (5) "Financial Asset Agreement - Capen, Daniel.pdf"; (6) "Financial Asset Agreement - Chang, Gary J MD, Inc.pdf"; (7) "Financial Asset Agreement - Cornerstone Medical Group Inc.pdf"; (8) "Financial Asset Agreement - Coufal, Frank.pdf"; (9) "Financial Asset Agreement - Dugger, Walter.pdf"; (10) "Financial Asset Agreement - Hirsch, Jeffrey A. M.D..pdf"; (11) "Financial Asset Agreement - Institute for Hand and Microsurgery, Inc.pdf"; (12) "Financial Asset Agreement - Marshak, Glenn.pdf"; (13) "Financial Asset Agreement - Memorial Orthopedic Surgery Group.pdf"; (14) "Financial Asset Agreement - Mulvania,

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071

1   Richard.pdf"; (15) "Financial Asset Agreement - Nelson, Russell.pdf"; (16)

2   "Financial Asset Agreement - Neurological Associates Med Group.pdf"; (17)

3   "Financial Asset Agreement - Orthopedic Sports & Spine Med Group.pdf"; (18)

4   "Financial Asset Agreement - Sequoia Orthopaedic Med Group, Inc.pdf"; and (19)

5   "Financial Asset Agreement - Uwaydah, Munir.pdf." I caused Mr. Kitson's cover

6   memorandum to be printed. A true and correct copy of Mr. Kitson's cover

7   memorandum is attached hereto as Exhibit 1.

8          3.      Also on Thursday, October 28, 2010, I received from Mr. Kitson

9   another email cover memorandum. Attached to the email memorandum were ten

10  PDF attachments, titled "Physician Office . . . Management Agreement" as

11  follows: (1) "Contract - DeGrange, Donald.pdf"; (2) "Contract - Aflatoon,

12  Kamran.pdf; (3) "Contract - Analib Chiropractor, Inc.pdf"; (4) "Contract -

13  Anderson, Paul MD.pdf"; (5) "Contract - Anguizola, Eduardo MD.pdf"; (6)

14  "Contract - Anguizola Eduardo-Tri City Medical.pdf"; (7) "Contract - Bristol Med

15  Clinic.pdf"; (8) "Contract - Caruso.Vito.pdf"; (9) "Contract - DeGrange,

16  Donald.pdf"; and (10) "Contract - Wolgin, Mark.pdf". I caused Mr. Kitson's cover

17  memorandum to be printed. A true and correct copy of Mr. Kitson's cover

18  memorandum is attached hereto as Exhibit 2.

19         4.      On November 3, 2010, I received from Mr. Kitson another email

20  cover memorandum. Attached to the email memorandum were six PDF

21  attachments, titled "Medical Lien Purchase and Financial Asset Agreement" as

22  follows: (1) "Med Lien Purchase – Bernadett, Faustino.pdf"; (2) "Med Lien

23  Purchase - Wolfsohn, Marc D. MD, Inc..pdf"; (3) "Med Lien Purchase - Bernadett,

24  Faustino.pdf"; (4) "Med Lien Purchase - Anguizola, Eduardo-South Metropolitan

25  Med.pdf"; (5) "Med Lien Purchase - Anguizola, Eduardo-Intercommunity Med

26  Center.pdf"; and (6) "Med Lien Purchase - Anel, Manuel-Intercommunity Med

27  Group.pdf". I caused Mr. Kitson's cover memorandum to be printed. A true and

28  correct copy of Mr. Kitson's cover memorandum is attached hereto as Exhibit 3.

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071

3

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071

5.      On Thursday, November 4, 2010, I received another email cover memorandum.  Attached to the email memorandum was one PDF attachment, titled "Physician Office Pharmacy Program Management Agreement" (SIPM Bizhub10110408040.pdf).  I caused Mr. Kitson's cover memorandum to be printed.  A true and correct copy of Mr. Kitson's cover memorandum is attached hereto as Exhibit 4.

6.      The nineteen documents titled "Financial Asset Agreements" produced by counsel for CPM on October 28, 2010 referred to in paragraph 2 above, the ten documents titled "Physician Office . . . Management Agreement" produced by counsel for CPM on October 28, 2010 referred to in paragraph 3 above, the six documents titled  "Med Lien Purchase Agreement" produced by counsel for CPM on November 3, 2010 referred to in paragraph 4 above, and the single document titled "Physician Office Pharmacy Program Management Agreement" produced by counsel for CPM on November 4, 2010 comprise all of the physician contracts CPM has produced to the Defendants in this case despite the fact that a Fed. R. Civ. P. 34 document request seeking all such documents was served on counsel for CPM on February 12, 2010.  Counsel for CPM has not to date communicated that CPM intends to produce any additional physician contracts and, in fact, continues to maintain that such contracts are not within the scope of permissible discovery.

7.      On Saturday, October 9, 2010, I took the deposition of Archie R. Mays, M.D. at the Los Angeles offices of Locke Lord.  I received a certified copy of the transcript of the deposition from Lori Scinta, RPR, on October 15, 2010.  I caused pages 62-64 of the transcript I received from Ms. Scinta to be printed.  A true and correct copy of pages 62-64 of the transcript of Mr. Mays' deposition is attached hereto as Exhibit 5.

8.      On Thursday, November 4, 2010, I took the deposition of Michael Tichon, Esq. at the Los Angeles offices of Locke Lord.  I received a certified copy

1   of the transcript of the deposition from Lori Scinta, RPR, on November 9, 2010. I

2   caused pages 34-38 and pages 68-69 of the transcript I received from Ms. Scinta to

3   be printed. True and correct copies of pages 34-38 and pages 68-69 of the

4   transcript of Mr. Tichon's deposition are attached collectively hereto as Exhibit 6.

5          9.    On Friday, November 5, 2010, I took the deposition of Michael R.

6   Drobot at the Los Angeles offices of Locke Lord. I received a certified copy of the

7   transcript of the deposition from Lori Scinta, RPR, on November 13, 2010. I

8   caused pages 38-86, pages 107-110, and pages 144-153 of the transcript I received

9   from Ms. Scinta to be printed. True and correct copies of pages 107-110 and 144-

10  153 of the transcript of Mr. Drobot's deposition are attached collectively hereto as

11  Exhibit 7. The remaining page range (pp. 38-86) designated by counsel as

12  HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY was submitted

13  with Defendants' Application to File Under Seal, manually filed on November 22,

14  2010, pursuant to Central District Local Rule 79-5.1, Paragraph 13 of the Parties'

15  protective order, and Plaintiff's designation of the contracts discussed as

16  confidential and attorney's eyes only pursuant to the protective order.

17         I declare under penalty of perjury under the laws of the United States of

18  America that the foregoing is true and correct. Executed this 22nd day of

19  November, 2010 at Los Angeles, California.

20

21

22  Dated:  November 22, 2010                    _____

23                                              Peter Roan

24

25

26

27

28

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071

# EXHIBIT "1"

Exhibit _1_, Page _6_

**Roan, Peter**

| | |
|---|---|
| **From:** | Kitson, Matthew [Kitson.Matthew@ARENTFOX.COM] |
| **Sent:** | Thursday, October 28, 2010 12:31 PM |
| **To:** | Roan, Peter; Kurtz, Ronald |
| **Cc:** | Bowers, Terree; Donald Norris |
| **Subject:** | CPM v Redwood et al |
| **Attachments:** | Financial Asset Agreement - Valdez, Vincent.pdf; Financial Asset Agreement - Allende, Diego-FIRM.pdf; Financial Asset Agreement - Anel, Manuel S..pdf; Financial Asset Agreement - California Neurosurgical & Spine Associates.pdf; Financial Asset Agreement - Capen, Daniel.pdf; Financial Asset Agreement - Chang, Gary J MD, Inc..pdf; Financial Asset Agreement - Cornerstone Medical Group Inc..pdf; Financial Asset Agreement - Coufal, Frank.pdf; Financial Asset Agreement - Dugger, Walter.pdf; Financial Asset Agreement - Hirsch, Jeffrey A. M.D..pdf; Financial Asset Agreement - Institute for Hand and Microsurgery, Inc.pdf; Financial Asset Agreement - Marshak, Glenn.pdf; Financial Asset Agreement - Memorial Orthopedic Surgery Group.pdf; Financial Asset Agreement - Mulvania, Richard.pdf; Financial Asset Agreement - Nelson, Russell.pdf; Financial Asset Agreement - Neurosurgical Associates Med Group.pdf; Financial Asset Agreement - Orthopedic Sports & Spine Med Group.pdf; Financial Asset Agreement - Sequoia Orthopaedic Med Group, Inc.pdf; Financial Asset Agreement - Uwaydah, Munir.pdf |

Counsel,

As we indicated we would do in this morning's meet and confer discussion, we are producing the attached, which are nineteen (19) exemplar physician assignments. We presently are having these documents bates numbered and will be producing "official" bates-numbered versions to you in the near future. However, we wanted to get these to you as quickly as possible so that you could review them immediately, in time to use them in the upcoming depositions if you needed. As we indicated this morning, these are exemplars. As we locate additional assignments, we will bates number and produce those as well. This preliminary production, and any follow-up production, is being made without waiver of our position that the Magistrate's October 19 Order concerning discovery should be reversed by Judge Carter on a number of grounds.

Additionally, we plan on providing a similar exemplar set of physician contracts in the near future, with similar follow-up in the near future. Any such exemplar production would be similarly without waiver of our position with respect to the October 19 Order.

Finally, please note that this preliminary production is being made pursuant to all the terms and conditions of the protective order in place governing this litigation.

Please contact us if you have any questions.

Many thanks,

Matthew J. Kitson
Attorney

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7576 DIRECT | 213.629.7401 FAX

kitson.matthew@arentfox.com | www.arentfox.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT "2"

**Roan, Peter**

| | |
|---|---|
| **From:** | Kitson, Matthew [Kitson.Matthew@ARENTFOX.COM] |
| **Sent:** | Thursday, October 28, 2010 5:16 PM |
| **To:** | Roan, Peter; Kurtz, Ronald |
| **Cc:** | Bowers, Terree; Donald Norris |
| **Subject:** | CPM v Redwood et al |
| **Attachments:** | Contract - DeGrange, DOnald.pdf; Contract - Aflatoon, Kamran.pdf; Contract - Analib Chiropractor, Inc.pdf; Contract - Anderson, Paul MD.pdf; Contract - Anguizola, Eduardo MD.pdf; Contract - Anguizola, Eduardo-Tri City Medical.pdf; Contract - Bristol Med Clinic.pdf; Contract - Caruso, Vito.pdf; Contract - DeGrange, DOnald.pdf; Contract - Wolgin, Mark.pdf |

Counsel,

As we indicated we would do in this morning's meet and confer discussion, we are producing the attached, which are ten (10) exemplar physician contracts. We presently are having these documents bates numbered and will be producing "official" bates-numbered versions to you in the near future. However, we wanted to get these to you as quickly as possible so that you could review them immediately, in time to use them in the upcoming depositions if you needed. As we indicated this morning, these are exemplars. As we locate additional contracts, we will bates number and produce those as well. This preliminary production, and any follow-up production, is being made without waiver of our position that the Magistrate's October 19 Order concerning discovery should be reversed by Judge Carter on a number of grounds.

Finally, please note that this preliminary production is being made pursuant to all the terms and conditions of the protective order in place governing this litigation, and is designated as confidential and attorney's-eyes only.

Please contact us if you have any questions.

Many thanks,

**Matthew J. Kitson**
**Attorney**

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7576 DIRECT | 213.629.7401 FAX
kitson.matthew@arentfox.com | www.arentfox.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein

# EXHIBIT "3"

## Roan, Peter

| | |
|---|---|
| **From:** | Kitson, Matthew [Kitson.Matthew@ARENTFOX.COM] |
| **Sent:** | Wednesday, November 03, 2010 4:49 PM |
| **To:** | Roan, Peter; Kurtz, Ronald |
| **Cc:** | Donald Norris; Bowers, Terree |
| **Subject:** | CPM v Redwood et al |
| **Attachments:** | Med Lien Purchase - Bernadett, Faustino.pdf; Med Lien Purchase - Wolfsohn, Marc D. MD, Inc..pdf; Med Lien Purchase - Bernadett, Faustino.pdf; Med Lien Purchase - Anguizola, Eduardo-South Metropolitan Med.pdf; Med Lien Purchase - Anguizola, Eduardo-Intercommunity Med Center.pdf; Med Lien Purchase - Anel, Manuel-Intercommunity Med Group.pdf |

Counsel,

We are producing the attached, which are additional exemplar documents. We presently are having these documents bates numbered and will be producing "official" bates-numbered versions to you in the near future. However, we wanted to get these to you as quickly as possible so that you could review them immediately, in time to use them in the upcoming depositions if you needed.   As we locate additional documents, we will bates number and produce those as well. This preliminary production, and any follow-up production, is being made without waiver of our position that the Magistrate's October 19 Order concerning discovery should be reversed by Judge Carter on a number of grounds.

Finally, please note that this preliminary production is being made pursuant to all the terms and conditions of the protective order in place governing this litigation, and is designated as confidential and attorney's-eyes only.

Please contact us if you have any questions.

Many thanks,


Matthew J. Kitson
Attorney

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7576 DIRECT | 213.629.7401 FAX
kitson.matthew@arentfox.com | www.arentfox.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

11/21/2010                    Exhibit 3 , Page 12

# EXHIBIT "4"

Exhibit __4__, Page _13_

**Roan, Peter**

| | |
|---|---|
| **From:** | Kitson, Matthew [Kitson.Matthew@ARENTFOX.COM] |
| **Sent:** | Thursday, November 04, 2010 2:56 PM |
| **To:** | Roan, Peter; Kurtz, Ronald |
| **Cc:** | Donald Norris; Bowers, Terree |
| **Subject:** | CPM v Redwood et al |
| **Attachments:** | SIPM Bizhub10110408040.pdf |

Counsel,

The attached document follows Don and Peter's conversation at this morning's deposition.  Additional documents will follow under separate cover.

This preliminary production, and any follow-up production, is being made without waiver of our position that the Magistrate's October 19 Order concerning discovery should be reversed by Judge Carter on a number of grounds.

Finally, please note that this preliminary production is being made pursuant to all the terms and conditions of the protective order in place governing this litigation, and is designated as confidential and attorney's-eyes only.

Please contact us if you have any questions.

Many thanks,


Matthew J. Kitson
Attorney

Arent Fox LLP | Attorneys at Law
Gas Company Tower
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
213.443.7576 DIRECT | 213.629.7401 FAX
kitson.matthew@arentfox.com | www.arentfox.com

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT "5"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

CALIFORNIA PHARMACY MANAGEMENT,
LLC, a California limited
liability company,

        Plaintiff,

vs.                    No. SACV 09-0242 DOC (ANx)

ZENITH INSURANCE COMPANY, a
California corporation; and
ZNAT INSURANCE COMPANY, a
California corporation,

        Defendants.

AND CONSOLIDATED ACTION.

**CERTIFIED**

**COPY**

VIDEOTAPED DEPOSITION OF ARCHIE R. MAYS, MD, MBA

Los Angeles, California

Saturday, October 9, 2010

Reported by:
LORI SCINTA, RPR
CSR No. 4811

Job No. 146719

Exhibit _5_, Page _16_

1   than CPM.  Correct?

2       A   Yes.

3       Q   Can you remember the names of any of those?

4       A   The name -- I would recognize it if the name

5   came out, but I can't recall right here at this moment.

6       Q   Do you participate in any such program

7   currently?

8       A   Oh, I don't call them dispensing pro- --

9   dispensing programs.  Now I procure my own medications

10   in the standard and correct way.  I purchase them, and I

11   dispense them.

12       Q   Okay.  So you do some physician -- your own

13   office dispensing to your patients now?

14       A   Yes.

15       Q   And that's how you're familiar with the

16   requirements for those programs?

17       A   Yes.

18       Q   How do you obtain the drugs?

19       A   I buy them.

20       Q   Who do you buy them from?

21       A   I buy them from a -- I guess they're called

22   repackagers or -- I don't know the formal names of those

23   entities that provide wholesale medications to me.

24       Q   So these are licensed wholesalers?

25       A   Yes.

Exhibit _5_, Page _17_

1      Q   And does someone help you with that process, or

2    do you do it yourself?

3      A   Well, I have office staff.

4      Q   And the office staff helps you arrange for

5    that?

6      A   Yes.

7      Q   But you pay -- procure the drugs and pay for

8    them yourself, correct?

9      A   Yes.

10      Q   And so the inventory is maintained by your

11    office staff, correct?

12      A   Absolutely.

13      Q   And -- and you make sure you're in control of

14    that, correct?

15      A   I have my own lockbox.  I have the key.  I have

16    it in my pocket right now.

17      Q   But that's all part of your own

18    office-dispensing program, correct?

19      A   Exactly.

20      Q   But you don't have any outside organization

21    that's managing that for you currently, like CPM?

22      A   No.

23      Q   How long have you been engaged in your own

24    office dispensing, other than the times you worked with

25    these other organizations like CPM?

Exhibit *5* , Page *18*

1      A   I'm approaching two years.

2      Q   Has -- has the revenue, the amount of revenue

3  that you can derive from dispensing, is it -- is it --

4  has it increased now that you're doing it on your own or

5  about the same?

6      A   My office revenue is -- is better with the

7  in-house dispensing than without.

8      Q   Do you use a pharmacy tech in your offices

9  currently to do this, or do you dispense on your own?

10     A   I've hired my son --

11     Q   You have?

12     A   -- to help me --

13     Q   Okay.

14     A   -- and I oversee him.

15     Q   All right.

16     A   I have my thumb on him.

17     Q   Got it.  Okay.

18     A   Yes.

19         MR. ROAN:  All right.  I don't think I have

20  anything further.

21         Thank you, Doctor.

22         THE WITNESS:  You're welcome.

23         MR. KITSON:  I think we need to go off the

24  record so that we can switch seats.

25         THE VIDEOGRAPHER:  We're going off the record

Exhibit _5_, Page _19_

1        I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11        Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [X] was [  ] was not requested.

15        I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:  OCT 14 2010

22

23

        LORI SCINTA, RPR

24       CSR No. 4811

25

Exhibit 5 , Page 20

# EXHIBIT "6"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

CALIFORNIA PHARMACY MANAGEMENT,
LLC, a California limited
liability company,

       Plaintiff,

   vs.                   No. SACV 09-0242 DOC (ANx)

ZENITH INSURANCE COMPANY, a
California corporation; and
ZNAT INSURANCE COMPANY, a
California corporation,

       Defendants.

_____

AND CONSOLIDATED ACTION.

_____

CERTIFIED
COPY

VIDEOTAPED DEPOSITION OF MICHAEL J. TICHON, ESQUIRE

Los Angeles, California

Thursday, November 4, 2010

Reported by:
LORI SCINTA, RPR
CSR No. 4811

Job No. 149052



Sarnoff
877.955.3855

Exhibit 6 , Page 22

TICHON, MICHAEL, ESQ. - Vol. I  11/4/2010  10:13:00 AM

1      A   That's my view of it, yes.

2      Q   Any other changes in the business model between

3   2002 and that point in time that you can recall?

4      A   Well, coincidentally, at some point in that

5   era, more towards the latter end of it, there was a

6   pharmacy board issue raised.

7          And it was thought rather than fighting it, the

8   better position was just to roll the CPM business into

9   IPM and avoid the issue that the board had raised, or

10  their inspectors had raised.

11     Q   What was that issue?

12     A   It was whether or not CPM required a pharmacy

13  license in California.

14     Q   Did CPM apply for a pharmacy license in

15  California?

16     A   Not until -- not for the first three or four

17  years of its activity.  And because of various concerns

18  about collection of -- of bills, we thought possibly

19  being in a stronger position -- or we'd be in a stronger

20  position --

21         MR. NORRIS:  Now you're getting into your

22  advice, so tread lightly.

23         THE WITNESS:  Okay.

24         MR. NORRIS:  I instruct you not to relate --

25         THE WITNESS:  Thank you.

California Pharmacy Management v. Zenith Insurance Co

Exhibit _6_, Page _23_

1          MR. NORRIS:  -- any legal advice you gave or

2     anything your clients told you in response --

3          THE WITNESS:  Okay.

4     BY MR. ROAN:

5          Q   What type of license did CPM apply for with the

6     pharmacy board?

7          A   I don't know.  I don't remember if there are

8     different categories.  I believe there are.  But it

9     would be as a wholesaler.

10         Q   And did CPM ever obtain a license from the

11     pharmacy board as a wholesaler?

12         A   No.

13         Q   Did CPM ever obtain any sort of license from

14     the pharmacy board in California?

15         A   No.

16         Q   Same questions now for IPM.

17         Did -- did IPM apply for any sort of license

18     with the California pharmacy board?

19         A   Yes.

20         Q   What type of license did IPM apply for?

21         A   I believe a wholesaler license.

22         I must say I'm a little fuzzy on those right

23     now, if there are different categories.

24         And even saying that, I knew for sure the

25     categories are very fuzzy themselves, so --

Exhibit ⟨ℓ⟩ , Page 24

1    Q   To your recollection, it was as a wholesaler?

2    A   Wholesaler.  But we weren't actually

3    wholesaling drugs, but it was -- a wholesaler license

4    was where you would fit.

5    Q   And you said that the pharmacy board had raised

6    some kind of issue at some point in time.

7         And I didn't really follow up with you, but I

8    guess I'm doing so now.

9         What was the issue the pharmacy board raised?

10   A   Well, the board didn't raise it.  There was an

11   inspection report that raised the question and said that

12   it should have a license.

13   Q   When the -- when the "it" is what?

14   A   Is CPM, yes.

15   Q   And who was -- or what was the inspector?  What

16   organization was that inspector affiliated with?

17   A   The pharmacy board.

18   Q   And -- and the inspector had concluded that CPM

19   should have a license?

20        How was that communicated to CPM?

21   A   I think there was either a letter or a report

22   that was issued.

23   Q   What was the basis on which the pharmacy board

24   was asserting that CPM needed a license?

25        MR. NORRIS:  Just to his understanding?

Exhibit _6_, Page _25_

1       MR. ROAN:  Yes.

2       THE WITNESS:  I don't remember the specifics,

3   but I do remember in looking at the letter a long time

4   ago that the premises -- the factual premise didn't

5   appear to be correct in what they were asserting.

6       And we had advice legally that we did not

7   require a license.

8   BY MR. ROAN:

9    Q   And what was the factual premise and the

10  communication that you believed was incorrect, this

11  communication by the pharmacy board representative?

12   A   Well, as I just said, I don't remember exact --

13  I only remember my impression that that's not right.  I

14  don't remember what it was at this point.

15   Q   So -- but you did obtain the wholesaler license

16  for IPM and essentially gave up obtaining a license for

17  CPM, correct?

18   A   Not in that sequence, but yes.

19      When IPM was started -- and I don't remember

20  exactly when -- it, as part of its start-up, obtained

21  the license.  And the reason was it was going to be

22  doing business in other states and it was -- the feeling

23  was it would be more appropriate to start with a license

24  here than have to apply for out-of-state licenses in

25  other states.

Exhibit _6_, Page _26_

1    Q   Getting back now to the -- you said you did

2    apply for a wholesaler license for CPM, or CPM, did,

3    correct?

4    A   (No audible response.)

5    Q   Is that a "Yes"?

6    A   Yes.

7    Q   The pharmacy board didn't issue that license?

8    A   No.

9    Q   Why not?

10       MR. NORRIS:  If you know.

11       MR. ROAN:  Yeah.

12       THE WITNESS:  I'm not totally certain, but just

13   to answer it, I believe we withdrew our application.

14   BY MR. ROAN:

15       Q   And what's the source of your belief in that

16   regard?

17       A   It was two things.  One, it was impractical to

18   meet the requirements as the board was explaining them.

19   Specifically, we would have required to have a separate

20   pharmacist in a separate location from the IPM location.

21       And, at the time, it was thought with the --

22   either the pending change or the change that was being

23   made in the fee schedule, it really wasn't practical to

24   go through all the work it would be -- required just to

25   obtain a license that we were advised we really didn't

Exhibit __6__, Page __27__

1    cessation of business of CPM to a large extent.

2        Q   So before March 2007?

3        A   And possibly thereafter as it relates to

4    collection issues.

5        Q   Were there any such agreements executed because

6    of -- let me strike and start over.

7            Any financial asset agreements that you can

8    recall with third parties and with CPM executed prior to

9    the filing of the lawsuit because of the fact that CPM

10   was considering filing a lawsuit?

11           MR. NORRIS:  Objection.  Attorney-client

12   privilege.

13           Instruct you not to answer.

14           (Instruction not to answer.)

15   BY MR. ROAN:

16       Q   Where -- do you -- do you know where those

17   financial asset agreements -- well, let me strike --

18   start over.

19           Are those financial asset agreements kept

20   anywhere?

21       A   Yes.

22       Q   Where are they kept?

23       A   Somewhere in Newport Beach, either with

24   Michael R. Drobot, or in someone's files somewhere, but

25   I'm not sure exactly where.

Exhibit _6_, Page _28_

TICHON, MICHAEL, ESQ. - Vol. I  11/4/2010  10:13:00 AM

1     Q   If you wanted to obtain one, what would you do?

2     A   I'd ask around until somebody was able to

3   produce it.

4     Q   Is there a particular location, to your

5   knowledge, where such contracts are kept?

6     A   Well, if they're not kept by Michael R. Drobot,

7   they might be with Matt Umbs or in the general files

8   that are sitting outside the accounting office.

9     Q   And are those paper files?

10    A   Yes.

11    Q   Are there any electronic files kept of the CPM

12   contracts or financial asset agreements?

13    A   I don't know how to answer that.  There may be

14   an email attachment of it, but it's not kept as a

15   document-management-type document.

16    Q   So an executed financial asset agreement would

17   be kept in hard copy, in all likelihood?

18    A   Yes.

19    Q   Same thing with respect to your physician

20   contracts with -- at CPM:  Kept as a hard copy?

21    A   Yes.

22    Q   There's an allegation in your lawsuit that my

23   clients was -- was -- engaged in communications designed

24   to lull CPM into the belief that my clients would

25   eventually pay them for the bills they submitted on

Exhibit _6_, Page 29

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11         Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20                 NOV 08 2010

21   Dated: _____

22

23                 _____
                    LORI SCINTA, RPR
24                  CSR No. 4811

25

Exhibit 6 , Page 30

# EXHIBIT "7"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

CALIFORNIA PHARMACY MANAGEMENT,
LLC, a California limited
liability company,

        Plaintiff,

   vs.               No. SACV 09-0242 DOC (ANx)

ZENITH INSURANCE COMPANY, a
California corporation; and
ZNAT INSURANCE COMPANY, a
California corporation,

        Defendants.

AND CONSOLIDATED ACTION.

CERTIFIED
COPY

VIDEOTAPED DEPOSITION OF MICHAEL R. DROBOT

pursuant to Federal Rule 30(b)(6)

Los Angeles, California

Friday, November 5, 2010

Reported by:
LORI SCINTA, RPR
CSR No. 4811

Job No. 149056



Sarnoff™
877.955.3855

Exhibit 7 , Page 32

DROBOT, MICHAEL R. - Vol. I  11/5/2010  9:22:00 AM

1    A  No.

2    Q  When did that end?

3    A  August of this year.

4    Q  So until August of this year, your father was

5    the CEO of CPM?

6    A  That's correct.

7    Q  We can put that one away again.  Thanks.

8       (Discussion off the record.)

9    BY MR. ROAN:

10    Q  I want to return now to the notice of

11    deposition and Item 14.  It's probably going to be very

12    short item, I imagine.

13       14 is "The leasing of space by pharmacists by

14    CPM and/or its affiliates."

15       Did CPM lease any space from pharmacists?

16    A  No.

17    Q  No. 15, Category 15, is "Licenses for which

18    CPM has applied, including, but not limited to, CPM's

19    application for a wholesale pharmacy license."

20       Did CPM apply for a wholesale pharmacy license

21    at some point?

22    A  We applied for a wholesale license.  I don't

23    know if it's a wholesale pharmacy license.  I don't

24    recall.

25    Q  All right.

Exhibit  7 , Page  33

1      A  We did.

2      Q  When did you make that -- well, let me -- from

3   whom did you attempt to obtain that license?

4      A  I believe it was the State Board of Pharmacy.

5      Q  And when, approximately, did you make that

6   application?

7      A  I don't recall.  I can get the information.

8      Q  Why -- why did CPM make a decision to seek a

9   wholesaler license?

10     A  Because IPM had one and our general counsel

11   thought that it wouldn't --

12         MR. NORRIS:  Well, here's the problem.

13         THE WITNESS:  Oh.  But this --

14         MR. NORRIS:  On advice of counsel?  I don't

15   want you to --

16         THE WITNESS:  Yeah, it was on advice of

17   counsel.

18   BY MR. ROAN:

19     Q  Any other reason?

20     A  We received a letter from a State Board

21   employee when they came out to visit IPM.  Upon a

22   follow-up letter, it incorrectly had the acronyms of

23   C-M-P, or something like that, but it said that they

24   recommended that we should apply for a license.

25     Q  What did you understand was the reason why they

Exhibit 7, Page 34

1    felt that CPM should be seeking a license?

2        A  They told me it was because IPM had a license.

3        Q  No other reason?

4        A  No other reason.

5        Q  Do you remember the name of that person?

6        A  No, but I can get it.

7        Q  But Industrial Pharmacy Management had sought

8    and obtained a wholesale license, correct?

9        A  Correct.

10       Q  Approximately when did IPM do that?

11       A  I can guess.  I'm going to guess it was '05

12   or '06.

13       Q  Why did -- why did IPM do it?

14       A  Upon recommendation from counsel.

15       Q  Any other reason?

16       A  No.  We knew we didn't need it, we didn't think

17   it could hurt us and applied for it.

18       Q  Did the pharmacy Board ever issue a wholesale

19   license to CPM?

20       A  Not to my knowledge.

21       Q  Do you know the reason why?

22       A  I don't know.

23       Q  Since you brought it up, let's look at

24   Category 16, "Inspection by and communications with the

25   California Board of Pharmacy."

Exhibit  7 , Page 35

1    Were there any inspections of IPM?  I think you

2    said there at least was one that you recall.

3    What was the purpose of that inspection?

4    A  I don't know the purpose.  I only know what

5    they told me.

6    They said that we applied for a license, and

7    this was part of their routine visit upon new license.

8    Q  So that was the license issued to IPM?

9    A  Correct.

10    Q  Any other communications come from that

11    inspection that occurred after IPM was issued its

12    license?

13    A  Not other than what I already mentioned.

14    Q  I'd like to talk about differences between

15    IPM's business and CPM's business.

16    Yesterday, I learned some information that

17    IPM has business in other states.

18    Does CPM -- did CPM have business in other

19    states?

20    A  No.

21    Q  CPM was always California-based?

22    A  Uh-huh.

23    Q  Is that a "Yes"?

24    A  That's a yes.

25    Q  Okay.  IPM -- where does IPM conduct business

Exhibit  7 , Page  36

DROBOT, MICHAEL R. - Vol. I   11/5/2010  9:22:00 AM

1       A  I read the collector notes on more than one

2    occasion.

3       Q  And you just knew that the assertions by the

4    adjusters were incorrect?

5       A  There -- there were accusations that we were

6    running an unlawful pharmacy, and we asked them to tell

7    us how so and what can we do to address those.

8       Q  Uh-huh.

9       A  And they gave us no information.

10      Q  Anything else, do you remember, other than the

11   unlawful pharmacy?

12      A  That we needed a license.  And we said, "No, we

13   don't.  Show us where we do."  And we got no

14   information.

15         Those two pop out.

16      Q  Anything else besides the two?

17      A  We're on a list.

18         That's all I can think of right now.

19      Q  All right.

20      A  That we have to contact BH's attorneys to get

21   paid.

22      Q  I want to move on to Category 26 on the notice.

23         There's been a reference to lulling

24   communications in this case.

25         (Addressing the reporter) Lulling being

Exhibit __7__, Page _37_

1    l-u-l-l-i-n-g.

2        THE REPORTER:  Thank you.

3    BY MR. ROAN:

4        Q   When -- when -- what do you know about any

5    lulling communications -- if you could characterize them

6    as that based on your knowledge -- what do you know

7    about those that occurred with respect to the Berkshire

8    defendants in this case?

9        A   Our collectors were under the assumption that

10   the initial requests by Berkshire adjusters were within

11   the same parameters as other carriers where whether it

12   was part of the requirements by law or additional

13   information that they wanted, CPM collectors were

14   instructed to try to get the adjusters -- all the

15   information that we could.

16       Our company has from the get-go been proud of

17   the fact that we act legally and we want to give

18   whatever information we can.

19       So we tried to do that, but we -- we were told

20   that if we gave that information, we would get paid.

21   But we weren't.  And other requests came up, and then

22   other accusations came up over the time period.

23       Q   So when you referred to the "lulling

24   communications," you mean those normal-course requests

25   for information that were made by the defendants in this

Exhibit  7 , Page  38

DROBOT, MICHAEL R. - Vol. I  11/5/2010  9:22:00 AM

1   case of CPM?

2       MR. NORRIS:  Objection.  Counsel's testifying.

3       Argumentative, vague as to "normal-course

4   communications."

5       THE WITNESS:  My -- my understanding of

6   "lulling" is that Berkshire Hathaway, being one of the

7   entities who wanted to boycott or stop payment for

8   baseless reasons, started that path based on what we

9   perceived as normal requests in the beginning to

10  collect.

11  BY MR. ROAN:

12      Q   When you talk about "the beginning," what

13  timeframe are you referring to?

14      A   I would say late '07.

15      Q   And sometime then thereafter, you became

16  concerned that, "Berkshire is not going to pay us,"

17  right?

18      A   That's -- that's fair.

19      Q   When did you first -- I think you testified

20  that either in late '07 or early '08, you became

21  concerned that Berkshire wasn't going to pay CPM,

22  correct?

23      MR. NORRIS:  Objection.  Asked and answered.

24      THE WITNESS:  I don't know if that's a "Yes" or

25  "No" --

Exhibit  7 , Page  39

1    BY MR. ROAN:

2        Q   Okay.

3        A   -- question, but we became concerned when we

4    started to see one dollar or nothing, $50 or nothing,

5    and accusations about our company, which we had not

6    received and have not received from any other carriers

7    except for Zenith.

8        Q   Give me an esti- -- so I just want to make sure

9    I understand your testimony.

10       When did the beginning of these -- when did

11   these lulling communications by the Berkshire

12   defendants, when did CPM first start receiving those?

13       A   I can't be very accurate.  My best guess is

14   early '07 -- or, excuse me, late '07.

15       Q   And when did you become concerned that

16   Berkshire just wasn't going to pay CPM on its bills?

17       A   Can't put a precise date on that.

18       MR. NORRIS:  Objection.  Asked and answered.

19   BY MR. ROAN:

20       Q   Give me the best estimate you can.  I'm

21   sorry --

22       A   I would say mid- to late '08.

23       Potty break soon?

24       MR. ROAN:  Yeah.

25       MR. NORRIS:  Break time okay?

Exhibit __7__, Page _40_

1         MR. ROAN:  Yeah.

2         THE VIDEOGRAPHER:  We're going off the record

3    at 1:30.

4         (Recess taken.)

5         THE VIDEOGRAPHER:  We are back on the record at

6    1:41.

7    BY MR. ROAN:

8      Q   Mr. Drobot, before we took the break, I was

9    asking you some questions about the lulling

10   communications, and I just kind of want to try and

11   conclude that topic, if we could.

12        I think you said, and correct me if I'm wrong,

13   that the lulling communications were what appeared to

14   your collectors as normal-course requests for

15   information that are often made by any workers' comp

16   insurer, correct?

17     A   That's my understanding.

18     Q   And that's a fair assessment of what a lulling

19   communication was?

20     A   We didn't know it was lulling at the time.

21     Q   Right.

22     A   But -- but that was -- that is what preceded

23   the unusual and the standout nature of the requests and

24   denials from Berkshire Hathaway and Zenith.

25     Q   The lulling communications being, I suppose,

Exhibit  7 , Page  41

1    the objection letters you received requesting

2    information from the Berkshire defendants being one,

3    correct?

4        A   That would be included.

5        Q   Were there any lulling communications by

6    adjusters that worked for the Berkshire defendants?

7            I'm talking about that in telephone discussions

8    with your collectors.

9        A   The telephone calls, the collector notes, the

10   denials and requests by Berkshire adjusters and the

11   information given to us by attorneys for Berkshire at

12   the Boards were all consistent.

13       Q   Consistent in what way?

14       A   Consistent in asking us for additional requests

15   in late '07 and early '08, and then flat-out denials and

16   accusations in beginning of '08, middle '08 and end of

17   '08.

18       Q   And, again, the people with knowledge of that

19   would be Boris Jimenez and the collectors working for

20   him, the people working for CPM before the Board to

21   collect on liens?

22       A   Correct.

23       Q   Anyone else?

24       A   Outside collection agencies.

25       Q   Which ones?

Exhibit __7__, Page _42_

1      A   Assertive and CMM.

2      Q   And they also perform collection functions for

3   CPM?

4      A   Right.

5      Q   What sort of collection functions?

6      A   Same ones that we tried to do internally but

7   could no longer afford to continue with them, so we had

8   to outsource.

9      Q   So I thought you said you still had a staff of,

10   say, 30 or so?

11      A   Internally.

12      Q   So you outsourced a part of that function to

13   these other organizations?

14      A   That's correct.

15      Q   Do you know what type of records those other

16   organizations might have of any lulling communications

17   as alleged in this case?

18      A   I don't.  I could guess that they have similar

19   ones to what we have internally.

20      Q   No one's made any inquiry, to your knowledge,

21   for those communications?

22      A   I think we have.

23      Q   You have?  Okay.

24         Do you know if you obtained any such

25   information from those organizations?

Exhibit  7 , Page 43

DROBOT, MICHAEL R. - Vol. I   11/5/2010   9:22:00 AM

1       A   I think we did.

2       Q   Do you know what was done with that

3    information, if anything?

4       A   It was accumulated through collections and

5    probably given to our general counsel.

6       Q   Do you know what happened to it after that?

7       A   No.

8       Q   Have you viewed any of that information?

9       A   Yes, I have.

10      Q   Is it similar to the types of information that

11   CPM had from its internal collection notes?

12      A   That's correct.

13      Q   Were there letters from Berkshire insurers,

14   part of those documents you obtained through your

15   third-party collection agents?

16      A   Yes.

17      Q   Those, again, were the sum and substance of the

18   things turned over to your general counsel?

19      A   (No audible response.)

20      Q   Is that a "Yes"?

21      A   I believe so.

22      Q   Did you play any part in making sure that

23   occurred?

24      A   No.

25          "Any part," perhaps, but it was in preparing

Exhibit ___7___, Page __44__

1    for this lawsuit that those were compiled.

2       Q   But after they were provided to your general

3    counsel, you don't know what happened to those --

4       A   I don't.

5       Q   -- for the third-party?

6       A   I don't.

7       Q   You don't.  All right.

8           Mr. Drobot, do you know whether CPM has

9    produced copies of all writings documenting the lulling

10   communications?

11      A   I don't know.

12      Q   Who would know that at CPM?

13          MR. NORRIS:  Objection.  Speculation.

14          THE WITNESS:  You used "all."  There are

15   hundreds of thousands of line items for these claims,

16   and I don't know what was provided or dug up.

17   BY MR. ROAN:

18      Q   Okay.  Would you agree that the period of

19   lulling ended at the time that CPM made the

20   determination that the Berkshire defendants were issuing

21   blanket objections to its bills?

22      A   In my humble understanding of the word

23   "lulling," I would say there was a period that it ended

24   and it became just a stonewall.

25          It was very public.

Exhibit  7 , Page 45

1          Q   Do you know if that had any connection to any

2     decision by the Berkshire defendants to essentially stop

3     paying CPM's bills?

4          MR. NORRIS:  Objection.  Speculation.

5          THE WITNESS:  I don't know.

6          MR. ROAN:  You don't know.

7          (Exhibit 12 was marked for

8               identification by the court reporter.)

9     BY MR. ROAN:

10         Q   Mr. Drobot, we've had marked as our Exhibit 12

11    and placed in front of you what appears to be some

12    notations.  The top of it, the page says, "Cal Pharmacy"

13    Management, "MGMT," and the top of the document also

14    lists the insurance company as Berkshire Hathaway.

15         Do you recognize kind of the form of this

16    document?  I know you probably have no recollection of

17    this specific document, but --

18         A   Your statement is accurate.  I recognize the

19    format of this document.

20         Q   And how do you recognize it?

21         A   It looks like collection notes.

22         Q   So this would be the types of collection notes

23    that Cal- -- CPM kept as part of its normal collection

24    process, correct?

25         A   That's correct.

Exhibit  7 , Page  46

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11    Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15    I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:  _____NOV 1 1 2010_____

22

23  _____
    LORI SCINTA, RPR

24  CSR No. 4811

25

Exhibit _7_, Page _47_

## **CERTIFICATE OF SERVICE**

     I, Ronald D. Kurtz, an attorney, do hereby certify that on November 22, 2010, I caused the foregoing to be served through the Court's Case Management/Electronic Case Files (CM/ECF) system upon all persons and entities registered and authorized to receive such service.

Dated: November 22, 2010        By:   /s/ Ronald D. Kurtz
                                       Ronald D. Kurtz

Locke Lord Bissell & Liddell LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA, 90071

48